22

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 0 5 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. B-02-172 |
| STEPHEN ESSES, M.D., | § | Jury |
| F.A. RICHARD & ASSOCIATES, INC. | § | |
| AND JANE ROSAMOND | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT STEPHEN ESSES, M.D.'S
## MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

Jeffrey B. McClure
ANDREWS & KURTH L.L.P.
State Bar No. 13428200
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4772
(713) 220-4285 (Fax)

ATTORNEYS FOR DEFENDANT, STEPHEN
ESSES, M.D.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... iii

I.     Nature And Stage Of The Proceedings ...................................................... 1

       A.     Nature Of The Case .......................................................................... 1

       B.     Stage Of The Proceedings ................................................................ 2

II.    Standard Of Review ................................................................................... 2

III.   Issues To Be Ruled Upon .......................................................................... 3

IV.    Summary Of Argument ............................................................................... 4

       A.     Claims Arising Out Of The I.M.E. .................................................. 4

       B.     Medical Malpractice Claims ............................................................ 5

       C.     Chart Of Plaintiff's Claims And Dr. Esses' Various Defenses ........ 6

V.     Summary Judgment Evidence ..................................................................... 7

VI.    Facts ........................................................................................................... 8

VII.   Arguments And Authorities ........................................................................ 13

       A.     All Of Plaintiff's Claims Arising From Dr. Esses' Surgical
              Recommendation During the I.M.E. Are Barred By The
              Applicable Statutes Of Limitations ................................................. 13

              1.     Tortious Interference ........................................................... 13

              2.      Conspiracy .......................................................................... 14

              3.     Medical Negligence ............................................................. 15

       B.     All Of Plaintiff's Claims Arising Out Of The Surgical
              Recommendations Are Barred By The Doctrine Of
              Quasi-Judicial Immunity ................................................................. 16

       C.     Plaintiff's Conspiracy And Tortious Interference Claims
              For Deprivation Of Workers' Compensation Medical
              Benefits Are Barred By Waiver ....................................................... 19

HOU:2193670.1

D.  Plaintiff's Tortious Interference Claim Fails
As A Matter Because Dr. Esses Was Legally
Justified In Providing His Opinion Regarding
Plaintiff's Medical Care ................................................................. 20

E.  Plaintiff's Negligence Claim Arising Out Of The
I.M.E. Fails As A Matter Of Law Because
The Summary Judgment Evidence Negates
The Element Of Duty .................................................................. 21

F.  All Of Plaintiff's Medical Negligence Claims Fail
As A Matter Of Law Because There Is No Evidence
Of Any (1) Breach Of The Standard Of Care Or (2) Causation .................... 22

G.  Plaintiff's Tortious Interference Claim Fails As A Matter Of
Law Because There Is No Evidence Of Any Willful And
Intentional Interference Of A Contract ........................................... 23

H.  Plaintiff's Conspiracy Claim Fails As A Matter Of Law
Because There Is No Evidence Of (1) A Meeting Of
The Minds Or (2) Unlawful Conduct ............................................... 24

VIII.  Conclusion ............................................................................. 24

-ii-

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

*5636 Alpha Road v. NCNB Tex. National Bank,*
   879 F. Supp. 655 (N.D. Tex. 1995) ........................................................13

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..............................................................................3

*Apani v. Southwest, Inc. v. Coca-Cola Enterprises, Inc.,*
   300 F.3d 620 (5th Cir. 2002) ...............................................................24

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..............................................................................3

*Colonial Penn Insurance Co. v. Market Planners Insurance Agency, Inc.,*
   1 F.3d 374 (5th Cir. 1993) ...................................................................14

*Hollis v. United States,*
   323 F.3d 330 (5th Cir. 2003) ...............................................................22

*Johnson v. Hospital Corp.,*
   95 F.3d 383 (5th Cir. 1996) .................................................................20

*MCI Telecomm. Corp. v. Ameri-Telegraph, Inc.,*
   852 F. Supp. 659 (N.D. Ill. 1994) ........................................................14

*Reliance Insurance Co. v. Louisiana Land & Exploration Co.,*
   110 F.3d 253 (5th Cir. 1997)) ..............................................................23

*Shanks v. AlliedSignal, Inc.,*
   169 F.3d 988 (5th Cir. 1999) ...............................................................17

*Spectators' Communication Network Inc. v. Colonial County Club,*
   253 F.3d 215 (5th Cir. 2001) ...............................................................24

*Thomas v. Barton Lodge II, Ltd.,*
   174 F.3d 636 (5th Cir. 1999) ...............................................................14

*Weinberg v. Whatcom County,*
   241 F.3d 746 (9th Cir. 2001) ...............................................................23

**STATE CASES:**

*Almaguer v. Jenkins,* 9 S.W.3d 835
   (Tex. App.-San Antonio 1999, no pet.) ................................................21

*Attaya v. Shoukfeh,* 962 S.W.2d 237
   (Tex. App.—Amarillo 1998, pet. denied)..............................................16

-iii-

*Crain v. Unauthorized Practice of Law Committee,*
     11 S.W.3d 328 [Tex. App. — Houston [1st Dist]
     1999, pet. denied).........................................................................18

*Crocker v. Paulyne's Nursing Home, Inc.,*
     95 S.W.3d 416 (Tex. App. — Dallas 2002, no pet. h.).........................22

*Delcourt v. Silverman,*
     919 S.W.2d 777 (Tex. App.—Houston [14th Dist.] 1996, writ denied)...............18

*Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268
     (Tex. App.—Austin 2002, pet. denied)...........................................22, 23

*Hernandez v. Hayes,*
     931 S.W.2d 648 (Tex. App.—San Antonio 1996, writ denied)...........................16

*Johnston v. Sibley,*
     558 S.W.2d 135 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.).........................21

*Prudential Ins. Co. v. Fin. Rev. Servs., Inc.,*
     29 S.W.3d 74 (Tex. 2000)..............................................................20, 23

*Shah v. Moss,* 67 S.W.3d 836 (Tex. 2001) ............................................15, 16

*Snyder v. Eanes I.S.D.,*
     860 S.W.2d 692 (Tex. App.—Austin 1993, writ denied).......................................13

*Stevenson v. Koutzarov,*
     795 S.W.2d 313 (Tex. App.—Houston [1st Dist.] 1990, writ denied)..................14

*Stroud v. VBFSB Holding Corp.,*
     917 S.W.2d 75 (Tex. App.—San Antonio 1996, writ denied)...............................15

## FEDERAL STATUTES AND RULES:

33 U.S.C. §§ 901-950 ...............................................................1, 19, 20

20 C.F.R. § 702, Subpart D.............................................................18

Fed. R. Civ. P. 26(a)(2).................................................................22

Fed. R. Civ. P. 56(c) ...................................................................2 - 3

## STATE STATUTES:

Tex. Civ. Prac. Rem. Code Ann. §16.003(a) .........................................13

Tex. Rev. Civ. Stat. Ann. art. 4590i, § 10.01............................................15, 16

HOU:2193788.1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **JUAN ESCOBEDO** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. B-02-172** |
| **STEPHEN ESSES, M.D.,** | § | **Jury** |
| **F.A. RICHARD & ASSOCIATES, INC.** | § | |
| **AND JANE ROSAMOND** | § | |
| | § | |
| **Defendants.** | § | |

### DEFENDANT STEPHEN ESSES, M.D.'S
### MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Stephen Esses, M.D. ("Dr. Esses") files this motion for summary judgment on all claims asserted against him by Plaintiff Juan Escobedo ("Plaintiff"). In support thereof, Dr. Esses respectfully shows the Court as follows:

### I.
### NATURE AND STAGE OF THE PROCEEDINGS

**A.    Nature Of The Case**

This case arises out of a dispute regarding medical care furnished to Plaintiff under the federal Longshore & Harbor Workers' Compensation Act ("LHWCA").[1]  A large part of Plaintiff's complaint is that the Defendants effectively denied him workers' compensation benefits available under his employer's LHWCA policy.

More precisely, Plaintiff asserts that Dr. Esses (1) conspired with Defendants F.A. Richard & Associates, Inc. and Jane Rosamond to (2) tortiously interfere with Plaintiff's right to

---

[1]        33 U.S.C. §§ 901-950 (2001).

receive benefits for a lower back surgery and (3) negligently recommended a simpler surgery instead. Such claims against Dr. Esses are premised on the allegation that in November 1999, Dr. Esses wrongfully recommended that Plaintiff undergo a simple discectomy, as opposed to the fusion with instrumentation sought by Plaintiff. Despite Plaintiff's wild notions about Dr. Esses' involvement in his workers' compensation claim, Dr. Esses is a neurosurgeon who, at that time, merely performed an independent medical examination ("I.M.E.") at the request of the United States Department of Labor ("DOL") pursuant to the LHWCA.

The following year, the DOL directed Plaintiff to change his treating physician to Dr. Esses. Thereafter, Dr. Esses performed the very surgery Plaintiff contends he was denied. Still dissatisfied, Plaintiff also asserts a claim against Dr. Esses in this case for negligently performing the spinal fusion with instrumentation, which Plaintiff alleges did not provide him with any relief of his lower back pain.

**B.     Stage Of The Proceedings**

This case is currently set for jury trial on October 3, 2003. The discovery deadline is August 29, 2003, and the dispositive motion deadline is September 5, 2003.

Dr. Esses now moves for summary judgment on all of Plaintiff's claims. As set forth below, all of Plaintiff's claims against Dr. Esses arising out of the I.M.E. on November 22, 1999, are barred as a matter of law on several alternative grounds. Additionally, as there has been adequate time for discovery, Dr. Esses also moves on all of Plaintiff's claims because there is no evidence on at least one element of each of them.

**II.**
**STANDARD OF REVIEW**

Summary judgment is proper under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."[2]  The mere existence of a factual dispute does

not by itself preclude the granting of summary judgment.  "[T]he requirement is that there be no

*genuine* issue of *material* fact."[3]

When a defendant moves on claims on which the plaintiff has the burden of proof, "the

plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a [plaintiff] who fails to make a showing sufficient to

establish the existence of an element essential to that [plaintiff's] case. . . ."[4]  Without sufficient

evidence, there is no genuine issue of material fact as a matter of law and defendant is entitled to

summary judgment.[5]

### III.
### ISSUES TO BE RULED UPON

Dr. Esses presents the following issues on defenses upon which he has the burden of

proof:

> A.    Whether all of Plaintiff's claims for tortious interference, conspiracy and negligence arising out of the I.M.E. are barred by the applicable statutes of limitations.
>
> B.    Whether all of Plaintiff's claims for tortious interference, conspiracy and negligence are barred by the doctrine of quasi-judicial immunity.
>
> C.    Whether Plaintiff's conspiracy and tortious interference claims for damages for deprivation of workers' compensation medical benefits are barred by waiver.

---

[2]    FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis in original).

[3]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]    *Celotex*, 477 U.S. at 322.

[5]    *Id.* at 322-23.

-3-

D.   Whether Plaintiff's tortious inference claims are barred by the defense of legal justification.

Additionally, Dr. Esses presents the following issues on Plaintiff's claims upon which he has the burden of proof:

E.   Whether Plaintiff's medical negligence claim arising out of the I.M.E. fails as a matter of law because the summary judgment evidence negates the element of duty.

F.   Whether all of Plaintiff's medical negligence claims fail as a matter of law because there is no evidence of any (1) breach of the standard of care, or (2) causation.

G.   Whether Plaintiff's tortious interference claim fails as a matter of law because there is no evidence of any willful and intentional interference of a contract.

H.   Whether Plaintiff's conspiracy claim fails as a matter of law because there is no evidence of (1) a meeting of the minds, or (2) unlawful conduct.

**IV.**
**SUMMARY OF ARGUMENT**

**A.    Claims Arising Out Of The I.M.E.**

Plaintiff's belated complaint about the workers' compensation benefits he received – or, allegedly, did not receive – is undermined by the following indisputable facts:

(1)   At all relevant times, Plaintiff's medical care was supervised by the DOL and was the subject of an administrative proceeding before the District Director for the Department of Labor's Eighth Compensation District ("District Director");

(2)   The allegedly wrongful recommendation of a simple discectomy at issue in this lawsuit was made during the course of an I.M.E. conducted at the direction of the DOL;

(3)   When, later, Plaintiff's clinical condition indicated that the fusion with instrumentation was reasonable, his employer authorized the surgery, which was performed in September 2000; and

(4)   Plaintiff settled all claims for medical care against his employer.

-4-

Under these facts, Plaintiff's claims for tortious interference, conspiracy and negligence arising out of Dr. Esses' surgical recommendation of a simple discectomy are barred as a matter of law.

More specifically, Plaintiff filed this suit on August 2, 2002. Yet, the only surgical recommendation that forms the basis for these claims consisted of Dr. Esses' report to the DOL in November of 1999. As such, Plaintiff's causes of action based on Dr. Esses' surgical recommendation accrued on November 22, 1999, and all claims that arise from such recommendation are barred by the applicable two-year statutes of limitations. Similarly, because all of these claims are based on statements that Dr. Esses made to the DOL in an administrative proceeding, they are also barred by quasi-judicial immunity.

Additionally, Plaintiff's tortious interference and conspiracy claims are also barred by waiver because Plaintiff could have objected to the medical care furnished to him after Dr. Esses' report in November of 1999, but he did not do so; in fact, he agreed to proceed with the simple discectomy recommended by Dr. Esses. Furthermore, his tortious interference claim also fails because Dr. Esses was legally justified in reporting his opinions to the DOL in response to the DOL's request. Finally, there is no genuine issue of material fact on at least one element of each of these claims.

## B.    Medical Malpractice Claims

With respect to Plaintiff's medical malpractice claims, they all fail because Plaintiff must produce expert testimony to show that Dr. Esses breached the standard of care *and* that this breach proximately caused Plaintiff's alleged damages. There is no expert testimony on these elements of Plaintiff's medical malpractice claims in this case, and these claims fail as a matter of law.

## C.    Chart Of Plaintiff's Claims And Dr. Esses' Various Defenses

As indicated in the preceding paragraphs, Dr. Esses has several viable alternative defenses to each of Plaintiff's claims.  For clarity, the following chart illustrates the various defenses on the particular claims:

| Plaintiff's Claim | Affirmative Defense | No Genuine Issue of Material Fact on Element of Plaintiff's Claim |
|---|---|---|
| Negligence (arising out of the I.M.E. in 1999) | • Barred by statute of limitations<br>• Barred by quasi-judicial immunity | • Summary judgment evidence negates element of duty<br>• No evidence of breach of standard of care<br>• No evidence of causation |
| Tortious interference with contract for workers' compensation benefits | • Barred by statue of Limitations<br>• Barred by quasi-judicial immunity<br>• Barred by waiver<br>• Barred justification | • No evidence of willful and intentional interference |
| Conspiracy to interfere with contractual relations | • Barred by statue of limitations<br>• Barred by quasi-judicial immunity<br>• Barred by waiver | • No meeting of the minds<br>• No unlawful conduct |
| Negligence (arising out of surgery performed in September 2000) | | • No evidence on breach of standard of care<br>• No evidence on causation |

For all of these reasons, Dr. Esses is entitled to summary judgment as a matter of law.

# V.
## SUMMARY JUDGMENT EVIDENCE

Dr. Esses offers the following exhibits in support of his Motion for Summary Judgment:

Exhibit A:    Agreed Stipulation and Compensation Order Pursuant to Section 908(i) of the Longshore and Harbor Workers' Compensation Act [33 U.S.C. § 908(i) (2001)] ("Agreed Stipulation").[6]

Exhibit B:    Excerpts from the June 6, 2003 Oral Deposition of Plaintiff Juan Escobedo ("Plaintiff's Depo.").

Exhibit C:    Affidavit of Stephen Esses, M.D.

Exhibit C-1:  Letter dated November 22, 1999, to Freddy Conley, U.S. Department of Labor, from Stephen I. Esses, M.D.

Exhibit C-2:  Letter dated June 29, 2000, to Freddy Conley, U.S. Department of Labor, from Stephen I. Esses, M.D.

Exhibit C-3:  Report of Procedure dated September 26, 2000.

Exhibit D:    Order dated September 1, 2000, signed by Chris John Gleasman, District Director, Eighth Compensation District, in Case No. 08-114563, *In the Matter of the Claim for Compensation Under the Longshore and Harbor Workers Compensation Act, Juan Escobedo v. A.D. Welding and Reliance Ins. Co.*; United States Department of Labor Employment Standards Administration, Office of Workers' Compensation Programs, Longshore and Harbor Workers' Compensation, Eighth Compensation District.[7]

Exhibit E:    Letter to the DOL District Director dated August 22, 2000, signed by Juan Escobedo, his attorney and the attorney for the Employer.[8]

Exhibit F:    Affidavit of M. Katherine Strahan.

---

[6]    The stipulated facts contained therein were approved by Plaintiff (and his attorney of record), as evidenced by Plaintiff's notarized signature and the translator's certificate dated February 26, 2002. *See* Ex. B, Plaintiff's Depo., pp. 159-160.

[7]    *See* Ex. B, Plaintiff's Depo., pp. 156-159.

[8]    *See* Ex. B, Plaintiff's Depo., pp. 155-56.

Exhibit F-1:   Letter dated July 6, 2000, from Debby J. Marcus, R.N., to Jack Carinhas.[9]

Exhibit F-2:   Letter to FARA/F.A. Richard & Assoc., dated June 29, 1999, from Madhavan Pisharodi, M.D.

Exhibit F-3:   Operative Report dated December 23, 1999.

Exhibit G:   Certified copy of Plaintiff's Original Petition bearing dated file-stamp.

## VI.
### FACTS

On or about April 2, 1998, Plaintiff sustained injuries to his lower back while working at the AMFELS shipyard in Brownsville, Texas.[10]   During May of 1998, Plaintiff continued to experience lower back pain and leg pain, and stopped working.[11]   Since Plaintiff's injury allegedly occurred during the course and scope of his employment with A.D. Welding (the "Employer"), Plaintiff filed a worker's compensation claim with the Houston District Office of the DOL's Longshore and Harbor Workers' Compensation Program.[12]   He then began receiving workers' compensation disability benefits.[13]

The Employer, who was insured for liability for workers' compensation benefits by Reliance National Insurance Company,[14] also furnished Plaintiff with medical services in accordance with the LHWCA.[15]   Defendant F.A. Richard & Associates provided medical claims

---

[9]    This documents was produced by Plaintiff with his Initial Disclosures.

[10]    See Plaintiff's Complaint at ¶IV. See also Ex. A, p. 1.

[11]    See Ex. A, p. 2.

[12]    See id., p. 1. See also Ex. B, page 44.

[13]    See Ex. A, p. 2.

[14]    See id., p. 1.

[15]    See Ex. A, p. 5.

administrative services, including medical management services, on behalf of the workers' compensation insurance carrier.[16]

When Plaintiff's treating physician determined Plaintiff was not progressing sufficiently with conservative care, he referred Plaintiff to Madhavan Pisharodi, M.D. (a Brownsville neurosurgeon) for a neurosurgical consultation.[17] In a report dated June 29, 1999, Dr. Pisharodi recommended that Plaintiff undergo back surgery.[18] More specifically, Dr. Pisharodi recommended a discectomy [*excision of disc between the spinal vertebra*] at L4/L5 and L5-S1 with fusion and instrumentation, referred to herein as "two-level discectomy with fusion and instrumentation."[19]

During 1998 and 1999, Plaintiff was referred to three other neurosurgeons for opinions regarding the necessity of a two-level discectomy with fusion and instrumentation. Each of these neurosurgeons gave a different opinion about whether the surgery recommended by Dr. Pisharodi was warranted at that time.[20] Consequently, a dispute arose in the workers' compensation proceedings between Plaintiff and the Employer regarding the proper course of treatment for Plaintiff.

Dr. Esses is a Brodsky Professor of Neurosurgery at the Baylor College of Medicine, in Houston, Texas. In October of 1999, the DOL contacted Dr. Esses, requesting him to conduct a medical examination of Plaintiff and to report his recommendations regarding surgery to the

---

[16]     *See* Ex. F-1.

[17]     *See* Ex. A, p. 2.

[18]     *See* Ex. F-2.

[19]     *Id.*

[20]     *See* Ex. A, pp. 2-4.

HOU:2172278.2

DOL.[21]  On or about October 26, 1999, Freddy Conley, Claims Examiner for the DOL, directed Plaintiff to report to Dr. Esses' office on November 22, 1999, for examination.[22]

On November 22, 1999, Plaintiff presented to Dr. Esses for an examination at the direction of the Department of Labor.[23]   Based upon a physical examination, a review of Plaintiff's medical records and x-rays, and a discussion with Plaintiff, by letter of November 22, 1999, Dr. Esses reported his opinion regarding surgery to the DOL as follows:

> I think it is reasonable for this man to have a discectomy on the right side at L5/S1.  I have explained to him that at this point I do not think it advisable to proceed with a two-level decompression, fusion and instrumentation.
>
> The patient understands that different surgeries have different approaches .  . .  I personally think he would get a great deal of benefit from a discectomy on the right side at L5/S1.
>
> [H]aving a discectomy now does not preclude [Plaintiff] from having a fusion down the road if necessary.[24]

Plaintiff agreed to have Dr. Pisharodi perform the simple discectomy.[25]   On December 23, 2000, Dr. Pisharodi, who continued to advocate for a two-level fusion with instrumentation, performed the following procedure: L4/L5 and L5-S1 partial laminectomy, L4/L5 and L5-S1 facetectomy and foraminotomy on the right side, L4/L5 and L5/S1 discectomy on the right side, L4/L5-S1 interspinous stabilization with secure strand.[26]

---

[21]    See Ex. C., p. 1.

[22]    See Ex. B, p. 45; see also Ex. C-1.

[23]    See id.

[24]    Ex. C-1.

[25]    See Ex. B, p. 61.

[26]    See Ex. F-3.  See also Ex. A, p. 4.

HOU:2172278.2

Dr. Esses did not provide any treatment to Plaintiff prior to the surgery performed by Dr. Pisharodi on December 23, 1999.[27]  Furthermore, other than the report of November 22, 1999, Dr. Esses did not render any additional opinions regarding surgery for Plaintiff prior to the December 23rd surgery performed by Dr. Pisharodi.[28]  While Dr. Esses did recommend a simple discectomy on the right side, Dr. Pisharodi did not perform the same surgery recommended by Dr. Esses.[29]

After the surgery, Plaintiff saw Dr. Pisharodi for follow-up care, continuing through June of 2000.[30]  Plaintiff reported lower back pain and leg pain post-operatively, and Dr. Pisharodi recommended an additional surgery of two-level fusion with instrumentation.[31]

On June 29, 2000, Dr. Esses again examined Plaintiff at the request of the DOL.[32]  At that time, Dr. Esses noted that Plaintiff's clinical picture had changed and that it would be reasonable for him to undergo a two-level laminectomy, discectomy and fusion with instrumentation.[33]

The spinal fusion and instrumentation recommended by Dr. Esses was authorized by the Employer on or before July 6, 2000.[34]  Although Plaintiff and the Employer originally disputed which physician should perform the surgery, by letter dated August 22, 2000, Plaintiff agreed

---

[27]    *See* Ex. C, p. 2.

[28]    *See id.*

[29]    *See id.*

[30]    *See* Ex. A, p. 4

[31]    *See id.*

[32]    *See* Ex. C, p. 2, & Ex. C-2.

[33]    *See id.*

[34]    *See* Ex. F-1.

-11-

that he would not object to or appeal an order from the District Director changing the treating physician to Dr. Esses.[35]

In an Order of September 1, 2000, the District Director of the Eighth Compensation District designated Stephen Esses, M.D., as Plaintiff's treating physician.[36] The Order states:

> Based upon a thorough review of the administrative file, the medical reports, and discussion with the Employee and his representative at informal conference, I am persuaded by the opinion of Stephen Esses, M.D. I find that reasonable and necessary treatment of the Employee should have been limited to a right-sided discectomy at L5-S1 as recommended by Dr. Esses in his November 22, 1999 report. As is clear from Dr. Esses' report, performing surgery limited to the simpler one-level procedure was reasonable and necessary, based on the total clinical picture, and such surgery would not in any way preclude the performance of a more complex procedure, if necessary. Even as Dr. Pisharodi admitted in his December 21, 1999 report, "there is always the possibility that the patient may do well with the simple discectomy."
>
> Having found that Dr. Pichardi furnished treatment that was not reasonable and necessary, I hereby find that a change of treating physicians is desirable or necessary pursuant to section 7(b) of the Act (33 USC 907(b)). Effective this date I hereby designate Stephen Esses, M.D., as the Employee's treating physician.[37]

On September 26, 2000, Dr. Esses performed surgery on Plaintiff, including spinal fusion with instrumentation at L4/L5 and L5/S1.[38] Plaintiff continued follow-up care with Dr. Esses through July of 2001.[39] In February of 2002, Plaintiff stipulated that he was able to return to work and settled any claims for future medical benefits from his Employer and its insurance

---

[35]    *See* Ex. E.

[36]    *See* Ex. D.

[37]    *Id.*

[38]    *See* Ex. C, p. 3, & C-3.

[39]    *See* Ex. C, p. 3.

HOU:2172278.2

carrier.[40]  Then, on August 2, 2002, Plaintiff filed this lawsuit complaining about the medical care provided to him pursuant to the LHWCA.[41]

## VII.
### ARGUMENTS AND AUTHORITIES

**A.**    **All Of Plaintiff's Claims Arising From Dr. Esses' Surgical Recommendation During The I.M.E. Are Barred By The Applicable Statutes Of Limitations**

Generally, Plaintiff's conspiracy, tortious interference, and negligence claims arising out of Dr. Esses' I.M.E. recommendation that a discectomy was reasonable treatment for Plaintiff are barred by the applicable statutes of limitations.  As to each claim, the summary judgment evidence shows that the surgical recommendation was made by letter dated November 22, 1999. Thus, Plaintiff's causes of action accrued on or before November 22, 1999.  Since Plaintiff did not file this suit until August 2, 2002, the respective two-year statutes of limitations had already expired on his tortious interference, conspiracy and negligence claims by the time he filed suit.

**1.**    **Tortious Interference**

The limitations period for a tortious interference claim is two years.[42]  Furthermore, the cause of action accrues when the defendant interferes with a contract that causes harm to the plaintiff.[43]

Regarding Plaintiff's allegations, he contends that Dr. Esses tortiously interfered with his workers' compensation medical benefits by making the "false statement" that Plaintiff really only needed a simple single-level discectomy, instead of a two-level discectomy with fusion and

---

[40]    *See* Ex. A, pp. 5-7.

[41]    *See* Ex. G.

[42]    *See* TEX. CIV. PRAC. REM. CODE ANN. §16.003(a) (Vernon 2002); *5636 Alpha Rd. v. NCNB Tex. Nat'l Bank*, 879 F. Supp. 655, 662-63 (N.D. Tex. 1995); *Snyder v. Eanes I.S.D.*, 860 S.W.2d 692, 699 (Tex. App.—Austin 1993, writ denied) (citing *First Nat'l Bank v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986)).

[43]    *See Snyder*, 860 S.W.2d at 699.

-13-

instrumentation. As set forth above, any such statement, even as alleged, occurred on or before November 22, 1999 when Dr. Esses reported his initial opinions to the DOL. The limitations period for Plaintiff's tortious interference claims would have therefore expired on **November 22, 2001**. Since Plaintiff did not file this lawsuit until **August 2, 2002,** the statute of limitations bars Plaintiff's tortious interference claims.[44]

### 2.    Conspiracy

The limitations period for a civil conspiracy claim is two years from the last overt act causing damages to the plaintiff.[45] Here, Plaintiff alleges that Defendants conspired to prevent him from receiving workers' compensation benefits for the spinal fusion and instrumentation. As with Plaintiff's tortious interference claim, any alleged wrongful act must have occurred on November 22, 1999, when Dr. Esses sent his letter to the DOL opining that the simple discectomy was reasonable. Moreover, Dr. Esses did not render any additional opinions or recommendations regarding Plaintiff's medical care, to anyone, prior to June 29, 2000.[46] And, on June 29, 2000, Dr. Esses reported to the DOL that, in his opinion, fusion with instrumentation

---

[44]        Plaintiff has not pleaded the discovery rule (in which case the limitations period would run from the date Plaintiff "discovered" the nature of his injury), and Dr. Esses further contends it is not applicable in this case because the alleged injury was not inherently undiscoverable. *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993) (per curiam) (quoting *Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990)), *aff'd*, 157 F.3d 1032 (5th Cir. 1998). *See also, e.g., MCI Telecomm. Corp. v. Ameri-Tel, Inc.*, 852 F. Supp. 659, 666 (N.D. Ill. 1994) (finding waiver of claims and defenses raised for the first time in response to a motion for summary judgment). In any event, the summary judgment evidence negates the effect of the discovery rule in this case because on June 29, 2000, Dr. Esses examined Plaintiff and recommended a two level-laminectomy, discectomy, and fusion with instrumentation, and by letter dated July 6, 2000, the Employer had approved the very surgery that Plaintiff contends he was denied. Moreover, Plaintiff testified in deposition that his treating physician recommended a second surgery during his follow-up visits from December of 1999 through June of 2000. Thus, even if the discovery rule were applicable here, Plaintiff was aware of any alleged injury, *i.e.*, the deprivation of the fusion with instrumentation, on or before July 6, 2000. Plaintiff still did not file his lawsuit within two years of this date.

[45]        *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 646 (5th Cir. 1999) (applying Texas law); *Stevenson v. Koutzarov*, 795 S.W.2d 313, 318 (Tex. App.—Houston [1st Dist.] 1990, writ denied).

[46]        *See* Ex. C, p. 2.

-14-

–the surgery sought by Plaintiff – was reasonable at that time.[47]  Notably, by July 6, 2000, the Employer had approved the spinal fusion with instrumentation.

Under these facts, Plaintiff's conspiracy cause of action must have accrued, if at all, on November 22, 1999, and in *no event,* later than July 6, 2000.  Therefore, Plaintiff's conspiracy claim is barred by the two-year statute of limitations.[48]

### 3.    Medical Negligence

Similarly, Plaintiff's medical negligence claim based on "not recommending the proper procedure to begin with," is barred by a two-year statute of limitations.   Under § 10.01 of article 4590i, the statute of limitations period in a health care liability claim runs from one of three possible dates: (1) the ascertainable date of the occurrence of the breach or tort, (2) the last date of the relevant course of treatment period, or (3) the last date of the relevant hospitalization period.[49]  If the alleged negligence or deviation from the appropriate standard of care is readily ascertainable from the facts of the case, the statute of limitations period begins to run from the date of such negligent act.[50]  Moreover, even if a plaintiff establishes a continuing course of treatment for an alleged injury, if the defendant physician committed an alleged standard of care deviation on an ascertainable date, the establishment of a course of treatment is immaterial because the limitations period starts running on the ascertainable date of the treatment.[51]  In other words, the ascertainable date rule and the continuing course of treatment rule are mutually exclusive.

---

[47]    *See* Ex. C-2.

[48]    *Stroud v. VBFSB Holding Corp.,* 917 S.W.2d 75, 82 (Tex. App.—San Antonio 1996, writ denied).

[49]    TEX. REV. CIV. STAT. ANN. art. 4590i, § 10.01 (Vernon Supp. 2003); *Shah v. Moss,* 67 S.W.3d 836, 841 (Tex. 2001).

[50]    *Shah,* 67 S.W.3d at 841 (citing *Earle v. Ratliff,* 998 S.W.2d 882, 887 (Tex. 1999)).

[51]    *See id.* at 841-45.

HOU:2172278.2

In the present case, Plaintiff's claim of negligence in not recommending the fusion and instrumentation accrued on November 22, 1999, when Dr. Esses examined Plaintiff and reported his opinions to the DOL.  Since the date of the alleged breach is ascertainable, inquiry into the second and third inquiries is unnecessary.[52]  Therefore, Plaintiff failed to bring his medical negligence claim based on the surgical recommendation within the limitations period, and it is time-barred.[53]

### B.    All Of Plaintiff's Claims Arising Out Of The Surgical Recommendations Are Barred By The Doctrine Of Quasi-Judicial Immunity

Additionally, and in the alternative, Plaintiff's claims for tortious interference, negligence and conspiracy arising out of Dr. Esses' surgery recommendation are also barred by the doctrine of quasi-judicial immunity.  Indeed, it is well established that the absolute immunity doctrine bars liability in a civil action for "any statement made in the trial of any case by anyone."[54]  It is also well established that this immunity extends to statements made in quasi-judicial proceedings, such as certain administrative proceedings.[55]

With respect to the facts of this case, the summary judgment evidence shows that the DOL was supervising Plaintiff's medical treatment in accordance with Section 7(b) of the LHWCA, in connection with Plaintiff's workers' compensation claim.  As part of this

---

[52]      *See id.* at 841.

[53]      Plaintiff did not assert an open courts challenge or other "defense" to limitations and therefore cannot rely on such an argument in response to Dr. Esses' Motion.  Even if Plaintiff had pleaded an open courts challenge, however, the summary judgment evidence conclusively establishes that Plaintiff underwent a fusion with instrumentation on September 26, 2000, over a year *before* limitations ran. Therefore, statutory limitations in this case does not operate to preclude the application of article 4590i, § 10.01 because Plaintiff had a reasonable opportunity to discover the alleged wrong and bring suit within the two-year limitations (*i.e.*, by November 22, 2001). *See Shah*, 67 S.W.3d at 847.

[54]      *See Attaya v. Shoukfeh*, 962 S.W.2d 237, 238 (Tex. App.—Amarillo 1998, pet. denied) (citing Texas Supreme Court authority).

[55]      *See id.* at 239; *see also Hernandez v. Hayes*, 931 S.W.2d 648, 650-51 (Tex. App.—San Antonio 1996, writ denied) (listing examples of quasi-judicial proceedings).

-16-

supervision, the DOL directed Plaintiff to present to Dr. Esses for an I.M.E., and ***Dr. Esses reported his findings and recommendations to the DOL in accordance with its directive***. Since this is clearly a statement made in administrative proceedings, the only legal question is whether the DOL proceedings at issue are "quasi-judicial proceedings."

In determining whether administrative proceedings are "quasi-judicial" proceedings for purposes of absolute immunity, courts look to several factors.[56] Not all of the factors need to be met, however, for an administrative agency to be "quasi-judicial."[57] Among such factors considered are whether the agency has the power to exercise judgment and discretion, the power to affect the personal rights of private persons, and the power to make binding orders.[58]

The supervision of medical care by the Secretary of Labor (acting through its district directors) in connection with a LHWCA compensation claim clearly meets these three factors, if not others factors as well. Specifically, the Secretary has the statutory authority:

- To actively supervise the medical care rendered to injured employees;

- To determine the necessity, character, and sufficiency of any medical aid furnished or to be furnished;

- On his own initiative or at the request of the employer, to order a change of physicians or hospitals when in his judgment such change is desirable or necessary in the interest of the employee;

---

[56] *See Shanks v. AlliedSignal, Inc.*, 169 F.3d 988 (5th Cir. 1999), *cert. denied*, 534 U.S. 1081 (2002). These factors include the following powers: (1) to exercise judgment and discretion; (2) to hear and determine or to ascertain facts and decide; (3) to make binding orders and judgment; (4) to affect the personal or property rights of private persons; (5) to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and (6) to enforce decisions or impose penalties. *Id.* at 994.

[57] *See id.* (noting that while the NTSB investigation lacked some indicia of quasi-judicial proceedings, a proceeding need not meet all of the criteria to be considered quasi-judicial under Texas law).

[58] *See id.*

-17-

- In the event that medical questions are raised in any case, to cause the employee to be examined by a physician employed or selected by the Secretary and to obtain from such physician a report;

- To order a review or reexamination unless he finds that it is clearly unwarranted;

- To make rules and regulations and to establish procedures, including the nature and extent of proof and evidence necessary for actions regarding the supervision of medical services and supplies; and

- To make findings of fact of the Secretary that, if based on substantial evidence in the record as a whole, shall be conclusive.[59]

Indeed, proceedings in connection with this authority are quasi-judicial proceedings.

Since the DOL was exercising its authority to supervise the medical treatment of Plaintiff when it directed Plaintiff to present to Dr. Esses for an I.M.E., any opinions offered by Dr. Esses to the DOL in connection with this authority were therefore made in quasi-judicial proceedings. Hence, any cause of action based on such statements of opinion (including Plaintiff's tortious interference, conspiracy and negligence claims) is barred by the doctrine of quasi-judicial immunity.[60]

---

[59]   *See* 20 C.F.R. § 702, Subpart D (2003).

[60]   Although the Fifth Circuit has noted that the Texas Supreme Court has not expressly extended the defense of immunity to all causes of action arising out of a communication, it did recognize that Texas appellate courts have applied the defense to several different types of claims, including civil conspiracy, negligence, intentional infliction of emotional distress and tortious interference. *See Shanks*, 169 F.3d at 995 n.8. Moreover, the Houston Court of Appeals for the First District has expressly held that the absolute immunity defense applies to all causes of action arising out of a communication made in the course of a judicial proceeding. *See Crain v. Unauthorized Practice of Law Committee*, 11 S.W.3d 328, 335 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Other Texas appellate courts have reached the same conclusion as the Houston Court of Appeals. *See, e.g., Attaya*, 962 S.W.2d at 240 (Amarillo) (concluding that all causes of action arising out of a defendant's conduct before the State Board of Medical Examiners are barred by the doctrine of immunity); *Delcourt v. Silverman*, 919 S.W.2d 777, 788 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (holding that conspiracy claims are barred by immunity).

-18-

**C.    Plaintiff's Conspiracy And Tortious Interference Claims For Deprivation Of Workers' Compensation Medical Benefits Are Barred By Waiver**

Additionally, and in the alternative, Plaintiff's tortious interference and conspiracy claims are also barred by the doctrine of waiver.  Under Texas law, a party waives a legal right when: (1) the legal right exists at the time of the waiver, (2) the party has constructive or actual knowledge of the right at the time, and (3) the party intended to relinquish that right.  The summary judgment evidence establishes each of these elements in this case.

The essence of Plaintiff's tortious interference and conspiracy claims is that he did not receive medical care to which he was allegedly entitled under his employer's LHWCA policy.  At the time, however, Plaintiff's medical care was under the supervision of the DOL District Director and the subject of administrative proceedings.  Under statute, Plaintiff had a right to continue to challenge decisions regarding his medical care in those proceedings or by filing a lawsuit.[61]   Nonetheless, while he was represented by a lawyer, Plaintiff actually agreed to undergo the simple discectomy instead of challenging the decision.

Additionally, Plaintiff agreed for Dr. Esses to perform the spinal fusion and instrumentation in August of 2000.  On February 26, 2002, Plaintiff even signed an agreed compensation order on the LHWCA proceedings wherein Plaintiff agreed:

> The Employee understands that this is a full and final settlement of his claim for compensation and medical benefit pursuant to the LHWCA for his injury of April 2, and *he further understands that . . . he could continue to pursue his claim for compensation and medical benefits except for his decisions to make this settlement.*

---

[61]    *See, e.g.*, 33 U.S.C. § 907(j).

In sum, Plaintiff could have pursued additional medical benefits in the DOL proceedings, but specifically agreed not to pursue them. By failing to do so, Plaintiff waived any right to complain about a loss of medical benefits to which he alleges he was entitled pursuant his Employer's policy. Thus, Plaintiff waived any right to complain about the deprivation of medical benefits available pursuant to the LHWCA, upon which his tortious interference and conspiracy claims are based.

**D.    Plaintiff's Tortious Interference Claim Fails As A Matter Of Law Because Dr. Esses Was Legally Justified In Providing His Opinion Regarding Plaintiff's Medical Care**

Additionally, and in the alternative, Plaintiff's tortious interference claim is also defeated by the defense of legal justification. Under Texas law, if a "defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant."[62]  Acting under statutory authority,[63] the DOL directed Plaintiff to undergo a medical examination by Dr. Esses and Dr. Esses to report his findings and recommendations. Dr. Esses complied with the DOL's directive. Dr. Esses was therefore legally justified in any alleged interference, *i.e.*, in reporting his opinions to the DOL, regardless of his motivations.[64]

---

[62]    *Prudential Ins. Co. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000) (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996)).

[63]    "In the event that medical questions are raised in any case, the Secretary shall have the power to cause the employee to be examined by a physician employed or selected by the Secretary and to obtain from such physician a report . . ." 33 U.S.C. § 907(e).

[64]    *Johnson v. Hosp. Corp.*, 95 F.3d 383, 394 (5th Cir. 1996).

-20-

**E.   Plaintiff's Negligence Claim Arising Out Of The I.M.E. Fails As A Matter Of Law Because The Summary Judgment Evidence Negates The Element Of Duty**

Even setting aside all of Dr. Esses' affirmative defenses above, Plaintiff's negligence claim based on Dr. Esses' recommendation that a simple discectomy was reasonable fails as a matter of law because there was no physician-patient relationship.   In fact, Texas courts have held as such in cases with very similar facts to this case.

For example, in *Almaguer v. Jenkins*, the defendant doctor examined the plaintiff (as in this case) "at the bequest of the Department of Labor for the purposes of conducting a second opinion consultation in conjunction with the adjudication of a claim for workers' compensation."[65]   And, like Plaintiff in this case, the plaintiff in *Almaguer* alleged that, *inter alia*, the defendant physician "incorrectly reported her condition to the Department of Labor," thereby causing her to experience delays in receiving treatment and workers' compensation benefits.[66]   The San Antonio Court of Appeals held that the defendant was entitled to summary judgment because there was no physician-patient relationship between the examinee/plaintiff and the physician/defendant and therefore there could be no breach of duty.[67]   In such instances, the duty of making the examination and preparing the report runs only to the party requesting it, and the only duty owed to the examinee is to not injure him in the examination.

In this case, Dr. Pisharodi – not Dr. Esses – was Plaintiff's treating neurologist at the time of the I.M.E. in November of 1999.   Dr. Esses did not treat Plaintiff at that time and did not see

---

[65]   9 S.W.3d 835, 837 (Tex. App.—San Antonio 1999, no pet.).

[66]   *Id.*

[67]   *Id.* at 838. *See also Johnston v. Sibley*, 558 S.W.2d 135, 137-38 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.) ("[W]e hold that where a doctor, as here, conducts an examination of an injured employee solely for the purpose of evaluating the employee's disability for the insurance carrier after a claim for workmen's compensation has been filed, and the doctor neither offers nor intends to treat, care for or otherwise benefit the employee and does not injure him during the course of the examination, the doctor is not liable for negligence in a suit for medical malpractice.").

-21-

Plaintiff again until the second I.M.E. on June 29, 2000. Thus, Plaintiff's negligence claim arising out of the I.M.E. and the surgical recommendation made in November of 1999, fails as a matter of law.

> **F.  All Of Plaintiff's Medical Negligence Claims Fail As A Matter Of Law Because There Is No Evidence Of Any (1) Breach Of The Standard Of Care Or (2) Causation**

Under Texas law, a plaintiff in a malpractice action must establish four elements, including (1) the defendant owes a duty to plaintiff, (2) a breach of that duty, (3) actual injury to the plaintiff, and (4) proof that the breach was the proximate cause of the injury.[68] Regarding the second element of breach of duty, "Texas tort law 'places the burden of proof on the plaintiff to establish by expert testimony that the act or omission of the defendant physician fell below the appropriate standard of care and was negligent.' "[69] Without expert testimony to establish a breach of the standard of care, Plaintiff's medical negligence claims fail as a matter of law.[70] Similarly, the element of proximate cause must also be established by expert testimony.[71]

Under the Court's Scheduling Order in this case, Plaintiff was required to name his experts and produce any report required under FED. R. CIV. P. 26(a)(2) by June 30, 2003. Plaintiff has failed to do so. Because there is no expert testimony on (1) the breach of standard

---

[68]    *See Hollis v. United States*, 323 F.3d 330, 336 (5th Cir. 2003).

[69]    *See id.* at 336-37 (quoting *Rodriquez v. Pacificare of Tex., Inc.*, 980 F.2d 1014, 1020 (5th Cir. 1993)).

[70]    *See, e.g., Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268, 274-75 (Tex. App.—Austin 2002, pet. denied).

[71]    *See Crocker v. Paulyne's Nursing Home, Inc.*, 95 S.W.3d 416, 421-22 (Tex. App.—Dallas 2002, no pet. h.).

HOU:2172278.2

of care and (2) causation on Plaintiff's medical negligence claims, his claims fail as a matter of law.[72]

Indeed, this Court may grant Dr. Esses' summary judgment on Plaintiff's medical negligence claims on this ground under Fifth Circuit authority.  For example, in *Reliance Insurance Co. v. Louisiana Land & Exploration Co.*, the Firth Circuit affirmed summary judgment on a plaintiff's engineering malpractice claim because there was no expert evidence to show breach of the standard of care.[73]  In that case, the plaintiff did file an expert report, but it addressed only the issue of causation, and not the standard of care.[74]  Without an expert report on this issue of breach, plaintiff's claims failed as a matter of law.[75]  Plaintiff's medical claims in this case therefore fail as a matter of law.

### G.    Plaintiff's Tortious Interference Claim Fails As A Matter Of Law Because There Is No Evidence Of Any Willful And Intentional Interference Of A Contract

To prevail on a claim for tortious inference, a plaintiff must show, *inter alia*, that a defendant willfully and intentionally interfered with an existing contract.[76]  Indeed, tortious inference is an intentional tort.  In this case, there is simply no evidence that Dr. Esses intended to affect Plaintiff's rights to receive workers' compensation benefits, if any.  Thus, Plaintiff's claim fails as a matter of law.

---

[72]    *See, e.g., Ersek,* 69 S.W.3d at 274-75 ("Ersek failed to designate his expert witness by the deadline. . . .  Accordingly, Ersek can offer no evidence to support his cause of action [for professional negligence].  This ground supports the summary judgment . . . .")

[73]    110 F.3d 253, 258 (5th Cir. 1997).

[74]    *See id.*

[75]    *See, e.g., Weinberg v. Whatcom County,* 241 F.3d 746, 750-51 (9th Cir. 2001).  The Ninth Circuit affirmed summary judgment on plaintiff's negligence claims that required expert evidence on damages.  The court found, first, that the trial court did not abuse its discretion in refusing to allow plaintiff more time to file an untimely expert report, and that without any expert evidence, summary judgment was appropriate.  Dr. Esses is therefore entitled to summary judgment on these claims.

[76]    *Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000).

-23-

**H.    Plaintiff's Conspiracy Claim Fails As A Matter Of Law Because There Is No Evidence Of (1) A Meeting Of The Minds Or (2) Unlawful Conduct**

Under Texas law, to prevail on a claim for conspiracy, a plaintiff must prove four elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[77]    To prove "a meeting of the minds," a plaintiff must show that the conspirators shared "a preconceived plan and unity of design and purpose."[78]

In this case, Plaintiff must show that Dr. Esses and one of his Co-Defendants, together, had a preconceived plan and unity of design and purpose in depriving Plaintiff of a spinal fusion and instrumentation.   Yet, there is absolutely no evidence that Dr. Esses "agreed" to report opinions to the DOL that would deprive Plaintiff of any medical benefits under a LHWCA insurance policy.  As with all of Plaintiff's other claims, his conspiracy claim, too, fails as a matter of law.

## VIII.
### CONCLUSION

In sum, Plaintiff's claims all fail as a matter of law because they lack evidentiary support. Furthermore, Plaintiff's attempt to turn an independent medical examination into a basis for tort claims is barred by several independent affirmative defenses.  Dr. Esses is therefore entitled to judgment as a matter of law.

WHEREFORE ALL PREMISES CONSIDERED, Defendant Stephen Esses, M.D., prays that the Court grant his Motion for Summary Judgment in its entirety and dismiss all of

---

[77]    *Apani v. Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002).

[78]    *Spectators' Communication Network Inc. v. Colonial County Club*, 253 F.3d 215, 226 (5th Cir. 2001) (applying Texas law).

Plaintiff's claims against him with prejudice, and prays for such other and further relief to which

he may be justly entitled.

Respectfully submitted,

ANDREWS & KURTH L.L.P.

BY: _____
Jeffrey B. McClure
State Bar No. 13428200
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4772
(713) 220-4285 (Fax)

ATTORNEYS FOR DEFENDANT, STEPHEN
ESSES, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon
counsel of record by facsimile transmission and by placing a copy thereof in the United States
mail, postage prepaid, certified, return receipt requested, on this ___ day of August, 2003,
addressed as follows:

Michael R. Cowen
Michael R. Cowen, P.C.
520 E. Levee Street
Brownsville, Texas 78520

Vaughn E. Waters
Thornton, Summers, Biechlin, Dunham & Brown, L.C.
Bank of America, Suite 1000
500 North Shoreline Blvd.
Corpus Christi, Texas 78471

_____
M. Katherine Strahan

-25-



UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
EIGHTH COMPENSATION DISTRICT

| | | |
|---|---|---|
| JUAN CARLOS ESCOBEDO, | § | OWCP NO. **8-114563** |
| Claimant-Employee | § | |
| | § | |
| VS. | § | |
| | § | AGREED STIPULATION AND |
| A. D. WELDING, | § | COMPENSATION ORDER PURSUANT |
| Employer | § | TO SECTION 8(i) OF THE LONGSHORE AND |
| | § | HARBOR WORKERS' COMPENSATION |
| | § | ACT [33U.S.C. § 908(i)] |
| RELIANCE NATIONAL INSURANCE | § | |
| COMPANY, | § | |
| Carrier | § | |

NOW COME **Juan Escobedo**, hereinafter called Employee, **A. D. Welding**, hereinafter called Employer, and **Reliance National Insurance Company**, hereinafter called Carrier, and stipulate and agree upon the following facts and, pursuant to the Longshore and Harbor Workers' Compensation Act, agree on the following basis to a settlement of the claim of the Employee for past and future compensation benefits, whether for total or partial, temporary or permanent disability.

I.

On April 2, 1998, the Employee was in the employ of the Employer, and the liability of the Employer for payment of worker's compensation benefits under the Longshore and Harbor Workers' Compensation Act was insured by the Carrier.

On April 2, 1998, Employee was employed by the Employer as a welder at the AMFELS shipyard in the Port of Brownsville Texas, and while engaged in his employment, he lifted equipment and when he turned to place the equipment, he injured his low back, right leg and foot, and his body generally.

45430;986434.2;022202

EXHIBIT NO. D
Bryant & Stingley, Inc.

## II.

The Employee was originally seen by Brownsville general practitioner, Jesus Caquias, M.D., who referred him to Brownsville orthopedic surgeon, Ricardo Adobbati, M.D. Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the glutal area but not down to the leg. A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain. Dr. Adobbati advised the Employee to discontinue working and ordered an MRI to determine if the Employee had sustained a herniated disc. In his May 19, 1998 report, Dr. Adobbati explained that the MRI scans were normal with no evidence of a ruptured disc. The Employee was advised to remain off work and additional conservative care was recommended. On July 1, 1998, Dr. Adobbati examined the Employee noting that he was not progressing as quickly as expected and recommended a neurosurgical consultation. The Employee was subsequently referred to a consultation to Brownsville neurosurgeon, Madhavan Pisharodi, M.D. Dr. Pisharodi first examined the Employee in July 1998 but his first report was on June 29, 1999. Dr. Pisharodi's report notes the negative MRI but relies on discogram he interprets "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing. An L4/L5 and L5-S1 diskectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disk syndrome. On November 5, 1998, the Employee was examined by H. Pacheco-Serrat, M.D., a neurosurgeon. In his report dated November 5, 1998, Dr. Pacheco-Serrat notes Dr. Pisharodi's recommendations for surgery, but finds that in the absence of a herniated disk or

instability that the recommended surgery is not warranted. The Employee was referred back to his primary physician for pain management.

In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available diagnostic study, including the discograms, fails to adequately explain the source of the Employee's pain. Dr. Adobbati recommends that the Employee refrain from undergoing the recommended surgery until another option is obtained. On May 12, 1999, the Employee was examined Eric Six, M.D., a Harlingen Texas neurosurgeon. Dr. Six concluded that in light of the positive discogram, the Employee may represent a rare instance where a lumbar fusion would be of benefit. However, Dr. Six recommends that the surgery should be done at a major institution of higher learning. On August 4, 1999, the Employee was examined by Houston neurosurgeon, Martin Barrash, M.D., a physician selected by the Employer, who states in his report that the overall clinical and diagnostic picture is, in his opinion, insufficient to justify multi-level disk excision with fusion with instrumentation. In view of the diagnostic studies, including a possible right-sided disc rupture at L5-S1 on the MRI scans, the Employee's continuing complaints of pain, Dr. Barrash recommends that the surgery be limited to a right-sided discectomy at L5-S1. Dr. Barrash further recommends that the Employee be reassessed after this minimal surgery is performed to determine if additional treatment is warranted.

In his report of August 11, 1999 and September 7, 1999, Dr. Pisharodi reaffirmed his original surgical recommendation. On November 22, 1999, the Employee was examined at the direction of the Unites States Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of Neurosurgery at the Baylor College of Medicine in Houston, Texas. After a thorough examination and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed

with a two-level disc excision and fusion with instrumentation. Dr. Esses recommended that a reasonable treatment would consist of simple discectomy at L5-S1 on the right side.

On December 23, 1999, the Employee was admitted to Valley Regional Medical Center in Brownsville, Texas for surgery. Dr. Pisharodi performed the following surgical procedure: L4/L5 and L5-S1 partial laminectomy, L4/L5 and L5-S1 facetectomy and foraminotomy on the right side; L4/L5 and L5-S1 discectomy on the right side; L4/L5, L5-S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow-up reports on January 7, January 28, February 17, March 3 and April 2000 indicating a normal post-operative course without complications, a slight decrease in the Employee's reported back pain and an increase in the Employee's leg pain. Dr. Pisharodi recommended additional low back surgery including a multi-level fusion with instrumentation.

On June 29, 2000, the Employee was examined by Dr. Esses at the request of the United States Department of Labor. Dr. Esses states in his report of the same date that, "It is my opinion that this man's clinical situation now is different then when I saw him on November 22, 1999. At that time, I was of the opinion that it would be reasonable for him to undergo a decompression and discectomy without fusion in order to provide him with significant pain relief." Based on the change in the Employee's clinical picture, Dr. Esses recommended further treatment: a two-level laminectomy, discectomy and fusion with instrumentation.

On September 18, 2000, Dr. Esses performed the recommended surgery on the Employee at St. Luke's Episcopal Hospital in Houston, Texas. After a normal hospital course, the Employee first saw Dr. Esses for a follow-up on November 2, 2000. At that time, the Employee's medical exam was normal and Dr. Esses stated, "He is doing extremely well following his surgery." The Employee saw Dr. Esses again on December 18, 2000 and Dr. Esses reported that the Employee

06/05/2003 14:11 FAX 95(    24370    ROYSTON,RAYZOR -    ☑006

continued to show improvement and provided a prescription for physical therapy. The Employee

underwent physical therapy and continued with follow-up appointments with Dr. Esses. The

Employee last saw Dr. Esses on July 26, 2001. Dr. Esses reports that he could not find any hard

findings or deficits. Dr. Esses completed an OWCP 5 Form which indicates that the Claimant can

work an eight hour day, but is restricted from lifting greater than 20 lbs. and not bending, squatting,

climbing, kneeling, twisting or standing on a constant basis. The OWCP 5 also indicates that the

Claimant has reached maximum medical improvement.

Employee has now been released from further medical care for the effects of this injury with

instructions to return to work with minimal work restrictions regarding his low back. The Employee

is now prepared to return to work with some restrictions as set forth by Dr. Esses. The Employee

acknowledges and stipulates and agrees that he is able to work eight (8) hours per day, five (5) days

per week, and that he has an earning capacity of $6.25 per hour. His plan is to earn this amount or

more through work in a business with his wife or on the open job market.

III.

The Employer furnished the Employee with medical services in accordance with the

provisions of Section 7 of the Act. Copies of reports from the Employee's treating and examining

physicians are attached hereto.

IV.

The Employer did not receive written notice of the Employee's injury within thirty (30) days

of the injury, but the Employer had knowledge of the injury and has not been prejudiced by lack of

such written notice.

## V.

The average weekly earnings of the Employee at the time of the injury of April 2, 1998 were $353.90.

## VI.

As a result of this injury, Employee was temporarily and totally disabled from May 6, 1998 until July 26, 2001, inclusive, entitling him to compensation at a rate of $235.95 per week for 168 weeks totaling $39,639.60. The Employee's permanent partial disability began on July 27, 2001 and continues, entitling him to compensation at the rate of $69.27 per week. The Employer/Carrier have continued to pay the Employee at the rate of $235.95 and have agreed to continue said payments through March 5, 2002. Through March 5, 2002, the Employee will have been paid a total of $47,356.23. This has resulted in an overpayment by the Employer/Carrier , which overpayment is waived by the Employer and Carrier. The Employee acknowledges receipt of weekly compensation benefits at the rate of $235.95 from May 6, 1998 to present, as a result of the injury of April 2, 1998.

## VII.

The Employee has now reached maximum medical improvement and has been released to return to work with minimal work restrictions regarding his low back. The Employee is 27 years of age (Date of Birth: September 14, 1974) and his education and employment background consists of a high school education in Mexico and employment as a dishwasher, waiter and welder. A controversy exists as to the nature and extent of disability and whether there is any medical connection between the injury of April 2, 1998, as described by the Employee, and his present physical condition and complaints. The Employer and Carrier deny both the nature and extent of

disability as claimed by the Employee and that such are the result of the incident of April 2, 1998, as claimed.

The parties agree that the liability of the Employer and Carrier is uncertain as to the nature and extent of Employee's present disability, if any, resulting from the injury of April 2, 1998, and as to whether the Employee's present physical condition and complaints are medically related to the injury of April 2, 1998. However, solely for the purposes of this application for a disposition of this claim under Section 8(i) of the Act, the parties have negotiated and compromised their differences and agreed upon a disposition of this claim.

## VIII.

The Employee, Employer and Carrier recognize that the outcome of any formal litigation is extremely speculative and that to require a formal hearing of this claim could possibly work to the detriment of the Employee. The Employee does not wish to pursue his claim to a formal hearing because of the contested nature of his claim and the dispute over the nature and extent of his present disability, if any, and the dispute as to whether any or all of the Employee's present complaints are in any way causally related to the accident of April 2, 1998. Therefore, whether or not the Employee has any disability resulting from the accident of April 2, 1998, the Employee wishes to compromise and settle any claim for further disability, be it temporary or permanent, for a lump sum payment of EIGHTY-FOUR THOUSAND AND NO/100 DOLLARS ($84,000.00) and the Employee requests approval of the proposed settlement.

## IX.

The Employee acknowledges that he has some degree of possible limitation of motion in his low back and that he has had two operations on his low back. Nevertheless, the Employee has

agreed to accept and the Employer and Carrier have agreed to pay a total sum of $84,000.00 in a

lump sum pursuant to Section 8(i) of the Act. The parties agree and stipulate that such sum shall

discharge the Employer's and Carrier's liability for any and all claims for compensation, which

Claimant may now have or which may at any time hereafter be asserted by the Employee, his heirs,

executors, or assigns, whether for total or partial, temporary or permanent disability, under the

Longshore and Harbor Workers' Compensation Act, as the result of any accident or illness arising

out of or in any way connected to the injury of April 2, 1998.

### X.

The parties also have agreed to settle the liability of the Employer and Carrier for future

medical benefits on the basis that the Employer and Carrier will not continue to provide medical care

and treatment and the medical will be CLOSED.

### X.

Medical benefits paid by the Carrier have been as follows:

| | |
|---|---|
| 1998 | $ 12,711.69 |
| 1999 | $ 12,731.00 |
| 2000 | $ 63,018.11 |
| 2001 | $ 14,237.61 |
| 2002 | $    198.00 |

In his report of July 26, 2001, Dr. Esses did not schedule a follow-up appointment for the Employee

until one year and Mr. Escobedo has not returned to Dr. Esses since this time.

XI.

The Employee's attorney is entitled to receive an attorney's fee under the provisions of Section 28 of the Act, such attorney's fee to be paid by the Employer and Carrier in addition to the compensation payable to the Employee. The Employer and Carrier have agreed to pay an attorney's fee to the Employee's attorney in an amount not to exceed $15,000.00.

XII.

This settlement has been explained in detail to the Employee by his attorney. The Employee understands that this is a full and final settlement of his claim for compensation and medical benefits pursuant to the Longshore and Harbor Workers' Compensation Act for his injury of April 2, and he further understands that he does not have to make this settlement, that he is not being forced to make this settlement in any way, and that he could continue to pursue his claim for compensation and medical benefits except for his decision to make this settlement. In view of the disputed issues presented by this claim, the nature and extent of the Employee's present disability, if any, and whether the Employee's current complaints are causally related to the incident of April 2, 1998, the present settlement is considered adequate by the parties, and approval is hereby requested.

**UPON THE FOREGOING STIPULATED FACTS**, the parties hereto waive a formal hearing and consent to the issuance of a formal compensation order based hereon.

**APPROVED AND STIPULATED** this ___26___ day of February, 2002.

By _____

JUAN CARLOS ESCOBEDO, Claimant

By _____

JACK G. CAΓINHAS,
Attorney for Employee

-9-

APPROVED AND STIPULATED this _____ day of February, 2002.

By 
    _____
    KEITH N. UHLES
    Of Royston, Rayzor, Vickery & Williams, L.L.P.,
    Attorneys for Employer and Carrier

THE STATE OF TEXAS            §
COUNTY OF CAMERON             §

      BEFORE ME, the undersigned authority, on this day personally appeared JUAN CARLOS ESCOBEDO, known to me to be the person who executed his name to the foregoing agreement, and after being duly sworn, on oath, stated that he has read the foregoing agreement and understands the effect thereof to be a full and final discharge and release of his claim arising out of the injury of April 2, 1998, and that he has executed this agreement as his free and voluntary act without any persuasion, promise, force, duress or representation of any kind except as stated in said agreement.

      SWORN TO AND SUBSCRIBED BEFORE ME by Juan Carlos Escobedo, Claimant, this **26 th** day of February, 2002, to certify which witness my hand and seal of office.

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2005

_Patricia M. Rivera_
Notary Public, State of Texas
My Commission Expires: _10/23/2005_

## TRANSLATOR'S CERTIFICATE

      I, _PATRICIA M. RIVERA_, being fluent in both English and Spanish, do hereby certify that I have read the foregoing AGREED STIPULATION, including the Notary's Certificate, to Juan Carlos Escobedo, the Claimant-Employee, in both English and Spanish, faithfully rendering the English text into idiomatic and grammatical Spanish verbatim, and he has confirmed to me that he has understood each and every word, phrase and number in the AGREED STIPULATION.

_Patricia M. Rivera_
Translator
_PATRICIA M. RIVERA_ (Printed Name)

45430:986434.2:022202

## ORDER APPROVING
## LUMP SUM SETTLEMENT

The undersigned District Director pursuant to the provisions of Section 8(i) of the Longshore and Harbor Workers' Compensation Act, having considered the foregoing settlement and the contents of the administrative file in this case, finds and determines the following:

1.    That the agreed settlement is adequate and was not procured by duress;

2.    That the agreed settlement should be and is hereby approved.

Upon such findings and determinations, the undersigned District Director **ORDERS**:

1.    That the Employer and Carrier having previously paid Compensation benefits through March 5, 2002 totaling $47,365.23, shall pay additional compensation in the amount of $84,00.00 to the Employee in a lump sum, which will discharge the liability of the Employer and Carrier for all past and future payments of compensation and this file will be CLOSED.

2.    The Employer and Carrier shall not be liable for any additional medical expenses pursuant to Section 7 of the Act.

3.    An attorney's fee in the amount of $ 15,000.00

is hereby approved in favor of Jack G. Carinhas, attorney, for services rendered on behalf of the Employee, such sum to be a lien upon and paid out of this award. Such sum to be paid by the Employer and Carrier pursuant to Section 28 of the Act in addition to the compensation payable to the Employee.

GIVEN UNDER MY HAND at Houston, Texas, on this 15th day of ___March___.

2002.

District Director
United States Department of Labor
Eighth Compensation District

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing Compensation Order was sent to the parties herein, as follows:

**BY CERTIFIED MAIL:**

Juan Carlos Escobedo                     5122 Amatista
Employee                                 Brownsville, Texas 78521

A. D. Welding                            P. O. Box 6086
Employer                                 Brownsville, Texas 78523

Reliance National Insurance Co.          c/o F.A. Richard & Associates
Carrier                                  P. O. Box 3107
                                         Brownsville, Texas 78523-3107

**BY REGULAR MAIL:**

Jack G. Carinhas                         302 Kings Highway, Suite 109
                                         Brownsville, Texas 78521

Keith N. Uhles                           Royston, Rayzor, Vickery & Williams, L.L.P.
                                         P. O. Box 3509
                                         Brownsville, Texas 78523-3509

Troy Milburn                             Texas Property & Casualty Insurance Guaranty
                                         Association
                                         9120 Burnet Road
                                         Austin, Texas 78758

MAILED:    3/15/02    mb

District Director

If any compensation, payable under the terms of an award, is not paid within ten (10) days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ESCOBEDO,              ) (
          Plaintiff        ) (
                           ) (
VS.                        ) ( CIVIL ACTION NO. B-02-172
                           ) (
STEPHEN ESSES, M.D.,       ) (
F.A. RICHARD & ASSOCIATES, ) (
INC. AND JANE ROSAMOND,    ) (
          Defendants       ) (

---

ORAL DEPOSITION OF
JUAN ESCOBEDO
JUNE 6, 2003



---

        ORAL DEPOSITION OF JUAN ESCOBEDO, produced as a

witness at the instance of the DEFENDANT STEPHEN ESSES,

M.D., taken in the above-styled and numbered cause on

JUNE 6, 2003, reported by RHONDA A. MARTIN, Certified

Court Reporter No. 4297, in and for the State of Texas,

at the offices of Michael R. Cowen, P.C., 520 East

Levee Street, Brownsville, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020
(800)462-0253 (STATEWIDE)

## APPEARANCES

COUNSEL FOR PLAINTIFF:

     CONRAD A. BODDEN
     MICHAEL R. COWEN
     MICHAEL R. COWEN, P.C.
     520 East Levee Street
     Brownsville, Texas 78520

COUNSEL FOR DEFENDANT STEPHEN ESSES, M.D.:

     MARY K. (KATHY) STRAHAN
     ANDREWS & KURTH, L.L.P.
     600 Travis, Suite 4200
     Houston, Texas 77002

COUNSEL FOR DEFENDANTS F.A. RICHARD & ASSOCIATES,
INC. and JANE ROSAMOND:

     VAUGHAN E. WATERS
     THORNTON, SUMMERS, BIECHLIN, DUNHAM & BROWN
     1000 Bank of America
     500 North Shoreline Boulevard
     Corpus Christi, Texas 78471-1010

ALSO PRESENT:

     Adela Garcia-Moreno, Interpreter

# INDEX

| | PAGE |
|---|---|
| Appearances ..................................... | 2 |

JUAN ESCOBEDO
| | |
|---|---|
| Examination by Ms. Strahan ..................... | 4 |
| Examination by Mr. Waters ...................... | 137 |
| Examination by Ms. Strahan ..................... | 168 |

| | |
|---|---|
| Errata Sheet/Signature Page .................... | 174 |

| | |
|---|---|
| Reporter's Certificate ......................... | 175 |

Attached to the end of the transcript:  Stipulations

# EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| A | Addendum to Disclosure and Consent, Medical and Surgical Procedures ......... | 76 |
| B | Letter to Mr. Gleasman from Juan Escobedo, Jack Carinhas, and Keith N. Uhles, dated 8-22-00 ................... | 155 |
| C | Findings of Fact ....................... | 156 |
| D | Agreed Stipulation and Compensation Order Pursuant to Section 8(i) of the Longshore and Harbor Workers' Compensation Act .... | 159 |

## REQUESTED DOCUMENTS/INFORMATION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Copy of 1997 income tax return ......... | 24 |

1                          JUAN ESCOBEDO,

2    having been duly sworn, testified through the duly

3    sworn interpreter, as follows:

4                          EXAMINATION

11:03:29  5    BY MS. STRAHAN:

11:03:30  6         Q.   Good morning, Mr. Escobedo.  My name is

11:03:34  7    Katherine Strahan, and I represent Stephen Esses, M.D.,

11:03:39  8    who is a defendant in a lawsuit that you brought

11:03:42  9    against him and a couple of other defendants.

11:03:45 10         A.   Okay.

11:03:45 11         Q.   We have an interpreter here today who is going

11:03:54 12    to translate my questions to you into Spanish and your

11:03:57 13    answers into English.

11:04:00 14         A.   Okay.

11:04:02 15         Q.   And if I have a long question, I will break it

11:04:06 16    down and pause to allow for the interpreter to

11:04:15 17    interpret that question to you.

11:04:18 18         A.   Okay.

11:04:19 19         Q.   And so if you have a long answer, I would

11:04:24 20    appreciate it if you would, likewise, pause and allow

11:04:29 21    the interpreter to interpret that portion of the

11:04:35 22    sentence to me.

11:04:37 23         A.   Okay.

11:04:40 24         Q.   Mr. Escobedo, have you ever been deposed

11:04:44 25    before?

13:49:59  1      A.  Yes.

13:50:01  2      Q.  In November of 1999, you were directed to

13:50:08  3  present to Dr. Stephen Esses for an independent medical

13:50:16  4  examination by the Department of Labor, correct?

13:50:22  5      A.  Yes.

13:50:23  6      Q.  You had never spoken with Dr. Esses prior to

13:50:26  7  the examination that he performed on you in November

13:50:31  8  of '99, correct?

13:50:31  9      A.  No.

13:50:33 10      Q.  And Dr. Esses' examination was requested by the

13:50:38 11  Department of Labor, correct?

13:50:39 12      A.  Yes.

13:50:41 13      Q.  Dr. Pisharodi did not refer you to Dr. Esses,

         14  correct?

13:50:46 15      A.  No.

13:50:50 16      Q.  Is it correct to say that Dr. Pasharodi did not

13:50:53 17  refer you to Dr. Esses?

13:51:03 18      A.  I'm sorry.  I did not understand your question.

13:51:05 19      Q.  Let me rephrase it.  Dr. Pisharodi did not

13:51:08 20  refer you to Dr. Esses, did he?

13:51:13 21      A.  No.  I was sent by Mr. Carinhas and Jane

13:51:25 22  Rosamond.  They told me that it was on behalf of the

13:51:28 23  commission.

13:51:30 24          MS. STRAHAN:  Objection to the

13:51:31 25  nonresponsive portion of the answer.

14:23:13 1    concerning the course of treatment for surgery and Dr.

14:23:21 2    Esses' recommendations in 1999?

14:23:27 3        A.  An appointment?

14:23:30 4        Q.  A conference.

14:23:33 5        A.  I did not know.  I never knew that.

14:23:43 6        Q.  After Dr. Esses' recommendation, after your

14:23:51 7    visit on November 22nd, 1999, you agreed in the

14:24:03 8    Department of Labor proceedings to undergo the simple

14:24:06 9    one-level discectomy recommended by Dr. Esses, correct?

14:24:17 10       A.  Was it in December?

14:24:23 11       Q.  My question is that after you saw Dr. Esses on

14:24:29 12   November 22nd, 1999, and he recorded his recommendation

14:24:31 13   to the Department of Labor, you agreed to the simple

14:24:36 14   one-level discectomy recommended by Dr. Esses, correct?

14:24:43 15       A.  Yes, I accepted that operation, the discectomy,

16   yes.

14:25:00 17       Q.  And Dr. Pisharodi performed an operation on you

14:25:06 18   on December 23rd, 1999, correct?

14:25:08 19       A.  Yes.

14:25:08 20       Q.  What did he tell you about that operation

14:25:11 21   afterwards?  What did Dr. Pisharodi tell you?

14:25:21 22       A.  What did he tell me?  That there were no

14:25:28 23   possibilities for me to end up well, that he never

14:25:33 24   agreed with the discectomy.  But when he saw that I

14:25:36 25   couldn't stand the pain and when he saw that I accepted

17:39:52  1    Mr. Escobedo, whether Dr. Esses did or did not insert

17:39:58  2    bone into the fusion?

17:39:59  3         A.   He did not insert bone.

17:40:01  4         Q.   Of your own personal knowledge, Mr. Escobedo,

17:40:06  5    do you know whether Dr. Esses did anything erroneously

17:40:09  6    or incorrectly in his surgery?

17:40:11  7                   MR. COWEN:  Objection, form.

17:40:12  8                   MS. STRAHAN:  Objection, form.

17:40:13  9         A.   No, I do not know.

17:40:24 10         Q.   Okay.  Let me show you some documents, Mr.

17:40:27 11    Escobedo, that have been marked as Exhibits B, C, and

17:40:32 12    D.  First of all, I'll show you what's been marked as

17:40:35 13    Exhibit B and ask you if you recognize that document.

17:40:58 14         A.   What is this document?

17:40:59 15         Q.   Do you recognize that?

17:41:05 16         A.   I don't know if this is from the director of --

17:41:09 17    the one that said for Dr. Esses to do the surgery, the

17:41:12 18    commission, the director of the commission from

17:41:14 19    Houston, something like that.  If you agree, the doctor

17:41:21 20    said to sign that the commission was putting him to do

17:41:23 21    the surgery.

17:41:24 22         Q.   Okay.  Do you agree that that is your

17:41:26 23    signature --

17:41:26 24         A.   Something like that.

17:41:27 25         Q.   -- that appears on the final page of that

17:41:29  1    document?

17:41:34  2        A.   This, yes.

17:41:36  3        Q.   Okay.  Do you recall where you were when you

17:41:41  4    signed that document?

17:41:44  5        A.   I'm not sure if it was at Dr. Esses' office --

17:41:48  6    no, at the office -- at the office where they treat

17:41:54  7    you.  I don't remember.

17:41:55  8        Q.   Okay.  But that is your signature on the

17:41:57  9    document?

17:42:00 10        A.   Yes.  Maybe it was at Mr. Carinhas' office.  I

17:42:05 11    don't remember.

17:42:23 12        Q.   Okay.  Let me show you what's been marked as

17:42:26 13    Exhibit C and ask if you can remember ever seeing that

17:42:30 14    document or having that document explained to you.

17:42:38 15        A.   If someone explained this document?

17:42:41 16        Q.   Yes.

17:42:50 17        A.   I think this was explained.  I don't remember

17:43:00 18    who explained it, but -- what does the document say?

17:43:07 19        Q.   Let me read a portion of this to you, and see

17:43:13 20    if this helps you recall.  Now, this is a document that

17:43:17 21    is signed by Mr. Chris John Gleasman, who is with the

17:43:27 22    Department of Labor.  Does that name sound familiar?

17:43:31 23        A.   Yes.  Yes.  I think it was at Mr. Carinhas'

17:43:34 24    office.

17:43:36 25        Q.   Okay.  Let me read you the final two paragraphs

17:43:40 1  of this document.  Okay?  And this is entitled "Order,"

17:43:47 2  Mr. Gleasman's order.  "Based upon a thorough review of

17:43:51 3  the administrative file, the medical reports, and

17:43:57 4  discussion with the Employee and his representative" --

17:44:02 5  and your representative was Mr. Carinhas at that time,

6  right?

17:44:06 7      A.   (Moving head up and down.)

17:44:09 8      Q.   -- "at an informal conference, I am persuaded

17:44:14 9  by the opinion of Stephen Esses.  I find that

17:44:18 10 reasonable and necessary treatment of the Employee

17:44:24 11 should have been limited to a right-sided discectomy at

17:44:34 12 L5-S1, as recommended by Dr. Esses in his November

17:44:48 13 22nd, 1999 report."

17:44:50 14     A.   Yes.

17:44:51 15     Q.   "As is clear from Dr. Esses' report, performing

17:44:54 16 surgery limited to the simpler one-level procedure was

17:44:59 17 reasonable and necessary, based on the total clinical

17:45:06 18 picture, and such surgery would not in any way preclude

17:45:11 19 the performance of a more complex procedure, if

17:45:17 20 necessary.  Even as Dr. Pisharodi admitted in his

17:45:27 21 December 21st, 1999 report, 'there is always the

17:45:38 22 possibility that the patient may do well with the

17:45:41 23 simple discectomy.'

17:45:44 24         "Having found that Dr. Pisharodi furnished

17:45:49 25 treatment that was not reasonable and necessary, I

17:45:57 1    hereby find that a change of treating physicians is

17:46:01 2    desirable or necessary pursuant to Section 7(b) of the

17:46:06 3    Act."  And he's referring to the Longshore and Harbor

17:46:13 4    Workers' Compensation Act.

17:46:15 5        A.   Yes.

17:46:15 6        Q.   "Effective this date, I hereby designate Dr.

17:46:21 7    Stephen Esses as the Employee's treating physician."

17:46:30 8    And this is signed by Mr. Gleasman on September 1st,

17:46:33 9    2000.

17:46:36 10       A.   Yes, I do remember.

17:46:37 11       Q.   Okay.  You remember someone explaining this

17:46:40 12   generally to you?

17:46:41 13       A.   Yes.  Yes.

17:46:42 14       Q.   So you would agree that Mr. Gleasman, on behalf

17:46:47 15   of the Department of Labor, changed your treating

17:46:51 16   physician to Dr. Esses, right?

17:46:53 17            MR. COWEN:   Objection, form.

17:46:58 18       A.   Yes.  I did know about that.  I never agreed.

17:47:07 19       Q.   But you agree that Mr. Gleasman was the one who

17:47:10 20   signed the order changing your physician to Dr. Esses?

17:47:15 21       A.   Yes.  Yes.

17:47:16 22       Q.   Even if you did not want him to do that?

17:47:18 23       A.   Yes.  Yes.

17:47:19 24       Q.   Okay.  Mr. Gleasman does not work for F.A.

17:47:23 25   Richard, correct?

17:47:25  1        A.   No.   Yes.   Correct.

17:47:27  2        Q.   He is a government employee?

17:47:29  3        A.   Yes.   Yes.

17:47:30  4        Q.   Okay.   Let me show you what's been marked now

17:47:34  5   as Exhibit D and ask if you recognize this.

17:47:47  6        A.   Yes.

17:47:48  7        Q.   Do you recognize what that document is?

17:47:56  8        A.   This is -- this is a summary of all the medical

17:48:04  9   history of the opinions that were given to me.

17:48:07 10        Q.   Does that also include the settlement of your

17:48:11 11   claim against the employer?

17:48:16 12        A.   Yes.   Yes.

17:48:23 13        Q.   Okay.   Do you recognize your signature on that

17:48:27 14   document?

17:48:32 15        A.   I'm going to look for it.

17:48:34 16        Q.   Take a moment to look through it if you want.

17:48:36 17        A.   Yes, it's here.   Yes.

17:48:38 18        Q.   Okay.   And you signed it?

         19        A.   Yes.

17:48:45 20        Q.   Okay.   Now, there is also on this document

17:48:48 21   Exhibit D, Mr. Escobedo, a translator's certificate,

17:48:57 22   and I'll read you the certificate signed by Ms.

17:49:02 23   Patricia Rivera.

17:49:02 24             MR. COWEN:   We'll stipulate that's the

17:49:04 25   document that was translated to him, if that will help.

17:49:09  1            MR. WATERS:  That's fine, as long as we

17:49:12  2   have the stipulation that this document was translated

17:49:14  3   to him and explained to him.

17:49:17  4            MR. COWEN:  Yes.

17:49:20  5      Q.  Let me read to you briefly from page 5 of this

17:49:28  6   document.  This is part of the stipulation that you had

17:49:31  7   agreed to here.  "Employee has now been released from

17:49:36  8   further medical care for the effects of this injury

17:49:45  9   with instructions to return to work with minimal work

17:49:51 10   restrictions regarding his low back.  The Employee is

17:49:55 11   now prepared to return to work with some restrictions

17:50:03 12   as set forth by Dr. Esses.  The Employee acknowledges

17:50:08 13   and stipulates and agrees that he is able to work eight

17:50:14 14   hours per day, five days per week, and that he has an

17:50:20 15   earning capacity of $6.25 per hour.  His plan is to

17:50:28 16   earn this amount or more through work in a business

17:50:39 17   with his wife or on the open job market."

17:50:45 18            Now, that is what was explained to you and

17:50:47 19   what you signed?

17:50:48 20            MR. COWEN:  Objection, form.

17:50:49 21      Q.  Is that what you signed?

17:50:52 22      A.  Yes.  I'm remembering.

17:50:54 23      Q.  Now, you testified earlier, I believe, that the

17:50:59 24   highest regular rate of pay that you recall earning

17:51:05 25   prior to the April 1998 accident was $7.75 per hour; is

# ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
### ATTORNEYS AT LAW

HOUSTON, TEXAS
  TELEPHONE 713-224-8380
  FACSIMILE 713-225-9945

GALVESTON, TEXAS
  TELEPHONE 409-763-1623
  FACSIMILE 409-763-3853

CORPUS CHRISTI
  TELEPHONE 361-884-8808
  FACSIMILE 361-884-7261

55 COVE CIRCLE
BROWNSVILLE, TEXAS 78521
TELEPHONE 956-542-4377
FACSIMILE 956-542-4370
INTERNET-royston@roystonlaw.com

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P.
SAN ANTONIO, TEXAS
  TELEPHONE 210-228-0655
  FACSIMILE 210-228-0839

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P. . . .
LUBBOCK, TEXAS
  TELEPHONE 806-763-9252
  FACSIMILE 806-763-8254
  (BY APPOINTMENT ONLY)

*Keith N. Uhles*
keith.uhles@roystonlaw.com

August 22, 2000

*VIA FACSIMILE (713) 943-1827*

Mr. Chris Gleasman
District Director
U.S. Department of Labor
Office of Workers' Compensation Programs
8866 Gulf Freeway, Suite 140
Houston, Texas 77017-6528

Escobedo
EXHIBIT NO. B
Bryant & Stingley, Inc.

|        | RE.  | OWCP No. | : 08-114563     |
|--------|------|----------|-----------------|
|        |      | Claimant | : Juan Escobedo |
|        |      | Employer | : A.D. Welding  |
|        |      | D/Injury | : 04/02/98      |

Dear Mr. Gleasman:

After the meeting was held on August 18, 2000 to follow up on the prior Informal Conference with you on this matter, a second meeting was held on August 22, 2000. We are pleased to report the parties have now reached an agreement as follows:

1.  Mr. Escobedo will not object to or appeal an order from the District Director changing treating physicians from Dr. Madhavan Pisharodi to Dr. Steven Esses.

2.  The employer/carrier will authorize the surgery by Dr. Esses described in his July 2000 report.

08/05/2003 14:16 FAX 95    24370          ROYSTON, RAYZOR -                                    @043
08/23/00  WED 08:21 FAX 956 54   370        R R V & W                                    @005

Mr. Chris Gleasman                                                                                   Page 2
District Director
August 22, 2000

3.    The employer/carrier will pay the cost of round trip airplane tickets for M r.
      Escobedo, his wife, and two children from Brownsville to Houston. The departure
      date will be the day before the scheduled surgery and the return date will be the day
      after the scheduled initial post-surgical follow-up with Dr. Esses, which is typically
      14 days after surgery. If the return date needs to be extended, Mr. Escobedo or his
      wife will promptly advise Mr. Carinhas who will, in turn promptly advise the
      employer/carrier.

4.    The surgery with Dr. Esses will be scheduled to allow the employer/carrier to
      purchase 14 day advanced round trip tickets from Continental Airlines for Mr.
      Escobedo and his family.

5.    The employer/carrier will advance to Mr. Escobedo $100.00 by providing a check
      payable to Jack Carinhas for ground transportation to and from Intercontinental
      Airport in Houston to Mr. Escobedo's hotel.

6.    The employer/carrier will provide a room for Mr. Escobedo and his family at the
      Econo-Lodge Medical Center located at 7905 S. Main Street in Houston, Texas
      during the time necessary for Mr. Escobedo to stay in Houston. This hotel has a free
      shuttle to and from the Medical Center.

7.    The employer/carrier will advance to Mr. Escobedo a per diem for meals for him and
      his family of $85.00 per day for the days Mr. Escobedo is anticipated to be in
      Houston by providing a check payable to attorney, Jack Carinhas.

8.    Additionally, the employer/carrier will advance an additional $150.00 to Mr.
      Escobedo for miscellaneous transportation and laundry in Houston by providing a
      check payable to Jack Carinhas.

9.    For post-surgical care by an orthopedic surgeon for Mr. Escobedo in Brownsville, the
      parties will ask Dr. Esses to refer Mr. Escobedo to either Dr. Achleitner or Dr.
      Sweeney. If Dr. Esses will not make this choice, the parties agree to Dr. Achleitner.
      Dr Esses, however, will remain the primary treating physician and will see Mr.
      Escobedo for follow-up appointments per Dr. Esses' instructions.   The
      employer/carrier will pay for medications prescribed by both Dr. Esses and the local
      orthopedic surgeon.

06/05/2003 14:17 FAX 9⁵   124370     ROYSTON, RAYZOR - ⅃.                    ☒044
08/23/00  WED 08:22 FAX ⱴ56 54⌐ 4370     R R V & W                          ☒006

Mr. Chris Gleasman                                                        Page 3
District Director
August 22, 2000

10.   Mr. Escobedo's post-surgical physical therapy will be conducted at Brownsville
      Physical Therapy under the supervision of Dr. Esses.

11.   Employer/carrier will provide transportation expense pursuant to the Act from
      Brownsville to Houston for follow up appointments with Dr. Esses. If Mr. Escobedo
      is in need of physical assistance to travel, the employer/carrier will also pay
      transportation cost for Mrs. Escobedo.

12.   The employer/carrier will continue to fulfill its obligation to make compensation
      payments to the extent required by the LHWCA.

      Yours very truly,


      Juan Escobedo, Claimant


      Jack Carinhas, Attorney for Claimant


      Keith N. Uhles, Attorney for Employer/Carrier


45430:923923.1:082200

UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
LONGSHORE AND HARBOR WORKERS COMPENSATION
EIGHTH COMPENSATION DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
In the matter of the claim                      \*
for compensation under the                      \*
Longshore and Harbor Workers                    \*
Compensation Act                                \*         ORDER TO CHANGE
                                                \*         TREATING PHYSICIANS
JUAN ESCOBEDO                                   \*
Employee                                        \*
        v                                       \*
                                                \*         CASE NUMBER 08-114563
A.D. WELDING                                    \*
Employer                                        \*
        and                                     \*
                                                \*
RELIANCE INSURANCE  COMPANY c/o                 \*
CRAWFORD & COMPANY                              \*
Insurance Carrier                               \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        Pursuant to section 7(b) of the Longshore Act (33 USC 907(b)), the Secretary, through her designee, the District Director, "shall actively supervise the medical care rendered to injured employees, shall require periodic reports as to the medical care rendered to injured employees, shall have authority to determine the necessity, character, and sufficiency of any medical aid furnished or to be furnished, and may, on his own initiative or at the request of the employer, order a change of physicians or hospitals when in his judgment such change is desirable or necessary in the interest of the employee...". In accordance with section 7(b) of the Act, after a careful review of the administrative file, and discussion of the parties respective positions at an informal conference, the District Director makes the following:

### FINDINGS OF FACT

        1.  On April 2, 1998, Juan Carlos Escobedo, (the Employee), was in the employ of A.D. Welding (Employer), when he injured his lower back, right leg, and right foot while picking up and carrying welding equipment during the course and scope of his employment. On the day this injury took place the Employer was insured for liability under the Longshore Act by Reliance Insurance Company (c/o Crawford & Co., adjusters).



Escobedo v A.D. Welding
Page 2

2.  The Employee began losing time from work on May 6, 1998 and the Employer voluntarily initiated compensation for temporary total disability effective that date.

3.  On October 2, 1998, the Employee filed form LS-203 (Employee's Claim for Compensation) in the Houston District Office, listing Jesus Caquias, M.D., and Ricardo Adobbati, M.D., as his treating physicians.  The Employer authorized the Employee's choice of physicians to furnish medical treatment in accordance with the provisions of the Act.

4.  Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the gluteal area, but not down to the leg.  A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain.  Dr. Addobati advised the Employee to discontinue working and ordered an MRI scan to determine if the Employee had sustained a ruptured disc.  In his May 19, 1998, report Dr. Addobati explained that the MRI scans were normal with no evidence of a ruptured disc.  The Employee was advised to remain off work and additional conservative care was recommended.

5.  On July 1, 1998, Dr. Adobbati examined the Employee, noting that he was not progressing as quickly as expected.   A neurosurgical consultation was therefore recommended.

6.  The Employee was subsequently referred for a consultation by Madhavan Pisharodi, M.D., a Neurosurgeon.  According to the June 29, 1999, report from Dr. Pisharodi, he first examined the Employee in July of 1998.  It is noted that this first report of examination was furnished to the Employer almost one year after the date of the Employee's first examination, in violation of the reporting requirements of 7(d)(2) of the Act.  Dr. Pisharodi's report notes the negative MRI's, but relies on discograms he interprets as "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing.  An L4-5 and L5-S1 discectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disc syndrome.

7.  On November 5, 1998, the Employee was examined by H. Pacheco-Serrant, M.D., a Neurosurgeon.  In his report dated November 5, 1998, Dr. Pacheco-Serrant notes Dr. Pisharodi's recommendation for surgery but finds that in the absence of a herniated disc or instability that the recommended surgery is not warranted.  The Employee was referred back to his primary physician for pain management.

Escobedo v A.D. Welding
Page 3

8. In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available diagnostic studies, including the discograms, fails to adequately explain the source of the Employee's pain. Dr. Adobbati recommends that the Employee refrain from undergoing the recommended surgery until another opinion is obtained.

9. On May 12, 1999, the Employee was examined by Eric Six, M.D., a Neurosurgeon. Dr. Six states in his report that, in light of the positive discogram, the Employee may represent a rare instance where a lumbar fusion would be of benefit. However, Dr. Six states that the procedure should be done at a major institution of higher learning.

10. On August 4, 1999, the Employee was examined by Martin Barrash, M.D., a Neurosurgeon selected by the Employer, who states in his report that the overall clinical and diagnostic picture is, in his opinion, insufficient to justify multi-level disc excision and fusion with instrumentation. In view of the diagnostic studies (including a possible right-sided disc rupture at L5-S1 on the MRI scans) and the Employee's continuing complaints of pain, Dr. Barrash recommends that surgery be limited to a right-sided discectomy at L5-S1. Dr. Barrash further recommends that the Employee be reassessed after this minimal surgery is performed to determine if additional treatment is warranted.

11. In his report dated August 11, 1999, Dr. Pisharodi comments on Dr. Barrash's report, reaffirming his original opinion that the Employee requires multi-level disc excision and fusion with instrumentation. Dr. Pisharodi states in this report that a one-level discectomy is not likely to adequately address the Employee's' condition. In his September 7, 1999 letter to Jack Carinhas, Esq., the Employee's authorized representative, Dr. Pisharodi again reaffirms his original treatment recommendations.

12. On November 22, 1999, the Employee was examined at the direction of the U.S. Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of Neurosurgery at the Baylor College of Medicine. After a thorough examination of the patient and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed with a two-level disc excision and fusion with instrumentation. Dr. Esses states that reasonable treatment would consist of a simple discectomy at L5-S1 on the right. The advantage of this approach is clearly explained by Dr. Esses report, as he anticipates that the Employee would benefit greatly from a simple one-level discectomy. However, Dr. Esses also points out that the more limited surgery does not preclude a more ambitious surgical approach (including fusion) in the future, if necessary.

13. Dr. Esses' examination was requested by the Department of Labor in anticipation of an informal conference, which was scheduled via form LS-141 (Notice of Informal Conference) dated December 3, 1999. This conference was scheduled solely

Escobedo v A.D. Welding
Page 4

to address the issue of medical treatment and Dr. Esses' recommendations. After receipt of the Notice of Conference and upon review of Dr. Esses' report, the parties agreed to proceed with the simple one-level discectomy recommended by the Department of Labor's choice of physicians. This agreement is set forth in the December 21, 1999 letter to Mr. Carinhas from Keith Uhles, Esq., the Employer's representative.

14.    In his report dated November 29, 1999, Dr. Pisharodi notes the additional opinion in favor of a one-level discectomy and again states his recommendation to proceed with multi-level disc excision and fusion with instrumentation.

15.    The Employee was seen by Dr. Pisharodi for a follow-up evaluation on December 20, 1999. In his report of December 21, 1999, Dr. Pisharodi notes the Employee's decision to proceed with the one-level discectomy recommended by Dr. Esses and Dr. Barrash:

> "At the present time, the patient states his pain seems progressively worse. He is thinking about having the simple surgery instead of waiting to get the two-level laminectomy, discectomy, fusion and instrumentation. He states his back pain and right leg pain are much more intense than his left leg pain. He is ready to have the surgery done as soon as possible. I have advised the patient there may be a possibility of a lumbar spine instability since the simple decompressive surgery may not address all his problems. The patient is aware of this and is willing to try the surgery... The patient is aware of the consequences and the possible need of a second surgery to fuse the area. There is always the possibility that the patient may do well with the simple diskectomy, but according to my experience and the pathology that Mr. Escobedo presents, it is quite likely that he will require a second surgery."

Based upon this report from Dr. Pisharodi the parties requested cancellation of the informal conference to discuss medical treatment, and the Employer authorized Dr. Pisharodi to proceed with the one-level disc excision recommended by Dr. Esses.

16.    The Employee was admitted to Valley Medical Center and on December 23, 1999 Dr. Pisharodi performed the following surgical procedures: L4-5 and L5-S1 partial laminectomy, L4-5 and L5-S1 facetectomy and foraminotomy on the right side; L4-5 and L5-S1 diskectomy on the right side; L4/L5/S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow-up reports on January 7, January, 28, February 17, March 3, and April 19, 2000, indicating a normal post-operative course without complications, a slight decrease in the Employee's reported back pain, and an increase in the Employee's leg pain.

Escobedo v A.D. Welding
Page 5

17.    On March 22, 2000, Dr. Barrash issued a report regarding the December 23, 1999 surgery, stating that the surgery performed was not the same procedure recommended by either Dr. Barrash or Dr. Esses. Dr. Barrash characterizes the treatment furnished as "unreasonable" and concludes that if further surgery is necessary, it is due to the performance of this unauthorized procedure. On June 9, 2000, the Employer filed a Notice of Controversion (LS-207) stating their objection to any further medical treatment by Dr. Pisharodi, based on Dr. Barrash's report.

18.    In an April 11, 2000, letter to Mr. Carinhas, and a May 25, 2000 letter to Claims Examiner Freddy Conley, Dr. Pisharodi states that surgery on two levels, instead of the one-level surgery recommended by Dr. Esses and Dr. Barrash, was medically necessary.    Dr. Pisharodi states that the Employee's failure to improve after the December 23, 1999 surgery is due exclusively to the fact that the correct procedure (multi-level disc excision and fusion with instrumentation) was not authorized.    Dr. Pisharodi also makes known his objections to the questions posed to Dr. Barrash by the Employer's representative.

19.    On May 8, 2000, Jose Kuri, M.D., a Neurosurgeon, issued a report stating that he assisted Dr. Pisharodi during the Employee's surgery. This report states Dr. Kuri's agreement with Dr. Pisharodi's original diagnosis and recommendations for treatment, and endorses the efficacy and appropriateness of Dr. Pisharodi's treatment, given the circumstances of the limited authorization.

20.    On May 30, and June 21, 2000, Dr. Pisharodi issued reports describing the Employee's symptoms and level of pain and recommending further surgery.

21.    On June 29, 2000, the Employee was examined by Dr. Esses at the request of the U.S. Department of Labor for the purpose of discussing the Employee's medical treatment at an informal conference. Dr. Esses states in his report of the same date that "it is my opinion that this man's clinical situation now is different that when I saw him on November 22, 1999. At that time I was of the opinion that it would be reasonable for him to undergo a decompression and discectomy without fusion in order to provide him with significant pain relief." Based on the change in the Employee's clinical picture Dr. Esses recommends further treatment, namely, a two-level laminectomy, discectomy and fusion with instrumentation.

22.    On August 8, 2000, Dr. Pisharodi issued a report to the District Director stating four reasons not to change medical management in this case. Dr. Pisharodi states that the Employee has been satisfied with his care for over two years, the Employee is capable of making a choice of physicians, Dr. Esses has never been his treating physician, and having surgery in Houston would result in additional and unnecessary expense.

Escobedo v A.D. Welding
Page 6

23.     On August 10, 2000, an informal conference was held by the District
Director by telephone to discuss Dr. Esses' treatment recommendations. The Employee,
his representative, and the Employer's representative participated in the conference call.
The Employer's representative reiterated their objection to the authorization of any
further medical treatment by Dr. Pisharodi and requested the Department of Labor issue
and order to change treating physicians. The Employee stated that he was comfortable
with Dr. Pisharodi continuing as treating physician, indicated his concern regarding travel
issues if a physician outside his area of residence was selected, and went on record as
opposing any change of treating doctors.

24.     On August 22, 2000, the parties submitted an agreement to the District
Director regarding additional travel arrangements to be furnished to the Employee by
Employer in the event that medical management is changed to a physician in the
Houston, Texas area. Said agreement is incorporated herein by reference.

## ORDER

Based upon a thorough review of the administrative file, the medical reports, and
discussion with the Employee and his representative at informal conference, I am
persuaded by the opinion of Stephen Esses, M.D. I find that reasonable and necessary
treatment of the Employee should have been limited to a right-sided discectomy at L5-S1
as recommended by Dr. Esses in his November 22, 1999 report. As is clear from Dr.
Esses report, performing surgery limited to the simpler one-level procedure was
reasonable and necessary, based on the total clinical picture, and such surgery would not
in any way preclude the performance of a more complex procedure, if necessary. Even
as Dr. Pisharodi admitted in his December 21, 1999 report, "there is always the
possibility that the patient may do well with the simple discectomy."

Having found that Dr. Pisharodi furnished treatment that was not reasonable and
necessary, I hereby find that a change of treating physicians is desirable or necessary
pursuant to section 7(b) of the Act (33 USC 907(b)). Effective this date I hereby
designate Stephen Esses, M.D., as the Employee's treating physician.

GIVEN UNDER MY HAND at Houston, Texas, this _____1_____ day of September, 2000.


CHRIS JOHN GLEASMAN
DISTRICT DIRECTOR
EIGHTH COMPENSATION DISTRICT

## CERTIFICATE OF FILING AND SERVICE

I certify that the foregoing Compensation Order was filed in the Office of the District Director, Eighth Compensation District, and a copy thereof was mailed on said date by certified mail to the parties and their representative at the last known address of each as follows:

Juan Escobedo
5122 Amatista
Brownsville, TX 78520


Reliance Insurance Company
% F. A. Richard & Associates
P. O. Box 3107
Brownsville, TX 78523-3107

A copy was also mailed by regular mail to the following:

Carinhas & Saldana, L.L.P.
Attorneys at Law
302 Kings Highway, Suite 109
Brownsville, TX 78521


Royston-Rayzor-Vickery & Williams
Attorneys at Law
P. O. Box 3509
Brownsville, TX 78520

CHRIS JOHN GLEASMAN
District Director
Eighth Compensation District
U S Department of Labor
ESA/OWCP/LHWCA

Mailed: 9/1/00  js

If any compensation, payable under the terms of an award, is not paid within ten days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.



UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
EIGHTH COMPENSATION DISTRICT

| | | |
|---|---|---|
| JUAN CARLOS ESCOBEDO, | § | OWCP NO. **8-114563** |
| Claimant-Employee | § | |
| | § | |
| VS. | § | |
| | § | AGREED STIPULATION AND |
| A. D. WELDING, | § | COMPENSATION ORDER PURSUANT |
| Employer | § | TO SECTION 8(i) OF THE LONGSHORE AND |
| | § | HARBOR WORKERS' COMPENSATION |
| | § | ACT [33 U.S.C. § 908(i)] |
| RELIANCE NATIONAL INSURANCE | § | |
| COMPANY, | § | |
| Carrier | § | |

NOW COME **Juan Escobedo**, hereinafter called Employee, **A. D. Welding** hereinafter called **Employer**, and **Reliance National Insurance Company**, hereinafter called Carrier, and stipulate and agree upon the following facts and, pursuant to the Longshore and Harbor Workers' Compensation Act, agree on the following basis to a settlement of the claim of the Employee for past and future compensation benefits, whether for total or partial, temporary or permanent disability.

I.

On April 2, 1998, the Employee was in the employ of the Employer, and the liability of the Employer for payment of worker's compensation benefits under the Longshore and Harbor Workers' Compensation Act was insured by the Carrier.

On April 2, 1998, Employee was employed by the Employer as a welder at the AMFELS shipyard in the Port of Brownsville Texas, and while engaged in his employment, he lifted equipment and when he turned to place the equipment, he injured his low back, right leg and foot, and his body generally.

Escobeda
EXHIBIT NO. 2
- Bryant & Stingley, Inc.

## II.

The Employee was originally seen by Brownsville general practitioner, Jesus Caquias, M.D., who referred him to Brownsville orthopedic surgeon, Ricardo Adobbati, M.D. Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the glutal area but not down to the leg. A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain. Dr. Adobbati advised the Employee to discontinue working and ordered an MRI to determine if the Employee had sustained a herniated disc. In his May 19, 1998 report, Dr. Adobbati explained that the MRI scans were normal with no evidence of a ruptured disc. The Employee was advised to remain off work and additional conservative care was recommended. On July 1, 1998, Dr. Adobbati examined the Employee noting that he was not progressing as quickly as expected and recommended a neurosurgical consultation. The Employee was subsequently referred to a consultation to Brownsville neurosurgeon, Madhavan Pisharodi, M.D. Dr. Pisharodi first examined the Employee in July 1998 but his first report was on June 29, 1999. Dr. Pisharodi's report notes the negative MRI but relies on discogram he interprets "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing. An L4/L5 and L5-S1 diskectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disk syndrome. On November 5, 1998, the Employee was examined by H. Pacheco-Serrat, M.D., a neurosurgeon. In his report dated November 5, 1998, Dr. Pacheco-Serrat notes Dr. Pisharodi's recommendations for surgery, but finds that in the absence of a herniated disk or

instability that the recommended surgery is not warranted. The Employee was referred back to his

primary physician for pain management.

In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available

diagnostic study, including the discograms, fails to adequately explain the source of the Employee's

pain. Dr. Adobbati recommends that the Employee refrain from undergoing the recommended

surgery until another option is obtained. On May 12, 1999, the Employee was examined Eric Six,

M.D., a Harlingen Texas neurosurgeon. Dr. Six concluded that in light of the positive discogram,

the Employee may represent a rare instance where a lumbar fusion would be of benefit. However,

Dr. Six recommends that the surgery should be done at a major institution of higher learning. On

August 4, 1999, the Employee was examined by Houston neurosurgeon, Martin Barrash, M.D., a

physician selected by the Employer, who states in his report that the overall clinical and diagnostic

picture is, in his opinion, insufficient to justify multi-level disk excision with fusion with

instrumentation. In view of the diagnostic studies, including a possible right-sided disc rupture at

L5-S1 on the MRI scans, the Employee's continuing complaints of pain, Dr. Barrash recommends

that the surgery be limited to a right-sided discectomy at L5-S1. Dr. Barrash further recommends

that the Employee be reassessed after this minimal surgery is performed to determine if additional

treatment is warranted.

In his report of August 11, 1999 and September 7, 1999, Dr. Pisharodi reaffirmed his original

surgical recommendation. On November 22, 1999, the Employee was examined at the direction of

the Unites States Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of

Neurosurgery at the Baylor College of Medicine in Houston, Texas. After a thorough examination

and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed

with a two-level disc excision and fusion with instrumentation. Dr. Esses recommended that a reasonable treatment would consist of simple discectomy at L5-S1 on the right side.

On December 23, 1999, the Employee was admitted to Valley Regional Medical Center in Brownsville, Texas for surgery. Dr. Pisharodi performed the following surgical procedure: L4/L5 and L5-S1 partial laminectomy, L4/L5 and L5-S1 facetectomy and foraminotomy on the right side; L4/L5 and L5-S1 discectomy on the right side; L4/L5, L5-S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow-up reports on January 7, January 28, February 17, March 3 and April 2000 indicating a normal post-operative course without complications, a slight decrease in the Employee's reported back pain and an increase in the Employee's leg pain. Dr. Pisharodi recommended additional low back surgery including a multi-level fusion with instrumentation.

On June 29, 2000, the Employee was examined by Dr. Esses at the request of the United States Department of Labor. Dr. Esses states in his report of the same date that, "It is my opinion that this man's clinical situation now is different then when I saw him on November 22, 1999. At that time, I was of the opinion that it would be reasonable for him to undergo a decompression and discectomy without fusion in order to provide him with significant pain relief." Based on the change in the Employee's clinical picture, Dr. Esses recommended further treatment: a two-level laminectomy, discectomy and fusion with instrumentation.

On September 18, 2000, Dr. Esses performed the recommended surgery on the Employee at St. Luke's Episcopal Hospital in Houston, Texas. After a normal hospital course, the Employee first saw Dr. Esses for a follow-up on November 2, 2000. At that time, the Employee's medical exam was normal and Dr. Esses stated, "He is doing extremely well following his surgery." The Employee saw Dr. Esses again on December 18, 2000 and Dr. Esses reported that the Employee

continued to show improvement and provided a prescription for physical therapy. The Employee

underwent physical therapy and continued with follow-up appointments with Dr. Esses. The

Employee last saw Dr. Esses on July 26, 2001. Dr. Esses reports that he could not find any hard

findings or deficits. Dr. Esses completed an OWCP 5 Form which indicates that the Claimant can

work an eight hour day, but is restricted from lifting greater than 20 lbs. and not bending, squatting,

climbing, kneeling, twisting or standing on a constant basis. The OWCP 5 also indicates that the

Claimant has reached maximum medical improvement.

Employee has now been released from further medical care for the effects of this injury with

instructions to return to work with minimal work restrictions regarding his low back. The Employee

is now prepared to return to work with some restrictions as set forth by Dr. Esses. The Employee

acknowledges and stipulates and agrees that he is able to work eight (8) hours per day, five (5) days

per week, and that he has an earning capacity of $6.25 per hour. His plan is to earn this amount or

more through work in a business with his wife or on the open job market.

### III.

The Employer furnished the Employee with medical services in accordance with the

provisions of Section 7 of the Act. Copies of reports from the Employee's treating and examining

physicians are attached hereto.

### IV.

The Employer did not receive written notice of the Employee's injury within thirty (30) days

of the injury, but the Employer had knowledge of the injury and has not been prejudiced by lack of

such written notice.

06/05/2003 14:11 FAX 956  ¦4370       ROYSTON, RAYZOR -                        ☑007

V.

The average weekly earnings of the Employee at the time of the injury of April 2, 1998 were

$353.90.

VI.

As a result of this injury, Employee was temporarily and totally disabled from May 6, 1998

until July 26, 2001, inclusive, entitling him to compensation at a rate of $235.95 per week for 168

weeks totaling $39,639.60. The Employee's permanent partial disability began on July 27, 2001 and

continues, entitling him to compensation at the rate of $69.27 per week. The Employer/Carrier have

continued to pay the Employee at the rate of $235.95 and have agreed to continue said payments

through March 5, 2002. Through March 5, 2002, the Employee will have been paid a total of

$47,356.23. This has resulted in an overpayment by the Employer/Carrier , which overpayment is

waived by the Employer and Carrier. The Employee acknowledges receipt of weekly compensation

benefits at the rate of $235.95 from May 6, 1998 to present, as a result of the injury of April 2, 1998.

VII.

The Employee has now reached maximum medical improvement and has been released to

return to work with minimal work restrictions regarding his low back. The Employee is 27 years of

age (Date of Birth: September 14, 1974) and his education and employment background consists

of a high school education in Mexico and employment as a dishwasher, waiter and welder. A

controversy exists as to the nature and extent of disability and whether there is any medical

connection between the injury of April 2, 1998, as described by the Employee, and his present

physical condition and complaints. The Employer and Carrier deny both the nature and extent of

disability as claimed by the Employee and that such are the result of the incident of April 2, 1998, as claimed.

The parties agree that the liability of the Employer and Carrier is uncertain as to the nature and extent of Employee's present disability, if any, resulting from the injury of April 2, 1998, and as to whether the Employee's present physical condition and complaints are medically related to the injury of April 2, 1998. However, solely for the purposes of this application for a disposition of this claim under Section 8(i) of the Act, the parties have negotiated and compromised their differences and agreed upon a disposition of this claim.

VIII.

The Employee, Employer and Carrier recognize that the outcome of any formal litigation is extremely speculative and that to require a formal hearing of this claim could possibly work to the detriment of the Employee. The Employee does not wish to pursue his claim to a formal hearing because of the contested nature of his claim and the dispute over the nature and extent of his present disability, if any, and the dispute as to whether any or all of the Employee's present complaints are in any way causally related to the accident of April 2, 1998. Therefore, whether or not the Employee has any disability resulting from the accident of April 2, 1998, the Employee wishes to compromise and settle any claim for further disability, be it temporary or permanent, for a lump sum payment of EIGHTY-FOUR THOUSAND AND NO/100 DOLLARS ($84,000.00) and the Employee requests approval of the proposed settlement.

IX.

The Employee acknowledges that he has some degree of possible limitation of motion in his low back and that he has had two operations on his low back. Nevertheless, the Employee has

agreed to accept and the Employer and Carrier have agreed to pay a total sum of $84,000.00 in a

lump sum pursuant to Section 8(i) of the Act. The parties agree and stipulate that such sum shall

discharge the Employer's and Carrier's liability for any and all claims for compensation, which

Claimant may now have or which may at any time hereafter be asserted by the Employee, his heirs,

executors, or assigns, whether for total or partial, temporary or permanent disability, under the

Longshore and Harbor Workers' Compensation Act, as the result of any accident or illness arising

out of or in any way connected to the injury of April 2, 1998.

## X.

The parties also have agreed to settle the liability of the Employer and Carrier for future

medical benefits on the basis that the Employer and Carrier will not continue to provide medical care

and treatment and the medical will be CLOSED.

## X.

Medical benefits paid by the Carrier have been as follows:

| | |
|------|------------|
| 1998 | $ 12,711.69 |
| 1999 | $ 12,731.00 |
| 2000 | $ 63,018.11 |
| 2001 | $ 14,237.61 |
| 2002 | $    198.00 |

In his report of July 26, 2001, Dr. Esses did not schedule a follow-up appointment for the Employee

until one year and Mr. Escobedo has not returned to Dr. Esses since this time.

## XI.

The Employee's attorney is entitled to receive an attorney's fee under the provisions of Section 28 of the Act, such attorney's fee to be paid by the Employer and Carrier in addition to the compensation payable to the Employee. The Employer and Carrier have agreed to pay an attorney's fee to the Employee's attorney in an amount not to exceed $15,000.00.

## XII.

This settlement has been explained in detail to the Employee by his attorney. The Employee understands that this is a full and final settlement of his claim for compensation and medical benefits pursuant to the Longshore and Harbor Workers' Compensation Act for his injury of April 2, and he further understands that he does not have to make this settlement, that he is not being forced to make this settlement in any way, and that he could continue to pursue his claim for compensation and medical benefits except for his decision to make this settlement. In view of the disputed issues presented by this claim, the nature and extent of the Employee's present disability, if any, and whether the Employee's current complaints are causally related to the incident of April 2, 1998, the present settlement is considered adequate by the parties, and approval is hereby requested.

**UPON THE FOREGOING STIPULATED FACTS**, the parties hereto waive a formal hearing and consent to the issuance of a formal compensation order based hereon.

**APPROVED AND STIPULATED** this ____ day of February, 2002.

By _____
JUAN CARLOS ESCOBEDO, Claimant

By _____
JACK G. CARINHAS,
Attorney for Employee

-9-

45430:986434.2:022202

APPROVED AND STIPULATED this _2 8th_ day of February, 2002.

By _____
KEITH N. UHLES
Of Royston, Rayzor, Vickery & Williams, L.L.P.,
Attorneys for Employer and Carrier

THE STATE OF TEXAS        §
COUNTY OF CAMERON        §

    BEFORE ME, the undersigned authority, on this day personally appeared **JUAN CARLOS ESCOBEDO**, known to me to be the person who executed his name to the foregoing agreement, and after being duly sworn, on oath, stated that he has read the foregoing agreement and understands the effect thereof to be a full and final discharge and release of his claim arising out of the injury of April 2, 1998, and that he has executed this agreement as his free and voluntary act without any persuasion, promise, force, duress or representation of any kind except as stated in said agreement.

    SWORN TO AND SUBSCRIBED BEFORE ME by Juan Carlos Escobedo, Claimant, this _26 th_ day of February, 2002, to certify which witness my hand and seal of office.

> PATRICIA M. RIVERA
> MY COMMISSION EXPIRES
> October 23, 2005

_Patricia M. Rivera_
Notary Public, State of Texas
My Commission Expires: _10/23/2005_

## TRANSLATOR'S CERTIFICATE

    I, _PATRICIA M. RIVERA_ , being fluent in both English and Spanish, do hereby certify that I have read the foregoing AGREED STIPULATION, including the Notary's Certificate, to Juan Carlos Escobedo, the Claimant-Employee, in both English and Spanish, faithfully rendering the English text into idiomatic and grammatical Spanish verbatim, and he has confirmed to me that he has understood each and every word, phrase and number in the AGREED STIPULATION.

_Patricia M. Rivera_
Translator
_PATRICIA M. RIVERA_ (Printed Name)

## ORDER APPROVING
## LUMP SUM SETTLEMENT

The undersigned District Director pursuant to the provisions of Section 8(i) of the Longshore and Harbor Workers' Compensation Act, having considered the foregoing settlement and the contents of the administrative file in this case, finds and determines the following:

1.    That the agreed settlement is adequate and was not procured by duress;

2.    That the agreed settlement should be and is hereby approved.

Upon such findings and determinations, the undersigned District Director **ORDERS**:

1.    That the Employer and Carrier having previously paid Compensation benefits through March 5, 2002 totaling $47,365.23, shall pay additional compensation in the amount of $84,00.00 to the Employee in a lump sum, which will discharge the liability of the Employer and Carrier for all past and future payments of compensation and this file will be CLOSED.

2.    The Employer and Carrier shall not be liable for any additional medical expenses pursuant to Section 7 of the Act.

3.    An attorney's fee in the amount of $ 15,000.00

is hereby approved in favor of Jack G. Carinhas, attorney, for services rendered on behalf of the Employee, such sum to be a lien upon and paid out of this award. Such sum to be paid by the Employer and Carrier pursuant to Section 28 of the Act in addition to the compensation payable to the Employee.

GIVEN UNDER MY HAND at Houston, Texas, on this 15th day of ___March___,

2002.

District Director
United States Department of Labor
Eighth Compensation District

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing Compensation Order was sent to the parties herein, as follows:

**BY CERTIFIED MAIL:**

| | |
|---|---|
| Juan Carlos Escobedo<br>Employee | 5122 Amatista<br>Brownsville, Texas 78521 |
| A. D. Welding<br>Employer | P. O. Box 6086<br>Brownsville, Texas 78523 |
| Reliance National Insurance Co.<br>Carrier | c/o F.A. Richard & Associates<br>P. O. Box 3107<br>Brownsville, Texas 78523-3107 |

**BY REGULAR MAIL:**

| | |
|---|---|
| Jack G. Carinhas | 302 Kings Highway, Suite 109<br>Brownsville, Texas 78521 |
| Keith N. Uhles | Royston, Rayzor, Vickery & Williams, L.L.P.<br>P. O. Box 3509<br>Brownsville, Texas 78523-3509 |
| Troy Milburn | Texas Property & Casualty Insurance Guaranty Association<br>9120 Burnet Road<br>Austin, Texas 78758 |

MAILED:   3/15/02   mb

District Director

45430:986434.2:022202                -2-

If any compensation, payable under the terms of an award, is not paid within ten (10) days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof.  The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. B-02-172 |
| STEPHEN ESSES, M.D., | § | |
| F.A. RICHARD & ASSOCIATES, INC. | § | |
| AND JANE ROSAMOND | § | |
| | § | |
| **Defendants.** | § | |

## AFFIDAVIT OF STEPHEN I. ESSES, M.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Stephen I. Esses, M.D., being by me duly sworn, deposes and says as follows:

1.     My name is Stephen I. Esses, M.D., and I am a Defendant in the above referenced cause of action.  I am over the age of 18, and I am fully competent to make this affidavit.

2.     I am a licensed physician and Brodsky Professor of Neurosurgery at the Baylor College of Medicine, in Houston, Texas.  In October of 1999, Freddy Conley at the United States Department of Labor requested that I examine Juan Escobedo and report my recommendations regarding a reasonable course of treatment for Mr. Escobedo's back and leg pain to the Department of Labor.

3.     On November 22, 1999, Mr. Escobedo presented to my office for the independent medical examination as directed by Mr. Conley.   On that date, I physically examined Mr.

Escobedo, reviewed all of his medical records and x-rays that had been provided to me, and discussed his medical history and current complaints with him. After my examination and review, I explained to Mr. Escobedo my opinion that a reasonable course of treatment would be a discectomy on the right side at L5/S1. I also told Mr. Escobedo that he could later have a fusion, which is a larger procedure, if necessary. I reported my findings and recommendations in the independent medical examination to the Department of Labor in a letter to Freddy Conley. A true and correct copy of my letter to Freddy Conley, dated November 22, 1999, is attached as Exhibit 1.

4.    I did not conduct any other medical examinations of Mr. Escobedo, or provide any other reports to the Department of Labor, until June 29, 1999. Furthermore, I did not provide any treatment to Mr. Escobedo prior to September of 1999. Other than the independent medical examination on November 22, 1999, I did have any involvement with Mr. Escobedo's medical care and treatment until I saw him for a second independent medical examination on June 29, 1999.

5.    In June of 1999, Freddy Conley again requested that I examine Mr. Escobedo. At that time, I again examined Mr. Escobedo and reviewed additional medical records, including the operative report for the surgery performed by Dr. Pisharodi in December of 1999. Dr. Pisharodi did not perform the same surgery that I recommended on November 22, 1999.

6.    During the independent medical examination on June 29, 2000, I found that Mr. Escobedo's clinical situation was different than when I saw him in November of 1999. At the time of the second examination, it was my opinion that further medical care was reasonable and that it would be reasonable for Mr. Escobedo to undergo a two-level laminectomy, discectomy

and fusion with instrumentation. I reported my findings and opinions to Mr. Conley in a letter dated June 29, 2000. A true and correct copy of my letter to Mr. Conley, dated June 29, 2000, is attached as Exhibit 2.

7.      In approximately August of 2000, I was advised that the Department of Labor had approved the two-level fusion with instrumentation, and I was to become Mr. Escobedo's treating physician. I began seeing Mr. Escobedo for pre-operative care in September of 2000. On September 26, 2000, I performed surgery on Mr. Escobedo at St. Luke's Episcopal Hospital in Houston, Texas. The surgery included a laminectomy and fusion with instrumentation at L4-5 and L5-S1. A true and correct copy of the operative report for the surgery of September 26, 2000, is attached as Exhibit 3.

8.      I continued to see Mrs. Escobedo for post-operative follow-up care until July of 2001. Post-operatively, Mr. Escobedo's x-rays reflected good position of the implants and solid fusion.

Further Affiant sayeth not.



_____
Steven I. Esses, M.D.

SUBSCRIBED AND SWORN TO before me on this __4th__ day of August _2003,_ 2003.

EDITH OROZCO
MY COMMISSION EXPIRES
NOVEMBER 12, 2005

_____
NOTARY PUBLIC in and for the State of Texas

November 22, 1999



**BAYLOR
COLLEGE OF
MEDICINE**

Stephen I. Esses, M.D.
Professor of Clinical
Orthopedic Surgery

Department of
Orthopedic Surgery

Address Correspondence to:
6560 Fannin, Suite 1900
Houston, Texas 77030
(713) 986-5740

Freddy Conley
U. S. Department of Labor
Office of Workers' Compensation Program
Division of Longshore & Harbor Workers'
 Compensation
8886 Gulf Freeway, Ste. 140
Houston, Texas 77017-6528

**RE:    JUAN ESCOBEDO/INDEPENDENT MEDICAL EXAM**
**DOI:  04/02/98**
**DOB:  09/14/74**

Dear Mr. Conley:

I am in receipt of your letter dated October 26, 1999 to Mr. Escobedo.  I am in receipt of
the various medical records concerning this man.  I have carefully reviewed these.

Mr. Escobedo presented to my office on November 22, 1999 for the purpose of an
Independent Medical Examination.

At that time interpretation was provided by my office staff.

This man is 25 years of age.  He works as a welder.

He recalls that in April of 1998 he was picking up some welding equipment.  He has
sudden pain in his back associated with pain down his right leg.  He subsequently saw
Dr. Michelle in Brownsville.

He subsequently had a variety of investigations including MR scanning, myelography,
CT scanning and EMGs.

He subsequently has come under the care of Dr. Pisharodi.  Apparently Dr. Pisharodi has
advised this gentleman that he should have a two-level L/4-S/1 decompression with
instrumentation and fusion.

SE 004

RE:    JUAN ESCOBEDO
P-2-

Apparently following that recommendation the patient was sent for a second opinion to
Dr. Marty Barrish. Dr. Barrish disagreed with the advised surgery and recommended that
the patient might benefit from a simple discectomy on the right side at L5/S1.

At the present time the patient is taking Cyclobenzaprine and Hydrocodone. He is
currently not doing physical therapy as he is awaiting a decision about surgery.

The patient stated that his major pain is right leg pain. He does have back pain. There is
no significant left leg symptoms.

He uses a cane in his right hand. He has been using this since September of 1998
because he feels unsteady on his feet.

Functional inquiry is unremarkable.

On examination today the patient appeared to be in pain. He does have pain to superficial
palpation around the low back. There is no structural spinal deformity. His range of
motion is limited due to pain and guarding. There is no true paravertebral spasm.

In the seated position he has straight leg raising creating back and some right leg pain on
the right side. On the left side there was no pain.

When tested independently he had giving way weakness in the right foot. When tested
simultaneously with the left side he had no weakness.

His reflexes are grade II and bilaterally symmetrical at the knees and at the ankles.

I personally reviewed this man MR scan dated May 15, 1998. I have personally reviewed
the plain x-rays dated April 3, 1998. I personally reviewed discograms dated October 16,
1998.

As indicated above I personally had the opportunity of reviewing this man's medical
records.

I have had a long discussion with this patient.

I think that it is reasonable for this man to have a discectomy on the right side at L5/S1. I
have explained to him that at this point I do not think it is advisable to proceed with a
two-level decompression, fusion and instrumentation.

The patient understands that different surgeries have different approaches and different
opinions. I have explained to the patient that I personally think he would get a great deal
of benefit from a discectomy on the right side at L5/S1.

SE 005

RE:    JUAN ESCOBEDO
P-3-

I personally think, however, that a fusion is a large procedure which would preclude him from ever returning to work as a welder or doing manual labor.

I have also explained to this patient that having a discectomy now does not preclude him from having a fusion down the road if necessary.

I would be happy to answer any other specific questions you might have about this patient.


Sincerely,

Stephen I. Esses, M. D.
Brodsky Professor of Spine Surgery

SIE:yb

June 29, 2000



**BAYLOR**
**COLLEGE OF**
**MEDICINE**

Stephen L. Esses, M.D.
Professor of Clinical
Orthopedic Surgery

Department of
Orthopedic Surgery

Address Correspondence to:
6560 Fannin, Suite 1900
Houston, Texas 77030
(713) 986-5740

Freddy Conley
U. S. Department of Labor
Office of Workers' Compensation Program
8886 Gulf Freeway, Ste. 140
Houston, Texas 77017-6528

RE:   JUAN ESCOBEDO

Dear Mr. Conley:

I am in receipt of your letter dated June 7, 2000 concerning Juan Escobedo.
This man was seen in my office on June 29, 2000. At that time I had a variety of medical
records available to me.   As you are aware I previously saw this man on November 22,
1999 for the purpose of assessment.

Since I saw this man he has had surgery.  This surgery was undertaken on December 23,
1999. I personally reviewed the operative report. At the time of surgery he underwent an
L4/L5 and an L5/S1 partial laminectomy and foraminotomy.  He underwent discectomies
on the right side at L4/5 and at L5/S1.  He underwent an intraspinous stabilization
procedure with secure strand at L4/5 and at L5/S1.

I have also reviewed the additional medical records from Dr. Pisharodi and the
communications and letters between the insurance company, the law firm, the U. S.
Department of Labor, and Dr. Barrash.

In my discussion with the patient on June 29, 2000 it is clear that he has very intense
back pain. It is clear that at this point in time his back pain is worse than his leg pain.

It is clear that before the surgery of December, 1999 he had discograms and had
concordant pain with discography at L4/5 and L5/S1.

His examination at the present time shows marked back pain with straight leg raising on
the right side.  He does not have any true nerve root tension signs.  He has no
demonstrable neurologic deficit.

It is my opinion that this man's clinical situation now is different than when I saw him on
November 22, 1999. At that time I was of the opinion that it would be reasonable for him
to undergo a decompression and discectomy without fusion in order to provide him with
significant pain relief.

SE 209

JUAN ESCOBEDO
P-2-

Clearly at the present time his major complaint is back pain and there is only secondary involvement of his right leg.

For this reason it is my opinion that this man has true discogenic back pain. It is my opinion that he has objective findings on his preoperative studies including discography. His subjective findings are back pain, which limits range of motion and activity.

It is my opinion that further medical care is reasonable.

It is my opinion that at this time further surgical intervention is reasonable. It is my opinion that it would be reasonable to carry out a two-level laminectomy, discectomy and fusion with instrumentation.

I would be happy to answer any further questions you might have about this patient.

Sincerely,

Stephen I. Esses, M. D.
Brodsky Professor of Spine Surgery

SIE:lb

SE 210

ST. LUKE'S EPISCOPAL HOSPITAL                    TEXAS HEART INSTITUTE
              P.O. BOX 20269  HOUSTON, TEXAS  77225
                       (713) 791-2011


                         REPORT OF PROCEDURE

ESCOBEDO, JUAN CAROLOS          MR #: A0-215-56-08    ROOM: ~~18T 186001~~
BILLING #: 0026900503

DATE OF PROCEDURE:  09/26/2000
SURGEON:            Stephen I Esses, MD

ASSISTANT:                      DR. ATIEF

PREOPERATIVE DIAGNOSIS:         Status post decompression, L4-5,
                                Status post decompression, L5-S1.
                                Status post soft fusion, L4-5.
                                Status post soft fusion, L5-S1.
                                Degenerative disk disease, L4-5.
                                Degenerative disk disease, L5-S1.
                                Spinal stenosis, L4-5.
                                Spinal stenosis, L5-S1.
                                Hypermobility, L4-5.
                                Hypermobility, L5-S1.

POSTOPERATIVE DIAGNOSIS:        Status post decompression, L4-5,
                                Status post decompression, L5-S1.
                                Status post soft fusion, L4-5.
                                Status post soft fusion, L5-S1.
                                Degenerative disk disease, L4-5.
                                Degenerative disk disease, L5-S1.
                                Spinal stenosis, L4-5.
                                Spinal stenosis, L5-S1.
                                Hypermobility, L4-5.
                                Hypermobility, L5-S1.

PROCEDURE:                      Decompression, L4-5.
                                Decompression, L5-S1.
                                Bilateral foraminotomy, L4-5,
                                Bilateral foraminotomy, L5-S1.
                                Partial laminectomy, L4.
                                Complete laminectomy L5.
                                Bone graft harvesting, right
                                iliac crest, (separate incision).
                                Segmental instrumentation with
                                Miami-Moss implant L4, L5, S1.
                                Posterolateral fusion, L4-5,
                                Posterolateral fusion, L5-S1.

PROCEDURE IN DETAIL:  This patient originally presented to me for an opinion
concerning surgery.  He subsequently underwent an operation elsewhere which
consisted primarily of a right sided decompression of L4-5 and at L5-S1 with
a soft fusion using ligament prosthetics.  Despite this surgery, he continued
to have intense back pain.  This was associated with bilateral leg pain.  His
repeat studies showed degenerative disk disease at L4-5 and at L5-S1.  He had
previously undergone diskography.  It is my opinion that it is reasonable to
offer him a two level arthrodesis and redo decompression.  He understood the
advantages and disadvantages and risks.

With the patient supine, general anesthesia was induced and endotracheal

REPORT OF PROCEDURE
ESCOBEDO, JUAN CAROLOS
MR #: A0-215-56-08
BILLING #: 0026900503
ROOM:  18T 186001

intubation was performed.  The patient was turned prone onto a four poster
frame.  We protected the eyes and axilla.  The abdomen was decompressed.  The
back was now prepped and draped.  Midline incision was made using the old
incision.  We now carefully exposed the L3, L4, L5 and S1 lamina.  Hemostasis
was meticulously obtained.

We now opened up the lateral gutters and transverse processes of L4 and L5
were identified and cleansed.  We opened up the sacral ala and carefully
exposed this amply on both the right and left side.  We now packed off that
wound and turned our attention to the right iliac crest.  We used a
subcutaneous approach to the right iliac crest.  We exposed the crest now and
took cortical cancellous bone using an osteotome and Capner gouges in the
usual fashion.  The wound was irrigated, we used bone wax to secure
hemostasis.  Then we closed the dead space with Vicryl suture.

Turning our attention back to the spine, we now took an intraoperative x-ray
and confirmed that we were at the L4 and L5 levels, which we were.  The
transverse processes, parts intra-articularis and facet joints were used as
landmarks for starting points which allowed us to place 40 mm screws down the
pedicles of L4 and L5 on the right and left side.  Excellent position was
noted on x-ray.

I was now able to expose the facet joints at L5-S1.  We decorticated and took
down the inferior articular process so that we could identify the pars intra-
articularis and superior articular facet of S1.  We now placed screws
laterally into the ala.

AP and lateral x-rays again confirmed excellent position of the implants.

We now used a #4 cutting bur to decorticate the transverse processes of the
ala. After meticulous decortication had been carried out, we took the bone
graft, previously harvested and placed it in the lateral gutters.  We used
Grafton 5 cc as an extend on the right and left side.

I was now happy with the amount of bone at both levels for the fusion. Rods
were carefully measured and contoured.  They were inserted into the polyaxial
screw heads.  They were secured with the inner set screws and nuts.  These
were tightened using the anti-torque device.

We now carried out a decompression.  Centrally, there was marked scarring,
and right side there was marked scarring.  We carefully teased out the
ligamentum flavum scar.  There was a small dural rent at the L4-L5 level
which was closed with #4 Nurulon.  This amply prevented any leakage of the
CSF even when we asked for multiple Valsalva maneuvers by anesthesia.

A full laminectomy of L5 was carried out.  Partial laminectomy of L4 was
carried out.  There was gross stenosis and this was thoroughly decompressed.
We used a ball-ended to ensure that there was no further foraminal stenosis
either on the right or left side.

We now covered the exposed neural elements with Adcon-L.  The wound was now
closed in layers. We used both interrupted and running sutures in the deep
fascia. We used a subcuticular stitch in the skin. Dressing was applied. The
patient was turned back onto the stretcher.  He was extubated, noted to be
moving all four extremities and returned to recovery room in good condition.

REPORT OF PROCEDURE
ESCOBEDO, JUAN CAROLOS
MR #: A0-215-56-08
BILLING #: 0026900503
ROOM:  18T 186001


In summary, therefore, I was quite happy with the segmental pedicle screw
fixation at L4, L5, S1.  There was quite an adequate decompression carried
out at both levels with complete decompression of the dural sac and nerve
roots.  There had been no intraoperative complications.



Stephen I Esses, MD

SIE/ma            D: 09/26/2000    T: 09/28/2000
Job#: 009407      Doc#: 30487      FN: 00031112.000


cc:  Stephen I Esses, MD
     FAX:  713-986-6258

UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
LONGSHORE AND HARBOR WORKERS COMPENSATION
EIGHTH COMPENSATION DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In the matter of the claim                          \*
for compensation under the                          \*
Longshore and Harbor Workers                        \*
Compensation Act                                    \*           ORDER TO CHANGE
                                                    \*           TREATING PHYSICIANS
JUAN ESCOBEDO                                       \*
Employee                                            \*
            v                                       \*
                                                    \*           CASE NUMBER 08-114563
A.D. WELDING                                        \*
Employer                                            \*
            and                                     \*
                                                    \*
RELIANCE INSURANCE COMPANY c/o                      \*
CRAWFORD & COMPANY                                  \*
Insurance Carrier                                   \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pursuant to section 7(b) of the Longshore Act (33 USC 907(b)), the Secretary, through her designee, the District Director, "shall actively supervise the medical care rendered to injured employees, shall require periodic reports as to the medical care rendered to injured employees, shall have authority to determine the necessity, character, and sufficiency of any medical aid furnished or to be furnished, and may, on his own initiative or at the request of the employer, order a change of physicians or hospitals when in his judgment such change is desirable or necessary in the interest of the employee...". In accordance with section 7(b) of the Act, after a careful review of the administrative file, and discussion of the parties respective positions at an informal conference, the District Director makes the following:

FINDINGS OF FACT

1.   On April 2, 1998, Juan Carlos Escobedo, (the Employee), was in the employ of A.D. Welding (Employer), when he injured his lower back, right leg, and right foot while picking up and carrying welding equipment during the course and scope of his employment. On the day this injury took place the Employer was insured for liability under the Longshore Act by Reliance Insurance Company (c/o Crawford & Co., adjusters).



Escobedo
EXHIBIT NO. C
Bryant & Stingley, Inc.

Escobedo v A.D. Welding
Page 2

2. The Employee began losing time from work on May 6, 1998 and the Employer voluntarily initiated compensation for temporary total disability effective that date.

3. On October 2, 1998, the Employee filed form LS-203 (Employee's Claim for Compensation) in the Houston District Office, listing Jesus Caquias, M.D., and Ricardo Adobbati, M.D., as his treating physicians. The Employer authorized the Employee's choice of physicians to furnish medical treatment in accordance with the provisions of the Act.

4. Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the gluteal area, but not down to the leg. A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain. Dr. Addobati advised the Employee to discontinue working and ordered an MRI scan to determine if the Employee had sustained a ruptured disc. In his May 19, 1998, report Dr. Addobati explained that the MRI scans were normal with no evidence of a ruptured disc. The Employee was advised to remain off work and additional conservative care was recommended.

5. On July 1, 1998, Dr. Adobbati examined the Employee, noting that he was not progressing as quickly as expected. A neurosurgical consultation was therefore recommended.

6. The Employee was subsequently referred for a consultation by Madhavan Pisharodi, M.D., a Neurosurgeon. According to the June 29, 1999, report from Dr. Pisharodi, he first examined the Employee in July of 1998. It is noted that this first report of examination was furnished to the Employer almost one year after the date of the Employee's first examination, in violation of the reporting requirements of 7(d)(2) of the Act. Dr. Pisharodi's report notes the negative MRI's, but relies on discograms he interprets as "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing. An L4-5 and L5-S1 discectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disc syndrome.

7. On November 5, 1998, the Employee was examined by H. Pacheco-Serrant, M.D., a Neurosurgeon. In his report dated November 5, 1998, Dr. Pacheco-Serrant notes Dr. Pisharodi's recommendation for surgery but finds that in the absence of a herniated disc or instability that the recommended surgery is not warranted. The Employee was referred back to his primary physician for pain management.

Escobedo v A.D. Welding
Page 3

8.  In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available diagnostic studies, including the discograms, fails to adequately explain the source of the Employee's pain.  Dr. Adobbati recommends that the Employee refrain from undergoing the recommended surgery until another opinion is obtained.

9.  On May 12, 1999, the Employee was examined by Eric Six, M.D., a Neurosurgeon.  Dr. Six states in his report that, in light of the positive discogram, the Employee may represent a rare instance where a lumbar fusion would be of benefit. However, Dr. Six states that the procedure should be done at a major institution of higher learning.

10.  On August 4, 1999, the Employee was examined by Martin Barrash, M.D., a Neurosurgeon selected by the Employer, who states in his report that the overall clinical and diagnostic picture is, in his opinion, insufficient to justify multi-level disc excision and fusion with instrumentation.  In view of the diagnostic studies (including a possible right-sided disc rupture at L5-S1 on the MRI scans) and the Employee's continuing complaints of pain, Dr. Barrash recommends that surgery be limited to a right-sided discectomy at L5-S1.  Dr. Barrash further recommends that the Employee be reassessed after this minimal surgery is performed to determine if additional treatment is warranted.

11.  In his report dated August 11, 1999, Dr. Pisharodi comments on Dr. Barrash's report, reaffirming his original opinion that the Employee requires multi-level disc excision and fusion with instrumentation.  Dr. Pisharodi states in this report that a one-level discectomy is not likely to adequately address the Employee's' condition.  In his September 7, 1999 letter to Jack Carinhas, Esq., the Employee's authorized representative, Dr. Pisharodi again reaffirms his original treatment recommendations.

12.  On November 22, 1999, the Employee was examined at the direction of the U.S. Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of Neurosurgery at the Baylor College of Medicine.  After a thorough examination of the patient and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed with a two-level disc excision and fusion with instrumentation.  Dr. Essess states that reasonable treatment would consist of a simple discectomy at L5-S1 on the right.  The advantage of this approach is clearly explained by Dr. Esses report, as he anticipates that the Employee would benefit greatly from a simple one-level discectomy.  However, Dr. Esses also points out that the more limited surgery does not preclude a more ambitious surgical approach (including fusion) in the future, if necessary.

13.  Dr. Esses' examination was requested by the Department of Labor in anticipation of an informal conference, which was scheduled via form LS-141 (Notice of Informal Conference) dated December 3, 1999.  This conference was scheduled solely

Escobedo v A.D. Welding
Page 4

to address the issue of medical treatment and Dr. Esses' recommendations. After receipt
of the Notice of Conference and upon review of Dr. Esses' report, the parties agreed to
proceed with the simple one-level discectomy recommended by the Department of
Labor's choice of physicians. This agreement is set forth in the December 21, 1999 letter
to Mr. Carinhas from Keith Uhles, Esq., the Employer's representative.

14.     In his report dated November 29, 1999, Dr. Pisharodi notes the additional
opinion in favor of a one-level discectomy and again states his recommendation to
proceed with multi-level disc excision and fusion with instrumentation.

15.     The Employee was seen by Dr. Pisharodi for a follow-up evaluation on
December 20, 1999.  In his report of December 21, 1999, Dr. Pisharodi notes the
Employee's decision to proceed with the one-level discectomy recommended by Dr.
Esses and Dr. Barrash:

> "At the present time, the patient states his pain seems
> progressively worse. He is thinking about having the
> simple surgery instead of waiting to get the two-level
> laminectomy, discectomy, fusion and instrumentation.
> He states his back pain and right leg pain are much more
> intense than his left leg pain. He is ready to have the
> surgery done as soon as possible. I have advised the
> patient there may be a possibility of a lumbar spine
> instability since the simple decompressive surgery may
> not address all his problems. The patient is aware of this
> and is willing to try the surgery... The patient is aware
> of the consequences and the possible need of a second
> surgery to fuse the area. There is always the possibility
> that the patient may do well with the simple diskectomy,
> but according to my experience and the pathology that
> Mr. Escobedo presents, it is quite likely that he will require
> a second surgery."

Based upon this report from Dr. Pisharodi the parties requested cancellation of the
informal conference to discuss medical treatment, and the Employer authorized Dr.
Pisharodi to proceed with the one-level disc excision recommended by Dr. Esses.

16.     The Employee was admitted to Valley Medical Center and on December
23, 1999 Dr. Pisharodi performed the following surgical procedures: L4-5 and L5-S1
partial laminectomy, L4-5 and L5-S1 facetectomy and foraminotomy on the right side;
L4-5 and L5-S1 diskectomy on the right side; L4/L5/S1 interspinous stabilization with
secure strand. Dr. Pisharodi issued follow-up reports on January 7, January, 28, February
17, March 3, and April 19, 2000, indicating a normal post-operative course without
complications, a slight decrease in the Employee's reported back pain, and an increase in
the Employee's leg pain.

Escobedo v A.D. Welding
Page 5

17.    On March 22, 2000, Dr. Barrash issued a report regarding the December
23, 1999 surgery, stating that the surgery performed was not the same procedure
recommended by either Dr. Barrash or Dr. Esses. Dr. Barrash characterizes the treatment
furnished as "unreasonable" and concludes that if further surgery is necessary, it is due to
the performance of this unauthorized procedure. On June 9, 2000, the Employer filed a
Notice of Controversion (LS-207) stating their objection to any further medical treatment
by Dr. Pisharodi, based on Dr. Barrash's report.

18.    In an April 11, 2000, letter to Mr. Carinhas, and a May 25, 2000 letter to
Claims Examiner Freddy Conley, Dr. Pisharodi states that surgery on two levels, instead
of the one-level surgery recommended by Dr. Esses and Dr. Barrash, was medically
necessary. Dr. Pisharodi states that the Employee's failure to improve after the
December 23, 1999 surgery is due exclusively to the fact that the correct procedure
(multi-level disc excision and fusion with instrumentation) was not authorized.    Dr.
Pisharodi also makes known his objections to the questions posed to Dr. Barrash by the
Employer's representative.

19.    On May 8, 2000, Jose Kuri, M.D., a Neurosurgeon, issued a report stating
that he assisted Dr. Pisharodi during the Employee's surgery. This report states Dr.
Kuri's agreement with Dr. Pisharodi's original diagnosis and recommendations for
treatment, and endorses the efficacy and appropriateness of Dr. Pisharodi's treatment,
given the circumstances of the limited authorization.

20.    On May 30, and June 21, 2000, Dr. Pisharodi issued reports describing the
Employee's symptoms and level of pain and recommending further surgery.

21.    On June 29, 2000, the Employee was examined by Dr. Esses at the request
of the U.S. Department of Labor for the purpose of discussing the Employee's medical
treatment at an informal conference. Dr. Esses states in his report of the same date that
"it is my opinion that this man's clinical situation now is different that when I saw him on
November 22, 1999. At that time I was of the opinion that it would be reasonable for him
to undergo a decompression and discectomy without fusion in order to provide him with
significant pain relief." Based on the change in the Employee's clinical picture Dr. Esses
recommends further treatment, namely, a two-level laminectomy, discectomy and fusion
with instrumentation.

22.    On August 8, 2000, Dr. Pisharodi issued a report to the District Director
stating four reasons not to change medical management in this case. Dr. Pisharodi states
that the Employee has been satisfied with his care for over two years, the Employee is
capable of making a choice of physicians, Dr. Esses has never been his treating
physician, and having surgery in Houston would result in additional and unnecessary
expense.

Escobedo v A.D. Welding
Page 6

     23.    On August 10, 2000, an informal conference was held by the District Director by telephone to discuss Dr. Esses' treatment recommendations. The Employee, his representative, and the Employer's representative participated in the conference call. The Employer's representative reiterated their objection to the authorization of any further medical treatment by Dr. Pisharodi and requested the Department of Labor issue and order to change treating physicians. The Employee stated that he was comfortable with Dr. Pisharodi continuing as treating physician, indicated his concern regarding travel issues if a physician outside his area of residence was selected, and went on record as opposing any change of treating doctors.

     24.    On August 22, 2000, the parties submitted an agreement to the District Director regarding additional travel arrangements to be furnished to the Employee by Employer in the event that medical management is changed to a physician in the Houston, Texas area. Said agreement is incorporated herein by reference.

**ORDER**

     Based upon a thorough review of the administrative file, the medical reports, and discussion with the Employee and his representative at informal conference, I am persuaded by the opinion of Stephen Esses, M.D. I find that reasonable and necessary treatment of the Employee should have been limited to a right-sided discectomy at L5-S1 as recommended by Dr. Esses in his November 22, 1999 report. As is clear from Dr. Esses report, performing surgery limited to the simpler one-level procedure was reasonable and necessary, based on the total clinical picture, and such surgery would not in any way preclude the performance of a more complex procedure, if necessary. Even as Dr. Pisharodi admitted in his December 21, 1999 report, "there is always the possibility that the patient may do well with the simple discectomy."

     Having found that Dr. Pisharodi furnished treatment that was not reasonable and necessary, I hereby find that a change of treating physicians is desirable or necessary pursuant to section 7(b) of the Act (33 USC 907(b)). Effective this date I hereby designate Stephen Esses, M.D., as the Employee's treating physician.

GIVEN UNDER MY HAND at Houston, Texas, this _____1_____day of September, 2000.

CHRIS JOHN GLEASMAN
DISTRICT DIRECTOR
EIGHTH COMPENSATION DISTRICT

# CERTIFICATE OF FILING AND SERVICE

I certify that the foregoing Compensation Order was filed in the Office of the District Director, Eighth Compensation District, and a copy thereof was mailed on said date by certified mail to the parties and their representative at the last known address of each as follows:

Juan Escobedo
5122 Amatista
Brownsville, TX 78520


Reliance Insurance Company
% F. A. Richard & Associates
P. O. Box 3107
Brownsville, TX 78523-3107

A copy was also mailed by regular mail to the following:

Carinhas & Saldana, L.L.P.
Attorneys at Law
302 Kings Highway, Suite 109
Brownsville, TX 78521


Royston-Rayzor-Vickery & Williams
Attorneys at Law
P. O. Box 3509
Brownsville, TX 78520

CHRIS JOHN GLEASMAN
District Director
Eighth Compensation District
U S Department of Labor
ESA/OWCP/LHWCA

Mailed: 9/1/00  js

If any compensation, payable under the terms of an award, is not paid within ten days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.

08/05/2003 11:02 FAX 956 542... Document 22    Filed in TXSD on 08/05/2003    Page 97 of 112
ROYSTON, RAYZOR - BRO.

08/23/00   WED 08:21 FAX 956 54 :370 .    R R V & W                    ( 041
                                                                          004

# ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
## ATTORNEYS AT LAW

HOUSTON, TEXAS
TELEPHONE 713-224-8380
FACSIMILE 713-225-9945

GALVESTON, TEXAS
TELEPHONE 409 763 1623
FACSIMILE 409-763-3853

CORPUS CHRISTI
TELEPHONE 361-884-8808
FACSIMILE 361-884-7261

55 COVE CIRCLE
BROWNSVILLE, TEXAS 78521
TELEPHONE 956-542-4377
FACSIMILE 956-542-4370
INTERNET·royston@roystonlaw.com

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P.
SAN ANTONIO, TEXAS
TELEPHONE 210-228-0655
FACSIMILE 210-228-0839

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P. . . .
LUBBOCK, TEXAS
TELEPHONE 806-763-8252
FACSIMILE 806-763-8254
(BY APPOINTMENT ONLY)

Keith N. Uhles
keith.uhles@roystonlaw.com

August 22, 2000


Escobedo
EXHIBIT NO. B
Bryant & Stingley, Inc.

**VIA FACSIMILE (713) 943-1827**

Mr. Chris Gleasman
District Director
U.S. Department of Labor
Office of Workers' Compensation Programs
8866 Gulf Freeway, Suite 140
Houston, Texas 77017-6528

|  | RE. | OWCP No. | : | 08-114563 |
|---|---|---|---|---|
|  |  | Claimant | : | Juan Escobedo |
|  |  | Employer | : | A.D. Welding |
|  |  | D/Injury | : | 04/02/98 |

Dear Mr. Gleasman:

After the meeting was held on August 18, 2000 to follow up on the prior Informal Conference with you on this matter, a second meeting was held on August 22, 2000. We are pleased to report the parties have now reached an agreement as follows:

1.    Mr. Escobedo will not object to or appeal an order from the District Director changing treating physicians from Dr. Madhavan Pisharodi to Dr. Steven Esses.

2.    The employer/carrier will authorize the surgery by Dr. Esses described in his July 2000 report.

06/05/2003 14:16 FAX 956 5424    ROYSTON, RAYZOR - BRO.    ☒043

08/23/00  WED 08:21 FAX 866 54  370 .    R R V & W    ☒005

Mr. Chris Gleasman                                                      **Page 2**
District Director
August 22, 2000

3.    The employer/carrier will pay the cost of round trip airplane tickets for Mr. Escobedo, his wife, and two children from Brownsville to Houston. The departure date will be the day before the scheduled surgery and the return date will be the day after the scheduled initial post-surgical follow-up with Dr. Esses, which is typically 14 days after surgery. If the return date needs to be extended, Mr. Escobedo or his wife will promptly advise Mr. Carinhas who will, in turn promptly advise the employer/carrier.

4.    The surgery with Dr. Esses will be scheduled to allow the employer/carrier to purchase 14 day advanced round trip tickets from Continental Airlines for Mr. Escobedo and his family.

5.    The employer/carrier will advance to Mr. Escobedo $100.00 by providing a check payable to Jack Carinhas for ground transportation to and from Intercontinental Airport in Houston to Mr. Escobedo's hotel.

6.    The employer/carrier will provide a room for Mr. Escobedo and his family at the Econo-Lodge Medical Center located at 7905 S. Main Street in Houston, Texas during the time necessary for Mr. Escobedo to stay in Houston. This hotel has a free shuttle to and from the Medical Center.

7.    The employer/carrier will advance to Mr. Escobedo a per diem for meals for him and his family of $85.00 per day for the days Mr. Escobedo is anticipated to be in Houston by providing a check payable to attorney, Jack Carinhas.

8.    Additionally, the employer/carrier will advance an additional $150.00 to Mr. Escobedo for miscellaneous transportation and laundry in Houston by providing a check payable to Jack Carinhas.

9.    For post-surgical care by an orthopedic surgeon for Mr. Escobedo in Brownsville, the parties will ask Dr. Esses to refer Mr. Escobedo to either Dr. Achleitner or Dr. Sweeney. If Dr. Esses will not make this choice, the parties agree to Dr. Achleitner. Dr. Esses, however, will remain the primary treating physician and will see Mr. Escobedo for follow-up appointments per Dr. Esses' instructions. The employer/carrier will pay for medications prescribed by both Dr. Esses and the local orthopedic surgeon.

06/05/2003 14:17 FAX 956 542                    ROYSTON, RAYZOR - BRO.                    @044

08/23/00 WED 08:22 FAX 956 54~ 4370            R R V & W                                  @006

Mr. Chris Gleasman                                                            Page 3
District Director
August 22, 2000

10.    Mr. Escobedo's post-surgical physical therapy will be conducted at Brownsville
       Physical Therapy under the supervision of Dr. Esses.

11.    Employer/carrier will provide transportation expense pursuant to the Act from
       Brownsville to Houston for follow up appointments with Dr. Esses. If Mr. Escobedo
       is in need of physical assistance to travel, the employer/carrier will also pay
       transportation cost for Mrs. Escobedo.

12.    The employer/carrier will continue to fulfill its obligation to make compensation
       payments to the extent required by the LHWCA.

                              Yours very truly,



                              Juan Escobedo, Claimant



                              Jack Carinhas, Attorney for Claimant



                              Keith N. Uhles, Attorney for Employer/Carrier



45430:923923.1:082200

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. B-02-172 |
| STEPHEN ESSES, M.D., | § | |
| F.A. RICHARD & ASSOCIATES, INC. | § | |
| AND JANE ROSAMOND | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF M. KATHERINE STRAHAN

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

M. Katherine Strahan, being by me duly sworn, deposes and says as follows:

1.      My name is M. Katherine Strahan.  I am over the age of 18, and I am fully competent to make this affidavit.  The factual statements made in this affidavit are true and correct and are based upon my personal knowledge.

2.      I am co-counsel for Stephen Esses, M.D., in the litigation in which this affidavit is being submitted.  I am licensed to practice in the State of Texas, and I am licensed to practice in the United States District Court for the Southern District of Texas.

3.      Exhibit 1 to this affidavit is a true and correct copy of a letter dated July 6, 2000, produced in this litigation by Plaintiff on March 4, 2003, as part of his Initial Disclosures under Rule 26(a)(1).

4.    Exhibit 2 to this affidavit is a true and correct copy of a letter dated June 29, 1999, that was produced by Plaintiff in this litigation in response to Dr. Esses' Request for Production.

4.    Exhibit 3 to this affidavit is a true and correct copy of an operative report that was produced by Plaintiff in this litigation in response to Dr. Esses' Request for Production.

Further Affiant sayeth not.

M. Katherine Strahan

SUBSCRIBED AND SWORN TO before me on this ___4th___ day of August, 2003.

LYNN CHEBETAR
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 25, 2006

NOTARY PUBLIC in and for the State of Texas

HOU:2193716.1



**FARA HEALTHCARE MANAGEMENT**
4646 Corona Drive, Suite 26
Corpus Christi, TX 78411
361-814-9500   FAX 361-814-9505

**F.A. Richard & Associates**

CERTIFIED MAIL

*Me I speak to:*

July 6, 2000

Mr. Jack Carinhas
Attorney At Law
302 Kings Highway, Suite 109
Brownsville, TX 78521

Re: Juan Escobedo

Dear Mr. Carinhas,

Jane Rosamond, with F.A. Richard & Associates, has requested FARA Healthcare Management provide case management services for Mr. Escobedo. The specific request at this time is to notify you and Mr. Escobedo of the arrangements that have been made with Dr. Stephen Esses' office in Houston.

Mr. Escobedo is scheduled for a pre-operative appointment with Dr. Esses on Monday, September 18, 2000 at 10:15 A.M. Mr. Escobedo will be instructed by Dr. Esses to go to St. Luke's Hospital for lab work and pre-registration following that appointment. He is scheduled for surgery on 09/19/00 at St. Luke's Hospital. The time for his surgery is still pending notification from Dr. Esses' staff. Mr. Escobedo will be hospitalized for two or three days following his surgery. His initial post-operative appointment with Dr. Esses is scheduled for 10/02/00 at 10:45 A.M. Dr. Esses' office location and telephone number are:

Dr. Stephen Esses, M.D.
6560 Fannin, Suite 1900
Houston, Texas 77030
713 986-5740

Dr. Esses' office is located across the street from Methodist Hospital, in the Scurlock Building on the 19th floor.

Please feel free to contact me at 1-800-992-6377 if you have any questions.

Sincerely,

*Debby J. Marcus, R.N.*

Debby J. Marcus, R.N.
Medical Case Manager

cc:    Jane Rosamond, Claims Adjuster
       F.A. Richard & Associates

✓ Juan Escobedo

*1-800-545-6784*

*Elvira*
*Gina*
*1-9:00*



# MADHAVAN PISHARODI, M.D., P.

942 Wildrose Lane • Brownsville, Texas 78520
Phone (956) 541-6725 • Fax (956) 541-2070
e-mail: Unniyettan @ aol.Com.

**MADHAVAN PISHARODI, M.D.**
Certified by American Board of Neurological Surgery
Certified by American Board of Spine Surgery

**A. P. CHANDRAN. PhD**
Certified in Electrodiagnosis and Neurophysiologic
Intraoperative Monitoring

June 29, 1999

FARA/F.A. Richard & Assoc.
P.O. Box 3107
Brownsville, TX 78523-3107

Re:        Juan Escobedo
DOI:       4-2-98
Employer:  AMFELS
SSN:       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

To Whom It May Concern:

Juan Escobedo is a 24-year-old male patient whom I started seeing in July of 1998 for evaluation of back pain and leg pain after he was referred to me by Dr. Adobbati.

Patient had the conventional studies done and none of these showed a herniated disk. After I evaluated him, I was impressed by the severity of his pain and the difficulty in rehabilitating with the existing amount of pain. For this reason, I advised him to have a discogram, which showed that his pain is coming mostly from L4-5 and L5-S1 disks. These disks showed tear inside without any actual disk herniation. Patients can have back pain due to mechanical pain factors as in this case, even in the absence of herniated disk. The theory is that when the disk tears inside the nerves grow into the disk and make the weight baring painful. In an intact disk there is no nerve endings and the weight baring is painless. The treatment for this condition is to remove the disk with the nerve endings. When you do that, the mechanical instability is going to be significant, and from experience, these patients do not do well after a diskectomy like that. For this reason, we recommend doing a simultaneous fusion after removing the painful disk and for the bone graft of the fusion to stay in the disk space, we also usually recommend instrumentation with pedicle screw and plate or rod.

The treatment is very elaborate for an apparently small problem, but patients who have had surgeries less than the elaborate surgery have not done well with this particular type of clinical picture. The patients' options are either to learn to live with the pain or to have the entire spectrum of surgical procedures done to remove the painful disk, fuse the disk spaces and stabilize the spine with screws and plates. The screws and plates can be removed later after the fusion has become solid. Over the years, physicians have been realizing this particular type of problem more and more and it is very easy to get confusing opinions from different doctors who believe in different philosophies.

If the ultimate aim is to improve the quality of life of the patient, then my only recommendation will be to go ahead with the diskectomy, fusion and instrumentation. It will not be very difficult to get four or five or even a dozen opinions from different doctors saying that since the MRI scan is normal this patient does not require surgery. However, looking at it from the patient's side, that will be an unfair decision and he will not be able to make his life useful under the circumstances.

One of the disadvantages of extensive opinion seeking is to convert his acute pain into more chronic pain, which is harder to control. He will also develop arthritis of the neighboring facets and wasting of his trunk muscles resulting in suboptimal result even with appropriate surgery. It is my opinion that the patient be given the chance to get better by the proper treatment and this be done without any further delay.

I saw the patient in my office on the 22nd of June, and at that time, he was still having significant pain and his back spasm was noted to be worse than the previous times. I feel that his pain condition is not improving and I feel that he requires the recommended treatment.

If you have any further questions with reference to this report or if you need any references regarding the mechanical pain in disk injuries short of disk herniation, please do not hesitate to contact me.

Yours sincerely,

Madhavan Pisharodi, M.D.
Neurosurgeon

MP/ma

COPY

THIS LETTER HAS BEEN DICTATED BY MADHAVAN PISHARODI, M.D. BUT NOT READ AND IS SUBJECT TO DICTATION AND TRANSCRIPTION VARIANCE

VALLEY REGIONAL MEDICAL CENTER
100 A ALTON GLOOR
BROWNSVILLE, TEXAS, 78521

PATIENT NAME: ESCOBEDO,JUAN          AGE: 25      ROOM#: VR.31      UNIT#: VR008315
DOCTOR: Pisharodi,Madhavan M.D.      ADM: 12/23/99      DIS:


DATE OF OPERATION:          12/23/99

PREOPERATIVE DIAGNOSIS:     LUMBAR-4/5 AND LUMBAR-5/SACRAL-1 DISK INJURY WITH
                            BILATERAL RADICULOPATHY, RIGHT WORSE THEN LEFT AND
                            DISKOGENIC PAIN.

POSTOPERATIVE DIAGNOSIS:    LUMBAR-4/5 AND LUMBAR-5/SACRAL-1 DISK INJURY WITH
                            BILATERAL RADICULOPATHY, RIGHT WORSE THEN LEFT AND
                            DISKOGENIC PAIN.

NAME OF OPERATION:          1.  LUMBAR-4, LUMBAR-5, AND SACRAL-1 PARTIAL LAMINECTOMY.
                            2.  LUMBAR-4/5 AND LUMBAR-5/SACRAL-1 FACETECTOMY AND
                                FORAMINOTOMY ON THE RIGHT SIDE.
                            3.  LUMBAR-4/5 AND LUMBAR-5/SACRAL-1 DISKECTOMY ON THE
                                RIGHT SIDE.
                            4.  LUMBAR-4, LUMBAR-5, SACRAL-1 INTERSPINOUS
                                STABILIZATION WITH SECURE STRAND.

SURGEON:                    MADHAVAN PISHARODI, M.D.

ASSISTANT:                  JOSE KURI, M.D.

ANESTHESIA:

ANESTHESIOLOGIST:

INDICATIONS FOR SURGERY:  This is a 25-year-old male patient who was referred to me by
Dr. Ricardo Adobbati in July of 1998 with complaints of back pain and bilateral leg
pain, right worse than left.  The patient started having pain following a work related
injury in April of 1998.  When his pain was not responding to conservative management,
Dr. Adobbati referred the patient to me for second opinion and evaluation. The MRI scan
was normal but the neurological examination showed right-sided radiculopathy.  In
addition, his pain was very severe, not explained by the MRI scan. The patient had a
myelogram done which showed some irregularity of the nerve root, filling on the right
side at L-4/5 and L-5/S-1 levels but no evidence of any disk herniation.  The patient
continued to have severe pain and so eventually the patient had a discogram done.  The
discogram showed disruption at L-4/5 and L-5/S-1 level.  This was significant in a
24-year-old man at that time and so he was was advised appropriate surgery for
diskectomy for the two level disk problems with the diskectomy, fusion and
instrumentation.  Since then, for the last one and a half years, the patient has been
trying to get his surgery clear.  The surgery was recommended because of the severe
nature of pain and the lack of response to conservative management.  The insurance
company sent the patient for a second opinion and their opinion was that the patient did
not require any surgery.  Since this did not resolve the patient's problem, he was sent
for another second opinion.  This doctor agreed with the diagnosis of diskogenic pain


PATIENT CARE INQUIRY  **LIVE** (PCI: OE Database COCVA)

**VALLEY REGIONAL MEDICAL CENTER**
**100 A ALTON GLOOR**
**BROWNSVILLE, TEXAS, 78521**

PATIENT NAME: ESCOBEDO,JUAN          AGE: 25      ROOM#: VR.31      UNIT#: VR008315
DOCTOR: Pisharodi,Madhavan M.D.      ADM: 12/23/99     DIS:

and the need for diskectomy and fusion but reported that there was nobody capable of
doing this type of surgery in the Valley.  The rational for this conclusion is unknown
to me at this time.  The patient was subsequently sent to two more second opinions by
the insurance company in Houston and both of them recommended simple diskectomy for
diskogenic pain.  I kept insisting that simple diskectomy for diskogenic pain has a
tract record of very poor results and in my  opinion the patient should have diskectomy
and fusion.  I informed the patient that I had done this surgery on several patients in
the past and I felt capable of doing the surgery for him and I did not agree with the
second opinion that there was nobody capable of doing this surgery in the Valley.  The
patient desired for me to do the surgery but the insurance company kept refusing the
approval.   The patient informed me that the insurance company was suggesting to the
patient that he should have the simple diskectomy done in Houston or else in the Valley
by either the doctor who said that the patient did not require the surgery or by the
physician who said that there was nobody in the Valley who was capable of doing his
surgery.  The patient was unwilling for these options and kept trying for the
appropriate surgery.  Eventually, in December his pain got acutely worse, probably
related to the cold weather, and he approached me and desired to have the simple
diskectomy done as a first stage and then to have the surgery for fusion at a later date
since he could not wait for the approval of the fusion with the pain he had.  Since this
was the patient's desire I agreed to do this simple diskectomy and he was scheduled for
the diskectomy. Since the diskogenic pain is from both L-4/5 and L-5/S-1 levels, I
recommended diskectomy at both levels.  Since the patient did not have the approval for
the fusion, I offered him interspinous fixation to minimize the motion between the
vertebral bodies and thus probably reduce the postoperative pain.  The patient is
agreeable for the same.  Accordingly, consent was obtained for two level diskectomy,
decompression and interspinous fixation with secure strand.

The risks and benefits of the surgery were explained in great detail before obtaining
informed consent.  No guarantees were given.  The risks of infection, bleeding,
paralysis, cerebrospinal fluid leak, persistent pain, recurrent disk herniation,
spinal instability, possible need for other surgeries including possible fusion and
all other possible complications were explained.   The patient considered all the risks
involved and consented for the procedure without expecting any guarantees.

DESCRIPTION OF OPERATION:
The patient was anesthetized in the operating room and was positioned prone over chest
rolls with flexion of the lumbar spine.  Back was shaved and prepared with Betadine soap
and paint and the usual drapes were applied.  A skin incision was made from L-4 spinous
processes to S-1 spinous process and the thoracolumbar fascia was exposed. The same was
incised on the right side of L-4/L-5 and S-1 spinous processes and the paraspinous
muscles were retracted.  Partial L-4/L-5 and S-1 laminectomies were done and the lateral
one third of the ligamentum flavum was removed.  Facetectomy and foraminotomy were done
at L-4/5 and L-5/S-1 levels and the nerve roots were decompresed.  There was no exiting
nerve root from the dural sac at the L-4/L-5 level and this was the abnormality seen on
the mylogram.  The nerve root was actually coming out at L-5/S-1 level as a conjoined

PATIENT CARE INQUIRY  **LIVE** (PCI: OE Database COCVA)

**VALLEY REGIONAL MEDICAL CENTER**
**100 A ALTON GLOOR**
**BROWNSVILLE, TEXAS, 78521**

PATIENT NAME: ESCOBEDO,JUAN          AGE: 25      ROOM#: VR.31     UNIT#: VR008315
DOCTOR: Pisharodi,Madhavan M.D.      ADM: 12/23/99      DIS:

nerve root.  This made the diskectomy at L-5/S-1 very difficult because the L-5 nerve
root was actually lying over the disk lateral to the S-1 nerve root.  Under the
circumstances the diskectomy had to be done through the axilla of S-1 by retracting the
S-1 nerve root laterally.  Adequate diskectomy was carried out and the disk material was
found to be soft and mushy from the degeneration as evidence in the diskogram.  The
L-4/L-5 disk was also removed in a similar manner and this disk was also found to be
soft and mushy degenerated as per the diskogram.  After removing adequate amount of disk
material to decompress the disk space, and after adequately decompressing the nerve
roots.  The thoracolumbar fascia was incised on the left side of L-4/L-5 and S-1 spinous
processes.  A secure strand was then taken around the top of L-4 and the bottom of S-1
spinous processes and the secure strand was tightened with the patient in slight
extension.  This was done to prevent excessive flexion at these two disk levels thus
reducing the risk of recurrent disk herniations and pain from the spinal instability.
Hemostasis was achieved and 4 mg of Astramorph was sprayed around the nerve roots.  The
thoracolumbar fascia was closed using 0 Vicryl and the subcutaneous fat was also closed
using 0 Vicryl.  The subcutaneous tissue was closed using 3-0 Vicryl and the skin was
closed using subcuticular 3-0 Vicryl closure.  Estimated blood loss about 120 cc.
Marcaine 1/2%, 30 cc was injected along the incision line.  Complications - none.  The
patient was transferred in a satisfactory condition to the recovery room.


DD: 12/23/99 1208
DT: 12/23/99 1734
OBG


                                        ----------------------------
                                        Madhavan Pisharodi, M.D.



cc:



CERTIFIED COPY

CAUSE NO. 2002-08-3094-D

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| STEPHEN ESSES, M.D., | § | |
| F.A. RICHARD & ASSOCIATES, INC. | § | |
| and JANE ROSAMOND | § | 108 JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW **JUAN ESCOBEDO**, Plaintiff, and files this its Plaintiff's Original Petition, complaining of Defendants Stephen Esses, M.D., F.A. Richard & Associates, Inc. and its employee, Jane Rosamond. For cause of action, Plaintiff would show the Honorable Court as follows:

### I.

### DISCOVERY CONTROL PLAN

Plaintiff intends to conduct discovery pursuant to a level three discovery control plan.

### II.

### PARTIES

Plaintiff is a resident of Cameron County, Texas.

Defendant Stephen Esses, M.D. is a physician residing in Harris County, Texas. He may be served at 6560 Fannin Street, Suite 1900, Houston, Texas 77030.

Defendant F.A. Richard & Associates, Inc. is a corporation doing business in Cameron County, Texas. It may be served through its registered agent, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

Defendant Jane Rosamond is an individual residing in Cameron County, Texas. She may be served at her address, P.O. Box 3545, South Padre Island, Texas 78597-3545, or at Amfels

 ᴇRTIFIED COPY

Shipyard in Brownsville, Texas.

## III.

## VENUE

Venue is proper in Cameron County, Texas because Defendant Rosamond resides in the county.

## IV.

## FACTS

Plaintiff was injured while working at Amfels, and was covered under the LHWCA. He chose Dr. Madhavan Pisharodi as his treating physician. Due to the injuries he sustained, Plaintiff needed a two-level diskectomy, fusion, and instrumentation in his lumbar spine.

Defendant Rosamond, in the course and scope of her employment with Defendant F.A. Richard, adjusted Plaintiff's claim. Despite clear evidence that Plaintiff needed a two-level diskectomy, fusion, and instrumentation, Defendant Rosamond conspired to save the insurance company money by denying Plaintiff the surgery he truly needed. She also conspired to have Plaintiff get another doctor, because she knew that Dr. Pisharodi would not give in to insurance company pressure and put profits ahead of his patients.

Defendant Rosamond forced Plaintiff to see Defendant Esses. Dr. Esses first orally agreed with Dr. Pisharodi that Plaintiff needed a two-level diskectomy, fusion, and instrumentation. However, after speaking to a person who Plaintiff believes to be Rosamond, he was persuaded to falsely state that Plaintiff really only needed a simple single-level diskectomy.

Plaintiff had a two-level diskectomy. However, due to Defendants' misfeasance and malfeasance, he did not get a fusion and instrumentation because Defendants would not approve it. Predictably, the diskectomy did not relieve his severe back pain.

 ...TIFIED COPY

In November 2000, Defendant Esses finally performed an instrumented spinal fusion. However, he did not use cross links to stabilize the fusion. As a result, the surgery failed to give Plaintiff relief. Had Defendant Esses properly performed the surgery by using cross links, in reasonable medical probability the surgery would have succeeded in alleviating Plaintiff's severe and debilitating back pain.

## V.

## CAUSE OF ACTION

Defendants have tortiously interfered with Plaintiff's contractual relations. Plaintiff was a third-party beneficiary of the insurance contract between his employer and the LHWCA insurer. Under the contract, he had a right to receive the medical benefits he needed, including a two-level disckectomy and fusion with instrumentation. Defendants tortiously interfered with these rights by conspiring to prevent him from receiving the benefits to which he was entitled. As a direct and proximate result of Defendants' misfeasance, Plaintiff has suffered damages in an amount in excess of this Court's jurisdictional minimum.

Defendant Esses was negligent in not recommending the proper procedure the begin with, and in failing to use a cross-brace in performing the fusion. This misfeasance proximately caused Plaintiff's damages.

Defendants Rosamond and F.A. Richard violated Article 21.21 of the Texas Insurance Code. Plaintiff sues for these violations.

All Defendants conspired with one another to commit the above-described tortious and illegal acts. As such, they are all vicariously liable for each other's conduct.

Defendant F.A. Richard is vicariously liable for the conduct of Defendant Rosamond under the doctrine of respondeat superior.

  CERTIFIED COPY

Further, Defendants have acted with malice, as that term is defined by Chapter 41 of the Texas Civil Practice and Remedies Code. Therefore, Plaintiff also seeks to recover exemplary damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that citations be issued and Defendants be served, and that upon trial on the merits Plaintiff have judgment against Defendants, jointly and severally, for actual damages, exemplary damages, prejudgment interest, postjudgment interest and court costs.

RESPECTFULLY SUBMITTED,

MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
Michael R. Cowen
Texas Bar No. 00795306

A TRUE COPY I CERTIFY
AURORA DE LA GARZA, CLERK
DISTRICT COURT CAMERON COUNTY, TEXAS
... 2 4 2003
DEPUTY
DISTRICT COURT CAMERON COUNTY, TEXAS

RUN DATE 07/24/03
RUN TIME 11:40 AM

# CERTIFIED COPY

PAGE: 01

2002-08-003094-D

* * * * C L E R K ' S   E N T R I E S * * * *

JUAN ESCOBEDO

VS

STEPHEN ESSES, M.D., F.A RICHARD & ASSOCIATES, INC.

THORNTON, SUMMERS, ET AL(CORP

(10)     08    02    02

00549801
MICHAEL R. COWEN
520 E. LEVEE STREET
BROWNSVILLE, TX.        78520 0000

DAMAGES                          30.00

00031509
VAUGHAN WATERS
500 NORTH SHORELINE BLVD
CORPUS CHRISTI, TX     78471 1010

MMURRAYJR/CW

09/12/02   ORDER ON NOTICE OF REVOMAL

| | |
|---|---|
| 08/02/02 | ORIGINAL PETITION FILED |
| 08/07/02 | CITATION: |
| 08/07/02 | CITATION: STEPHEN ESSES, M.D. |
| 08/07/02 | SERVED: |
| 08/07/02 | CITATION: F.A. RICHARD & ASSOCIATES, INC. |
| | SERVED: 08/12/02          FILED: 08/20/02 |
| 08/07/02 | CITATION: JANE ROSAMOND |
| | SERVED: 08/13/02          FILED: 08/15/02 |
| 08/07/02 | ORIGINAL ANSWER: F.A. RICHARD & ASSOCIATES, INC. |
| 08/28/02 | ORIGINAL ANSWER: JANE ROSAMOND |
| 08/28/02 | DEFENDANTS F.A. RICHARD & ASSOCIATES, INC. AND JANE ROSAMOND'S JURY DEMAND |
| 08/28/02 | JURY FEE - Pd. by VAUGHAN WATERS |
| 08/28/02 | DEFTS F.A. RICHARD & ASSOCIATES, INC. & JANE ROSAMOND'S JURY DEMAND /CWARFORD |
| 09/12/02 | NOTICE OF REMOVAL /CWARFORD |
| 05/12/03 | REC MGT BOX 42 |

A TRUE COPY I CERTIFY
AURORA DE LA GARZA, CLERK
DISTRICT COURT CAMERON COUNTY, TEXAS
JUN 24 2003
BY_____ DEPUTY