

United States District Court
Southern District of Texas
FILED

SEP 0 9 2003

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO: B-02-172** |
| | § | |
| STEPHEN ESSES, M.D., | § | |
| F. A. RICHARD & ASSOCIATES, INC. | § | |
| and JANE ROSAMOND | § | |

### *MOTION TO DISMISS AND, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, F. A. RICHARD & ASSOCIATES, INC. AND JANE ROSAMOND*

TO THE HONORABLE JUDGE OF SAID COURT:

Now come **F. A. RICHARD & ASSOCIATES, INC. AND JANE ROSAMOND**, Defendants, and file this their Motion to Dismiss pursuant to and in accordance with Rule 12(b)(6), Federal Rules of Civil Procedure, and, alternatively, their Motion for Summary Judgment pursuant to and in accordance with Rule 56(b), Federal Rules of Civil Procedure; and in support thereof, will respectfully show this Honorable Court as follows:

### I.
### INTRODUCTION

Defendants would show that Plaintiff, as conclusively demonstrated by the pleadings herein, has failed to state a claim upon which relief can be granted within the meaning of Rule 12(b)(6), Federal Rules of Civil Procedure, and that Defendants accordingly are entitled as a matter of law to a dismissal of Plaintiff's claims and causes of action against these Defendants.

In the alternative, and without waiving the foregoing, Defendants would show the Court that, as to all claims and causes of action of Plaintiff, there is no genuine issue as to any material fact, and

*Page - 1 -*

Defendants are conclusively entitled as a matter of law to a take-nothing summary judgment. Further, and without waiving the foregoing, Defendants would show that there is no evidence of one or more essential elements of Plaintiff's claims against said Defendants, and that Defendants are accordingly entitled to a take-nothing summary judgment as to all such claims and causes of action, as further set forth hereinbelow.

## II.
## FACTS

The pleadings, affidavits, and products of discovery on file herein, or filed herewith and expressly incorporated herein by reference for all purposes, conclusively establish the following:

(1)    Plaintiff, JUAN ESCOBEDO, was employed at Amfels Shipyard in Brownsville, Texas on April 2, 1998. Plaintiff's Original Petition (Exhibit A).

(2)    As an employee of Amfels Shipyard, Plaintiff was a covered employee under the terms of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et. seq.* (hereinafter "LHWCA"). *Id.*

(3)    Plaintiff alleges that he was injured while in the course and scope of his employment at Amfels Shipyard on or about April 2, 1998. *Id.*

(4)    Defendant, F. A. RICHARD & ASSOCIATES, INC. (hereinafter "FARA"), a claims administration service, began administering workers' compensation claims for the Amfels Shipyard in January 1999, on behalf of Amfels' insurance carrier, Reliance National Insurance Company (later in liquidation).  Affidavit of Jane Rosamond (Exhibit B).

(5)    FARA, through JANE ROSAMOND, administered the claim of Plaintiff for compensation and medical benefits under LHWCA.  *Id.*

(6)    Plaintiff was represented by an attorney, Mr. Jack Carinhas, in connection with the

*Page - 2 -*

administration of his LHWCA claim.  Deposition of Juan Escobedo, at 149-150, deposition exhibit B, dep. ex. D (Exhibit C).

(7)    Plaintiff began losing time from work on May 6, 1998 following the injury.  Exhibit B; Exhibit C, at 159-160, dep. ex. D.

(8)    On that date Plaintiff was examined by Dr. Ricardo Adobbati, M.D., at which time Dr. Adobbati advised Plaintiff to discontinue working and ordered an MRI to determine if there was a herniated disk; Dr. Adobbati reported on May 19, 1998 that the MRI scans were normal, with no evidence of a ruptured disk, and he advised Plaintiff to remain off work and recommended additional conservative care.  Exhibit B; Exhibit C, at dep. ex. D.

(9)    On July 1, 1998 Dr. Adobbati again examined Plaintiff and recommended a neurosurgical consultation, resulting in Plaintiff's referral to a consultation with Dr. Madhavan Pisharodi, M.D., a Brownsville neurosurgeon and the treating physician selected by Plaintiff.  *Id.*

(10)    Dr. Pisharodi first examined Plaintiff in July 1998, but did not issue his first report until June 29, 1999, in which report Dr. Pisharodi stated his opinions that there was a positive discogram for internal disk tear and disruption, which explained Plaintiff's painful weight bearing, and he recommended an L4/L5 and L5/S1 diskectomy with fusion and instrumentation, to address what he termed Plaintiff's "painful disc syndrome".  *Id.*

(11)    By his report dated January 6, 1999 Dr. Adobbati recommended against the surgical option referenced by Dr. Pisharodi until another option is obtained.  *Id.*

(12)    On May 12, 1999 Plaintiff was examined by Dr. Eric Six, M.D., a neurosurgeon, who concluded that in light of the positive discogram referenced by Dr. Pisharodi a lumbar fusion might be of benefit; however, Dr. Six recommended that the surgery be done at a major institution of higher learning.  *Id.*

(13)    On August 4, 1999 Plaintiff was examined by Dr. Martin Barrash, M.D., a neurosurgeon selected by the employer through FARA for consultation, who stated in his report that the overall clinical and diagnostic picture of Plaintiff was in his opinion insufficient to justify multi-level disc excision with fusion and instrumentation; Dr. Barrash recommended surgery limited to a right sided diskectomy at L5/S1, and that Plaintiff be reassessed after this minimal surgery to determine if additional treatment is warranted. *Id.*

(14)    November 22, 1999 Plaintiff was examined, at the direction of the United States Department of Labor, by DR. STEVEN ESSES, M.D., who advised that he did not recommend proceeding with a two level disc excision and fusion with instrument; he recommended that a reasonable treatment would consist of simple diskectomy at L5/S1 on the right side. *Id.*

(15)    On December 23, 1999 Dr. Pisharodi performed on Plaintiff a surgical procedure consisting of L4/L5 and L5/S1 partial laminectomy; L4/L5 and L5/S1 facetectomy and foraminotomy on the right side; L4/L5 and L5/S1 diskectomy on the right side; and L4/L5 and L5/S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow up reports from January 2000 until April 2000 indicating a normal postoperative course without complication, but an increase in Plaintiff's leg pain; Dr. Pisharodi recommended additional low back surgery including a multiple level fusion with instrumentation.  *Id.*

(16)    The procedure performed by Dr. Pisharodi was not "reasonable and necessary" within the meaning of the LHWCA.  Exhibit C, at dep. ex. C.

(17)    On March 22, 2000, Dr. Barrash issued a report stating that the surgery performed was not the procedure recommended either by him or by DR. ESSES, and was unreasonable; he concluded that if further surgery is necessary, it is due to the performance of this unauthorized procedure. *Id.*

(18)    Plaintiff's employer, through FARA, filed a Notice of Controversion under the LHWCA objecting to further treatment by Dr. Pisharodi. *Id.*

(19)    The United States Department of Labor issued an order on September 1, 2000, changing treating physicians and designating DR. ESSES as Plaintiff's treating physician. *Id.*

(20)    On June 29, 2000 Plaintiff was again examined by DR. ESSES at the request of the United States Department of Labor; DR. ESSES reported in writing on that date that he recommended further treatment consisting of a two level laminectomy, diskectomy and fusion with instrumentation. Exhibit B; Exhibit C, at dep. ex. D.

(21)    On September 18, 2000 DR. ESSES performed this recommended surgery on Plaintiff who, according to DR. ESSES' follow-up exams in November and December 2000, demonstrated improvement; Plaintiff underwent physical therapy and continued with follow-up appointments with DR. ESSES. *Id.*

(22)    As a result of his injury, Plaintiff was temporarily and totally disabled from May 6, 1998 until July 26, 2001, inclusive, entitling him to compensation at the rate of $235.95 per week for 168 weeks totaling $39,639.60. *Id.*

(23)    Plaintiff's permanent partial disability began on July 27, 2001 and continues, entitling him to compensation at the rate of $69.27 per week through March 5, 2002. *Id.*

(24)    As of March 5, 2002 Plaintiff was paid a total of $47,356.23 in disability payments resulting in an overpayment by Plaintiff's employer and carrier, which overpayment has been waived by the employer and carrier. *Id.*

(25)    As of March 5, 2002 Plaintiff had reached maximum medical improvement. *Id.*

(26)    Plaintiff, his employer, and the employer's carrier fully and finally compromised and settled Plaintiff's LHWCA claim for the sums above referenced, as well as for medical benefits paid

by the carrier in the total amount of $102,896.41, and the additional lump sum payment of $84,000.00. *Id.*

(27)    The decision to change Plaintiff's treating physician from Dr. Pisharodi to Dr. Esses was a decision made by the United States Department of Labor, not by FARA or JANE ROSAMOND. Exhibit B; Exhibit C, at 158, dep. ex. D.

(28)    Plaintiff agreed not to object to or appeal from the United States Department of Labor order changing treating physicians from Dr. Pisharodi to DR. ESSES. Exhibit B; Exhibit C, at dep. ex. B.

(29)    Plaintiff's settlement agreement was fully funded according to the terms thereof, was approved by Plaintiff and by his attorney, Mr. Jack Carinhas, and was explained to Plaintiff through an English/Spanish interpreter. Exhibit B; Exhibit C, at 163 - 164, dep. ex. D.

### III.
### GROUNDS OF MOTION TO DISMISS AND OF
### MOTION FOR SUMMARY JUDGMENT

Defendants FARA and JANE ROSAMOND move for dismissal and, alternatively, for summary judgment on grounds that, based on pleadings and on the undisputed summary judgment evidence, and as a matter of law, all claims and causes of action of Plaintiff herein against said Defendants are barred by the doctrine of res judicata and by federal preemption under the LHWCA. In addition to and without waiving the foregoing, there is a complete absence of competent and admissible summary judgment evidence tending to establish that Defendants or either of them tortiously interfered with any contractual relations between Plaintiff and the LHWCA insurer, Reliance National.

In addition to and without waiving the foregoing, the following argument and authorities are expressly incorporated by reference into the foregoing grounds of said motions.

# IV.
## ARGUMENT AND AUTHORITIES

Plaintiff has in essence filed two lawsuits under the same instrument: a common law medical malpractice claim against DR. STEPHEN ESSES; and a "tortious interference"/insurance bad faith cause of action against FARA and JANE ROSAMOND, Plaintiff's employer's claim administrators, for alleged wrongful denial or delay of LHWCA benefits. This latter claim is unauthorized, and is meritless as a matter of law, because it is preempted in its entirety by the LHWCA and barred by the exclusive remedy provision thereof (33 U.S.C. § 905(a)).

The case of ***Atkinson v. Gates, McDonald & Co.***, 838 F.2d 808 (5th Circuit 1988) is squarely on point. In that case the plaintiff, an employee of the Navy Resale Services Support Office ("NAVRESSO"), sustained an injury in the course of her employment. NAVRESSO, a self-insurer for compensation purposes, contracted with Gates, McDonald - a claims administrator (like FARA) - to administer its self- insurance fund, investigate and settle workers' compensation claims under the LHWCA, and to pay compensation benefits to employees in accordance therewith. Gates, McDonald paid LHWCA disability compensation benefits and medical expenses to the plaintiff through May 31, 1984, but then terminated all payments, supposedly without notification to the plaintiff. The plaintiff then filed a claim with the United States Department of Labor under the LHWCA, which ordered her disability benefits reinstated and further ordered the payment of retroactive benefits and a 10% penalty thereon, under the terms of the LHWCA. She ultimately received all compensation benefits, but nonetheless sued Gates, McDonald, arguing that it had "arbitrarily, callously, intentionally, capriciously, wrongfully, unreasonably, in bad faith, without any reasonably legitimate or reasonably arguable reason", failed and refused to make disability or medical payments to her between March 31, 1984, and January 22, 1986, or to pay certain medical expenses which allegedly had become due even prior to March 31, 1984. Gates, McDonald filed a

motion to dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure, and for summary judgment under Rule 56, which the district court granted, dismissing the plaintiff's claims. *Atkinson*, at 808-809.

The Fifth Circuit affirmed, "being essentially in agreement with the district court's well reasoned opinion". *Id.,* at 809. It noted - as the district court had noted - that the plaintiff "is asserting what are in essence state law claims for bad faith [and] intentional infliction of emotional distress" in failing and refusing to pay compensation benefits and medical expenses under the LHWCA; however, the exclusivity provision of the LHWCA (as well as that of the Non-Appropriated Fund Instrumentalities Act, 5 U.S.C. § 8173) operated to bar the plaintiff's claims, which are preempted under both Acts. *Id.,* at 809-810.

The Fifth Circuit quoted from the language of 33 U.S.C. § 905(a): "The liability of an employer prescribed in § 904 of this title shall be exclusive and in place of all liability of such employer to the employee...on account of such injury or death...". *Id.,* at footnote 2. The Court further quoted with approval from the observations of the district court:

> Since the Act itself provides not only for payment of benefits, but also for redress in the event of nonpayment of benefits, and further does not distinguish between good faith and bad faith nonpayment of benefits, the apparent intent of the Act is that the penalty provisions provide the exclusive remedy for late payment or nonpayment of benefits.

*Id.,* at 812 (citing 665 F.Supp. at 521). "In these circumstances, the LHWCA is plainly preemptive of any state law claim for intentional or bad faith wrongful refusal to pay benefits under the Act, and this is true even in the absence of any expressly preemptive language." *Id.* (This is consistent with the district court's observation that "the delay penalty provision of the LHWCA contemplates that the intentional test of bad faith will be expiated by payment of the [§ 91.4] penalty." 665 F. Supp. at 522.)

Significantly, the plaintiff in *Atkinson* advanced the theory that the exclusivity provision of § 905(a) of the LHWCA is directed only to the liability of the "employer", whereas she was suing not her employer, but Gates, McDonald. Again the Court's reasoning is not only instructive, but determinative:

> We reject these contentions...[W]e have held that the LHWCA impliedly grants the employer's insurance carrier, and the insurance carrier of co-employees, the same immunity which it grants the employer and co-employees [citations omitted]...It obviously makes no sense for the employer's agent not to have the immunity which the employer would if carrying out the same actions directly...*This is no less true where the liability is sought to be imposed on the self-insured employer's claims' agent.*

*Id.,* at 811 (emphasis added).

To like effect is the case of ***Texas Employer's Insurance Association v. Jackson***, 820 F.2d 1406 (5th Circuit 1987). There too the Fifth Circuit concluded that Texas state law claims against an insurance carrier were precluded by the LHWCA. Again, the Court read the LHWCA "so that the rights and obligations of the employer's insurer are congruent with those of the employer". ***Jackson***, at 1414.

So too in the case of ***Hetzel v. Bethelhem Steel Corporation***, 50 F.3rd 360 (5th Circuit 1995) the Fifth Circuit recognized the scope of federal preemption under the LHWCA in the context of an asserted Texas DTPA claim against the injured worker's employer; the Court discussed the issue thusly:

> As set forth above, federal preemption can occur where a state statute either directly conflicts with federal law or frustrates the purpose behind the federal law. We find that both conditions occur here. First, § 905(a) [of the LHWCA] provides in part, "the liability of an employer prescribed in § 904 of this title shall be exclusive and *in place of all other liability* of such employer to the employee" (emphasis supplied). Where liability arises as a result of the employment relationship, Congress explicitly intended for the LHWCA to be the exclusive remedy...

*Hetzel*, at 366 (footnote omitted) (emphasis in the original) See also ***Levene v. Pintail Enterprises, Inc.***, 943 F.2d 528, 531 (5th Circuit 1991) ("The LHWCA absolutely bars suit for all other acts taken in the capacity as the employer of the injured worker".)

In the instant case, not only did Plaintiff pursue his statutory remedy under the LHWCA, *he pursued it to a full, final and comprehensive settlement, freely acknowledging that the employer, the employer's carrier, and FARA have honored the settlement terms.*

In view of the foregoing, Defendants FARA and JANE ROSAMOND are conclusively entitled as a matter of law to a summary judgment, and to a Rule 12(b)(6) dismissal of Plaintiff's claims with prejudice. It is thus not necessary, strictly speaking, to address the meritlessness of Plaintiff's "tortious interference" claim even under Texas common law. It might be noted, however, that it is well established in Texas that one cannot interfere with one's own contract. ***Holloway v. Skinner***, 898 S.W.2d 793, 795-796 (Tex. 1995). Thus an interference claim "cannot be brought against a principal's agent or a party in a confidential relationship to the party to the contract". 13 W. Dorsaneo, TEX. LITIGATION GUIDE § 205.02[3] (2002). The agent is not liable for tortious interference with its principal's contracts, because in this arena - just as in the LHWCA - the agent and the principal are treated as one. ***John Masek Corporation v. Davis***, 848 S.W.2d 170, 175 (Tex. App. - Houston 14th District] 1992, writ denied).

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully pray that this motion to dismiss and, alternatively, for summary judgment be set for a hearing at the earliest practicable time upon due notice to the parties; that upon hearing the motions be granted in their entirety, a take-nothing judgment in favor of Defendants FARA and JANE ROSAMOND be entered accordingly, and Plaintiff's claims and causes of action against these Defendants be severed from the remainder of this cause; that such claims and causes of action of Plaintiff against said Defendants be dismissed

with prejudice; and for such other and further relief, at law or in equity, to which Defendants might

show themselves justly entitled.

Respectfully submitted,

**THORNTON, SUMMERS, BIECHLIN,
    DUNHAM & BROWN, L.C.**
Bank of America - Suite 1000
500 North Shoreline Boulevard
Corpus Christi, Texas 78471
361/884-2037        Fax:  361/884-5239


Vaughan E. Waters
Federal ID No: 9206
State Bar No.  20916700
*Attorney for Defendants F. A. Richard &
Associates, Inc., and Jane Rosamond*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been

served in accordance with the Federal Rules of Civil Procedure, on this the  __8th__  day of September,

2003.

Mr. Michael R. Cowen
**MICHAEL R. COWEN, P.C.**
765 E. 7th Street, Suite A
Brownsville, Texas 78520

Mr. Jeff McClure
Ms. M. Katherine Strahan
**ANDREWS & KURTH**
600 Travis, Suite 4200
Houston, Texas   77002


Vaughan E. Waters

# COPY

FILED ____ O'CLOCK ___
AURORA DE LA GARZA DIST. CL
AUG 0 2 2002
DISTRICT COURT OF CAMERON COUNTY, TI
DEP

CAUSE NO. 2002-08-3024-D

| | | |
|---|---|---|
| JUAN ESCOBEDO | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| STEPHEN ESSES, M.D., | § | |
| F.A. RICHARD & ASSOCIATES, INC. | § | |
| and JANE ROSAMOND | § | 103 JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW JUAN ESCOBEDO, Plaintiff, and files this its Plaintiff's Original Petition,

complaining of Defendants Stephen Esses, M.D., F.A. Richard & Associates, Inc. and its employee,

Jane Rosamond. For cause of action, Plaintiff would show the Honorable Court as follows:

### I.

### DISCOVERY CONTROL PLAN

Plaintiff intends to conduct discovery pursuant to a level three discovery control plan.

### II.

### PARTIES

Plaintiff is a resident of Cameron County, Texas.

Defendant Stephen Esses, M.D. is a physician residing in Harris County, Texas. He may be

served at 6560 Fannin Street, Suite 1900, Houston, Texas 77030.

Defendant F.A. Richard & Associates, Inc. is a corporation doing business in Cameron

County, Texas. It may be served through its registered agent, CT Corporation System, 350 N. St.

Paul Street, Suite 2900, Dallas, Texas 75201.

Defendant Jane Rosamond is an individual residing in Cameron County, Texas. She may

be served at her address, P.O. Box 3545, South Padre Island, Texas 78597-3545, or at Amfels



Shipyard in Brownsville, Texas.

## III.

## VENUE

Venue is proper in Cameron County, Texas because Defendant Rosamond resides in the county.

## IV.

## FACTS

Plaintiff was injured while working at Amfels, and was covered under the LHWCA. He chose Dr. Madhavan Pisharodi as his treating physician. Due to the injuries he sustained, Plaintiff needed a two-level diskectomy, fusion, and instrumentation in his lumbar spine.

Defendant Rosamond, in the course and scope of her employment with Defendant F.A. Richard, adjusted Plaintiff's claim. Despite clear evidence that Plaintiff needed a two-level diskectomy, fusion, and instrumentation, Defendant Rosamond conspired to save the insurance company money by denying Plaintiff the surgery he truly needed. She also conspired to have Plaintiff get another doctor, because she knew that Dr. Pisharodi would not give in to insurance company pressure and put profits ahead of his patients.

Defendant Rosamond forced Plaintiff to see Defendant Esses. Dr. Esses first orally agreed with Dr. Pisharodi that Plaintiff needed a two-level diskectomy, fusion, and instrumentation. However, after speaking to a person who Plaintiff believes to be Rosamond, he was persuaded to falsely state that Plaintiff really only needed a simple single-level diskectomy.

Plaintiff had a two-level diskectomy. However, due to Defendants' misfeasance and malfeasance, he did not get a fusion and instrumentation because Defendants would not approve it. Predictably, the diskectomy did not relieve his severe back pain.

In November 2000, Defendant Esses finally performed an instrumented spinal fusion. However, he did not use cross links to stabilize the fusion. As a result, the surgery failed to give Plaintiff relief. Had Defendant Esses properly performed the surgery by using cross links, in reasonable medical probability the surgery would have succeeded in alleviating Plaintiff's severe and debilitating back pain.

**V.**

**CAUSE OF ACTION**

Defendants have tortiously interfered with Plaintiff's contractual relations. Plaintiff was a third-party beneficiary of the insurance contract between his employer and the LHWCA insurer. Under the contract, he had a right to receive the medical benefits he needed, including a two-level disckectomy and fusion with instrumentation. Defendants tortiously interfered with these rights by conspiring to prevent him from receiving the benefits to which he was entitled. As a direct and proximate result of Defendants' misfeasance, Plaintiff has suffered damages in an amount in excess of this Court's jurisdictional minimum.

Defendant Esses was negligent in not recommending the proper procedure the begin with, and in failing to use a cross-brace in performing the fusion. This misfeasance proximately caused Plaintiff's damages.

Defendants Rosamond and F.A. Richard violated Article 21.21 of the Texas Insurance Code. Plaintiff sues for these violations.

All Defendants conspired with one another to commit the above-described tortious and illegal acts. As such, they are all vicariously liable for each other's conduct.

Defendant F.A. Richard is vicariously liable for the conduct of Defendant Rosamond under the doctrine of respondeat superior.

Further, Defendants have acted with malice, as that term is defined by Chapter 41 of the Texas Civil Practice and Remedies Code. Therefore, Plaintiff also seeks to recover exemplary damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that citations be issued and Defendants be served, and that upon trial on the merits Plaintiff have judgment against Defendants, jointly and severally, for actual damages, exemplary damages, prejudgment interest, postjudgment interest and court costs.

RESPECTFULLY SUBMITTED,

MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
Michael R. Cowen
Texas Bar No. 00795306

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **JUAN ESCOBEDO** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO: B-02-172** |
| | § | |
| | § | |
| **STEPHEN ESSES, M.D.,** | § | |
| **F. A. RICHARD & ASSOCIATES, INC.** | § | |
| **and JANE ROSAMOND** | § | |

*AFFIDAVIT OF JANE ROSAMOND IN SUPPORT OF*
*MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS F. A.*
*RICHARD & ASSOCIATES, INC. and JANE ROSAMOND*

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned authority, personally appeared **JANE ROSAMOND**, who stated upon her oath as follows:

"My name is Jane Rosamond. I am over 18 years of age, of sound mind, have never been convicted of a felony or crime of moral turpitude, and am capable of making this Affidavit. I have personal knowledge of the facts stated herein.

I am presently employed as a Risk Management Adjuster for Amfels, Inc.. Between January 4, 1999, and June 30, 2002, I was employed as an adjuster for F.A. RICHARD & ASSOCIATES, INC. ("FARA"), a Defendant in the above-entitled and numbered cause.

FARA is a claims administration service which assists various insurance carriers in administering claims for worker's compensation, including claims asserted under the Federal

*Page - 1 -*

EXHIBIT
B

Longshore & Harbor Worker's Compensation Act ("LHWCA"). In January 1999 FARA began administering worker's compensation and LHWCA claims for the Amfels Shipyard, on behalf of Amfels' insurance carrier, Reliance National Insurance Company (a company which was later placed in liquidation). In my capacity as an adjuster for FARA, and only in that capacity, I administered the claim of JUAN ESCOBEDO, Plaintiff in the above-entitled and numbered cause, for compensation and medical benefits under LHWCA. I administered Plaintiff's LHWCA claim from the time it was referred to FARA until it was concluded by settlement on March 5, 2002.

I have reviewed the recitations of facts contained in the Motion To Dismiss, And Alternatively, Motion For Summary Judgment of Defendants F. A. RICHARD & ASSOCIATES, INC. and JANE ROSAMOND. The facts stated in that motion are within my knowledge and are true and correct.

"FURTHER AFFIANT SAYETH NOT."

Signed this ___5th___ day of September, 2003.

_Jane Rosamond_
Jane Rosamond

SUBSCRIBED AND SWORN TO BEFORE ME to before me by the said **JANE ROSAMOND** on this the __5-th__ day of September, 2003, to certify which witness my hand and seal of office.

    S E A L

Notary Public in and for the State of Texas

NORMA BENNETT
Notary Public
State of Texas
My Commission Expires
October 14, 2006

*Page - 2 -*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JUAN ESCOBEDO,                    ) (
        Plaintiff                ) (
                                 ) (
VS.                              ) ( CIVIL ACTION NO. B-02-172
                                 ) (
STEPHEN ESSES, M.D.,             ) (
F.A. RICHARD & ASSOCIATES,       ) (
INC. AND JANE ROSAMOND,          ) (
        Defendants               ) (

ORAL DEPOSITION OF
JUAN ESCOBEDO
JUNE 6, 2003



        ORAL DEPOSITION OF JUAN ESCOBEDO, produced as a

witness at the instance of the DEFENDANT STEPHEN ESSES,

M.D., taken in the above-styled and numbered cause on

JUNE 6, 2003, reported by RHONDA A. MARTIN, Certified

Court Reporter No. 4297, in and for the State of Texas,

at the offices of Michael R. Cowen, P.C., 520 East

Levee Street, Brownsville, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFF:

    CONRAD A. BODDEN
    MICHAEL R. COWEN
    MICHAEL R. COWEN, P.C.
    520 East Levee Street
    Brownsville, Texas 78520

COUNSEL FOR DEFENDANT STEPHEN ESSES, M.D.:

    MARY K. (KATHY) STRAHAN
    ANDREWS & KURTH, L.L.P.
    600 Travis, Suite 4200
    Houston, Texas 77002

COUNSEL FOR DEFENDANTS F.A. RICHARD & ASSOCIATES,
INC. and JANE ROSAMOND:

    VAUGHAN E. WATERS
    THORNTON, SUMMERS, BIECHLIN, DUNHAM & BROWN
    1000 Bank of America
    500 North Shoreline Boulevard
    Corpus Christi, Texas 78471-1010

ALSO PRESENT:

    Adela Garcia-Moreno, Interpreter

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020
(800)462-0253 (STATEWIDE)

<u>INDEX</u>

                                                            <u>PAGE</u>
Appearances .................................  2

<u>JUAN ESCOBEDO</u>
Examination by Ms. Strahan ......................   4
Examination by Mr. Waters ...................... 137
Examination by Ms. Strahan ...................... 168

Errata Sheet/Signature Page .................... 174

Reporter's Certificate ......................... 175

Attached to the end of the transcript:  Stipulations

<u>EXHIBITS</u>

                                                        PAGE
<u>NUMBER</u>   <u>DESCRIPTION</u>                                  IDEN.

  A     Addendum to Disclosure and Consent,
        Medical and Surgical Procedures ........  76

  B     Letter to Mr. Gleasman from Juan
        Escobedo, Jack Carinhas, and Keith N.
        Uhles, dated 8-22-00 ................... 155

  C     Findings of Fact ....................... 156

  D     Agreed Stipulation and Compensation Order
        Pursuant to Section 8(i) of the Longshore
        and Harbor Workers' Compensation Act .... 159

<u>REQUESTED DOCUMENTS/INFORMATION</u>

<u>NUMBER</u>   <u>DESCRIPTION</u>                                  <u>PAGE</u>

  1     Copy of 1997 income tax return .........  24

17:26:44　1　wanted to stay with the first one, a long time was

17:26:49　2　going to pass before the company approved the costs of

17:26:55　3　Dr. Pisharodi, something like that.  So I went to Dr.

17:27:00　4　Pisharodi and I told him that I was sorry, but what --

17:27:09　5　what he recommended, what point to accept.  And he said

17:27:16　6　that because of my health, for me to go to Houston

17:27:24　7　because he could not retain me there with him and he

17:27:28　8　couldn't do anything for me, to legally fight for him

17:27:38　9　to operate on me.  So he said, "Accept and go.  Go get

17:27:42　10　operated on in Houston."

17:27:47　11　　　　　　MR. WATERS:  Object to nonresponsiveness.

17:27:49　12　　　Q.  So someone was telling the interpreter that the

17:27:53　13　third option was the best recommendation; is that your

17:27:56　14　recollection?

17:27:56　15　　　A.  Yes, that is what I remember.  Yes.

17:27:59　16　　　Q.  Now, was your attorney, Mr. Carinhas, present

17:28:08　17　with you at this hearing?

17:28:09　18　　　A.  Yes.

17:28:10　19　　　Q.  He was present with you while these

17:28:13　20　recommendations were being discussed?

17:28:15　21　　　A.  Yes.  Yes.

17:28:15　22　　　Q.  Okay.  And, again, I don't want to ask you

17:28:18　23　about any talks you might have had with Mr. Carinhas,

17:28:23　24　but do you recall whether Mr. Carinhas voiced any

17:28:29　25　objection to Mr. Uhles or to the other people in the

17:28:33  1    room about any of these recommendations?

17:28:39  2        A.   No objection.

17:28:40  3        Q.   He had no objections?

17:28:43  4        A.   No.

17:28:44  5        Q.   Okay.

17:28:44  6        A.   No, he had no objection.

17:28:49  7        Q.   Okay.

17:28:49  8              MR. BODDEN:  Can we take a short break?

17:28:54  9              MR. WATERS:  Yeah.

17:28:55 10              MR. BODDEN:  I've got to go.

17:32:21 11              (Brief recess)

17:32:22 12        Q.   Back on the record, Mr. Escobedo.

17:32:25 13              Now, again, the surgery that ended up

17:32:28 14    being performed by Dr. Esses was the same surgery that

17:32:33 15    Dr. Pisharodi had been recommending earlier, correct?

17:32:38 16              MR. COWEN:  Objection, form.

17:32:39 17              MS. STRAHAN:  Objection, form.

17:32:48 18        A.   No.  Of what Dr. Pisharodi explained, no.

17:32:53 19        Q.   How is it different from what Dr. Pisharodi had

17:32:56 20    explained or recommended to you that you needed to

17:32:58 21    have?

17:32:59 22              MR. COWEN:  Objection, form.

17:33:07 23        A.   He had explained since '98, when he made the

17:33:11 24    diagnosis of the problem, the instrumentation.  And I

17:33:22 25    don't remember, but the instrumentation that Dr. Esses

17:45:57  1    hereby find that a change of treating physicians is

17:46:01  2    desirable or necessary pursuant to Section 7(b) of the

17:46:06  3    Act."  And he's referring to the Longshore and Harbor

17:46:13  4    Workers' Compensation Act.

17:46:15  5        A.   Yes.

17:46:15  6        Q.   "Effective this date, I hereby designate Dr.

17:46:21  7    Stephen Esses as the Employee's treating physician."

17:46:30  8    And this is signed by Mr. Gleasman on September 1st,

17:46:33  9    2000.

17:46:36 10        A.   Yes, I do remember.

17:46:37 11        Q.   Okay.  You remember someone explaining this

17:46:40 12    generally to you?

17:46:41 13        A.   Yes.  Yes.

17:46:42 14        Q.   So you would agree that Mr. Gleasman, on behalf

17:46:47 15    of the Department of Labor, changed your treating

17:46:51 16    physician to Dr. Esses, right?

17:46:53 17               MR. COWEN:   Objection, form.

17:46:58 18        A.   Yes.  I did know about that.  I never agreed.

17:47:07 19        Q.   But you agree that Mr. Gleasman was the one who

17:47:10 20    signed the order changing your physician to Dr. Esses?

17:47:15 21        A.   Yes.  Yes.

17:47:16 22        Q.   Even if you did not want him to do that?

17:47:18 23        A.   Yes.  Yes.

17:47:19 24        Q.   Okay.  Mr. Gleasman does not work for F.A.

17:47:23 25    Richard, correct?

17:47:25  1      A.   No.   Yes.   Correct.

17:47:27  2      Q.   He is a government employee?

17:47:29  3      A.   Yes.   Yes.

17:47:30  4      Q.   Okay.   Let me show you what's been marked now

17:47:34  5  as Exhibit D and ask if you recognize this.

17:47:47  6      A.   Yes.

17:47:48  7      Q.   Do you recognize what that document is?

17:47:56  8      A.   This is -- this is a summary of all the medical

17:48:04  9  history of the opinions that were given to me.

17:48:07 10      Q.   Does that also include the settlement of your

17:48:11 11  claim against the employer?

17:48:16 12      A.   Yes.   Yes.

17:48:23 13      Q.   Okay.   Do you recognize your signature on that

17:48:27 14  document?

17:48:32 15      A.   I'm going to look for it.

17:48:34 16      Q.   Take a moment to look through it if you want.

17:48:36 17      A.   Yes, it's here.   Yes.

17:48:38 18      Q.   Okay.   And you signed it?

         19      A.   Yes.

17:48:45 20      Q.   Okay.   Now, there is also on this document

17:48:48 21  Exhibit D, Mr. Escobedo, a translator's certificate,

17:48:57 22  and I'll read you the certificate signed by Ms.

17:49:02 23  Patricia Rivera.

17:49:02 24           MR. COWEN:  We'll stipulate that's the

17:49:04 25  document that was translated to him, if that will help.

17:49:09  1        MR. WATERS:  That's fine, as long as we

17:49:12  2    have the stipulation that this document was translated

17:49:14  3    to him and explained to him.

17:49:17  4        MR. COWEN:  Yes.

17:49:20  5    Q.   Let me read to you briefly from page 5 of this

17:49:28  6    document.  This is part of the stipulation that you had

17:49:31  7    agreed to here.  "Employee has now been released from

17:49:36  8    further medical care for the effects of this injury

17:49:45  9    with instructions to return to work with minimal work

17:49:51 10    restrictions regarding his low back.  The Employee is

17:49:55 11    now prepared to return to work with some restrictions

17:50:03 12    as set forth by Dr. Esses.  The Employee acknowledges

17:50:08 13    and stipulates and agrees that he is able to work eight

17:50:14 14    hours per day, five days per week, and that he has an

17:50:20 15    earning capacity of $6.25 per hour.  His plan is to

17:50:28 16    earn this amount or more through work in a business

17:50:39 17    with his wife or on the open job market."

17:50:45 18        Now, that is what was explained to you and

17:50:47 19    what you signed?

17:50:48 20        MR. COWEN:  Objection, form.

17:50:49 21    Q.   Is that what you signed?

17:50:52 22    A.   Yes.  I'm remembering.

17:50:54 23    Q.   Now, you testified earlier, I believe, that the

17:50:59 24    highest regular rate of pay that you recall earning

17:51:05 25    prior to the April 1998 accident was $7.75 per hour; is

17:54:19   1   involved in drafting or participating in the drafting

17:54:22   2   of this document?

17:54:23   3            MR. COWEN:  Objection, form.

17:54:24   4       A.  I do not know.

17:54:48   5       Q.  Okay.  Now, this document recites, Mr.

17:54:58   6   Escobedo, that up until the date of the document, which

17:55:00   7   is February 26th, 2002 --

17:55:03   8       A.  Yes.

17:55:03   9       Q.  -- you had been paid by your employer's

17:55:07  10   insurance carrier a total of $47,356.23 in disability

17:55:28  11   payments.

17:55:29  12       A.  Yes.

17:55:29  13       Q.  Do you have any reason to believe that that

17:55:31  14   figure was incorrect as of February 26, 2002?

17:55:38  15       A.  No.

17:55:38  16       Q.  So you agree that that is a correct figure, to

17:55:43  17   your knowledge?

17:55:43  18       A.  That I remember, I think so.

17:55:47  19       Q.  Okay.  Now, this agreement also recites that as

17:55:52  20   part of the settlement of this claim, you are going to

17:55:57  21   receive from your employer and its carrier an

17:56:02  22   additional lump sum payment of $84,000.  And the

17:56:14  23   document recites that you, the employee, request

17:56:16  24   approval of that settlement.  Is that your

17:56:19  25   recollection?

17:56:19  1    A.  Yes.  Yes.

17:56:21  2    Q.  Did you, in fact, receive that $84,000?

17:56:30  3    A.  Yes.

17:56:30  4    Q.  Now, your employer's carrier, through F.A.

17:56:36  5  Richard, paid for both of your surgeries and your

17:56:40  6  related medical treatments from this accident; is that

17:56:45  7  correct?

17:56:45  8    A.  Yes.

17:56:46  9    Q.  And this document recites medical benefits that

17:56:51  10  have been paid from 1998, when the accident happened,

17:56:57  11  through 2002, the date of this document.

        12    A.  Yes.

17:57:02  13    Q.  Okay.  And it recites for 1998 you received

17:57:08  14  medical benefits of $12,711.69 for 1999; $12,731 during

17:57:24  15  the year 2000; payments of $63,018.11 during the year

17:57:37  16  2001, payments of $14,237.61; and during the year 2002,

17:57:47  17  medical payments of $198.  You had no doctor visits

17:57:54  18  during the period from January 1 to February 26th,

17:58:04  19  2002, is that correct, if you recall?

17:58:13  20    A.  I don't think so.  I don't remember.

17:58:15  21    Q.  Okay.  Do you have any reason to dispute any of

17:58:17  22  these figures?

17:58:18  23    A.  No.

17:58:22  24    Q.  Okay.  In addition to that, your employer's

17:58:28  25  carrier, your employer or its carrier, paid for you to

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| JUAN ESCOBEDO, | ) ( |
| Plaintiff | ) ( |
| | ) ( |
| VS. | ) ( CIVIL ACTION NO. B-02-172 |
| | ) ( |
| STEPHEN ESSES, M.D., | ) ( |
| F.A. RICHARD & ASSOCIATES, | ) ( |
| INC. AND JANE ROSAMOND, | ) ( |
| Defendants | ) ( |

REPORTER'S CERTIFICATION

I, RHONDA A. MARTIN, Certified Court Reporter,
certify that the witness, JUAN ESCOBEDO, was duly sworn
by me, and that the deposition is a true and correct
record of the testimony given by the witness on JUNE 6,
2003; that the deposition was reported by me in
stenograph and was subsequently transcribed by me or
under my supervision.

I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

WITNESS MY HAND on this the 16th day of
June, 2003.

RHONDA A. MARTIN, Texas CSR 4297
Expiration Date: 12-31-03
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550
(956)428-0755

# STIPULATIONS

Deposition(s) of: _Juan Escobedo_

Cause No.: _B-02-172_      CIVIL Action     Style: _Juan Escobedo_

Date: _6-6-03_   Trial Date: _October 2003_ vs. _Stephen Esses, M.D., etc_

1.    This deposition is taken pursuant to:
   - ✓ A. Notice           ___ C. Agreement
   - ___ B. Notice and Subpoena    ___ D. Court Order

2.    Objections:
   - ✓ A. Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
   - ___ B. All objections are reserved.
   - ___ C. All objections will be made at the time of taking the deposition.

3.    Signature and Delivery:
   - ___ A. The original transcript will be sent to _____ _Strahan_ _____,
     the Custodial Attorney, and the original signature page, along with a copy of the
     transcript(s), will be submitted to _____ the witness or ✓ the witness' _Bodden_
     attorney, who will return the executed signature page, including any changes, to
     Bryant & Stingley, Inc., within _30_ days of transmittal.

   - ___ B. Signature is waived and the reporter will deliver the original transcript and
     exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1.    Copy of Transcript: Yes ✓ No ___     Video: (If Applicable) Yes ___ No ___
   *( ASCII Disk and Condensed Transcript included)*

   e-mail   Yes ✓ No ___   e-mail address _strak@akllp.com_
   Signature: _Katherine Stre_   Representing: _Stephen Esses, M.D_

2.    Copy of Transcript: Yes ✓ No ___     Video: (If Applicable) Yes ✓ No ___
   *( ASCII Disk and Condensed Transcript included)*

   e-mail   Yes ___ No ✓   e-mail address _____
   Signature: _[signature]_   Representing: _J FARA + J. Rosewood_

3.    Copy of Transcript: Yes ___ No ✓     Video: (If Applicable) Yes ___ No ___
   *( ASCII Disk and Condensed Transcript included)*

   _mcowen@cowenlaw.com_
   e-mail   Yes ✓ No ___   e-mail address _cbodden@cowenlaw.com_
   Signature: _Conrad Bodden_   Representing: _Plaintiff_

4.    Copy of Transcript: Yes ___ No ___     Video: (If Applicable) Yes ___ No ___
   *( ASCII Disk and Condensed Transcript included)*

   e-mail   Yes ___ No ___   e-mail address _____
   Signature: _____   Representing: _____

06/05/2003 14:18 FAX 956 5423670 Case 1:02-cv-00173 Document 26 ROYSTON, RAYZOR BRO. Filed in TXSD on 09/09/2003 Page 30 of 52 ☑041

08/23/00 WED 08:21 FAX 956 54 :370 R R V & W ☑004

# ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.

### ATTORNEYS AT LAW

HOUSTON, TEXAS
TELEPHONE 713-224-8380
FACSIMILE 713-225-9945

GALVESTON, TEXAS
TELEPHONE 409 762 1823
FACSIMILE 409-763-3853

CORPUS CHRISTI
TELEPHONE 361-884-8808
FACSIMILE 361-884-7261

55 COVE CIRCLE
BROWNSVILLE, TEXAS 78521
TELEPHONE 956-542-4377
FACSIMILE 956-542-4370
INTERNET royston@roystonlaw.com

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P.
SAN ANTONIO, TEXAS
TELEPHONE 210-228-0655
FACSIMILE 210-228-0839

ROYSTON, RAYZOR, VICKERY,
NOVAK & DRUCE, L.L.P.
LUBBOCK, TEXAS*
TELEPHONE 806-763-9252
FACSIMILE 806-763-8254
(*BY APPOINTMENT ONLY)

*Keith N. Uhles*
keith.uhles@roystonlaw.com

August 22, 2000

<u>*VIA FACSIMILE (713) 943-1827*</u>

Mr. Chris Gleasman
District Director
U.S. Department of Labor
Office of Workers' Compensation Programs
8866 Gulf Freeway, Suite 140
Houston, Texas 77017-6528


Escobedo
EXHIBIT NO. B
Bryant & Stingley, Inc.

RE.   OWCP No.   : 08-114563
        Claimant   : Juan Escobedo
        Employer   : A.D. Welding
        D/Injury   : 04/02/98

Dear Mr. Gleasman:

      After the meeting was held on August 18, 2000 to follow up on the prior Informal Conference with you on this matter, a second meeting was held on August 22, 2000. We are pleased to report the parties have now reached an agreement as follows:

     1.     Mr. Escobedo will not object to or appeal an order from the District Director changing treating physicians from Dr. Madhavan Pisharodi to Dr. Steven Esses.

     2.     The employer/carrier will authorize the surgery by Dr. Esses described in his July 2000 report.

Mr. Chris Gleasman                                              Page 2
District Director
August 22, 2000

3.    The employer/carrier will pay the cost of round trip airplane tickets for Mr.
      Escobedo, his wife, and two children from Brownsville to Houston. The departure
      date will be the day before the scheduled surgery and the return date will be the day
      after the scheduled initial post-surgical follow-up with Dr. Esses, which is typically
      14 days after surgery. If the return date needs to be extended, Mr. Escobedo or his
      wife will promptly advise Mr. Carinhas who will, in turn promptly advise the
      employer/carrier.

4.    The surgery with Dr. Esses will be scheduled to allow the employer/carrier to
      purchase 14 day advanced round trip tickets from Continental Airlines for Mr.
      Escobedo and his family.

5.    The employer/carrier will advance to Mr. Escobedo $100.00 by providing a check
      payable to Jack Carinhas for ground transportation to and from Intercontinental
      Airport in Houston to Mr. Escobedo's hotel.

6.    The employer/carrier will provide a room for Mr. Escobedo and his family at the
      Econo-Lodge Medical Center located at 7905 S. Main Street in Houston, Texas
      during the time necessary for Mr. Escobedo to stay in Houston. This hotel has a free
      shuttle to and from the Medical Center.

7.    The employer/carrier will advance to Mr. Escobedo a per diem for meals for him and
      his family of $85.00 per day for the days Mr. Escobedo is anticipated to be in
      Houston by providing a check payable to attorney, Jack Carinhas.

8.    Additionally, the employer/carrier will advance an additional $150.00 to Mr.
      Escobedo for miscellaneous transportation and laundry in Houston by providing a
      check payable to Jack Carinhas.

9.    For post-surgical care by an orthopedic surgeon for Mr. Escobedo in Brownsville, the
      parties will ask Dr. Esses to refer Mr. Escobedo to either Dr. Achleitner or Dr.
      Sweeney. If Dr. Esses will not make this choice, the parties agree to Dr. Achleitner.
      Dr. Esses, however, will remain the primary treating physician and will see Mr.
      Escobedo for follow-up appointments per Dr. Esses' instructions. The
      employer/carrier will pay for medications prescribed by both Dr. Esses and the local
      orthopedic surgeon.

06/05/2003 14:27 FAX 956 5424978 ROYSTON,RAYZOR BRO. Case 1:02-cv-00132 Document 26 Filed in TXSD on 09/09/2003 Page 32 of 52 @044

08/23/00 WED 08:22 FAX 956 4370 R R V & W @006

Mr. Chris Glensman                                                    Page 3
District Director
August 22, 2000

10. Mr. Escobedo's post-surgical physical therapy will be conducted at Brownsville Physical Therapy under the supervision of Dr. Esses.

11. Employer/carrier will provide transportation expense pursuant to the Act from Brownsville to Houston for follow up appointments with Dr. Esses. If Mr. Escobedo is in need of physical assistance to travel, the employer/carrier will also pay transportation cost for Mrs. Escobedo.

12. The employer/carrier will continue to fulfill its obligation to make compensation payments to the extent required by the LHWCA.

Yours very truly,

Juan Escobedo, Claimant

Jack Carinhas, Attorney for Claimant

Keith N. Uhles, Attorney for Employer/Carrier

45430:923923.1:082200

UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
LONGSHORE AND HARBOR WORKERS COMPENSATION
EIGHTH COMPENSATION DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In the matter of the claim      \*
for compensation under the      \*
Longshore and Harbor Workers    \*
Compensation Act          \*     **ORDER TO CHANGE**
                           \*     **TREATING PHYSICIANS**
**JUAN ESCOBEDO**        \*
**Employee**            \*
       v             \*
                         \*     **CASE NUMBER 08-114563**
**A.D. WELDING**         \*
**Employer**             \*
      and           \*
                         \*
**RELIANCE INSURANCE COMPANY c/o**   \*
**CRAWFORD & COMPANY**      \*
Insurance Carrier          \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

      Pursuant to section 7(b) of the Longshore Act (33 USC 907(b)), the Secretary, through her designee, the District Director, "shall actively supervise the medical care rendered to injured employees, shall require periodic reports as to the medical care rendered to injured employees, shall have authority to determine the necessity, character, and sufficiency of any medical aid furnished or to be furnished, and may, on his own initiative or at the request of the employer, order a change of physicians or hospitals when in his judgment such change is desirable or necessary in the interest of the employee...".   In accordance with section 7(b) of the Act, after a careful review of the administrative file, and discussion of the parties respective positions at an informal conference, the District Director makes the following:

### FINDINGS OF FACT

      1.   On April 2, 1998, Juan Carlos Escobedo, (the Employee), was in the employ of A.D. Welding (Employer), when he injured his lower back, right leg, and right foot while picking up and carrying welding equipment during the course and scope of his employment. On the day this injury took place the Employer was insured for liability under the Longshore Act by Reliance Insurance Company c/o Crawford & Co., adjusters).



Escobedo

**EXHIBIT NO.** C

Bryant & Stingley, Inc.

Escobedo v A.D. Welding
Page 2

2.  The Employee began losing time from work on May 6, 1998 and the Employer voluntarily initiated compensation for temporary total disability effective that date.

3.  On October 2, 1998, the Employee filed form LS-203 (Employee's Claim for Compensation) in the Houston District Office, listing Jesus Caquias, M.D., and Ricardo Adobbati, M.D., as his treating physicians. The Employer authorized the Employee's choice of physicians to furnish medical treatment in accordance with the provisions of the Act.

4.  Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the gluteal area, but not down to the leg. A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain. Dr. Addobati advised the Employee to discontinue working and ordered an MRI scan to determine if the Employee had sustained a ruptered disc. In his May 19, 1998, report Dr. Addobati explained that the MRI scans were normal with no evidence of a ruptured disc. The Employee was advised to remain off work and additional conservative care was recommended.

5.  On July 1, 1998, Dr. Adobbati examined the Employee, noting that he was not progressing as quickly as expected. A neurosurgical consultation was therefore recommended.

6.  The Employee was subsequently referred for a consultation by Madhavan Pisharodi, M.D., a Neurosurgeon. According to the June 29, 1999, report from Dr. Pisharodi, he first examined the Employee in July of 1998. It is noted that this first report of examination was furnished to the Employer almost one year after the date of the Employee's first examination, in violation of the reporting requirements of 7(d)(2) of the Act. Dr. Pisharodi's report notes the negative MRI's, but relies on discograms he interprets as "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing. An L4-5 and L5-S1 discectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disc syndrome.

7.  On November 5, 1998, the Employee was examined by H. Pacheco-Serrant, M.D., a Neurosurgeon. In his report dated November 5, 1998, Dr. Pacheco-Serrant notes Dr. Pisharodi's recommendation for surgery but finds that in the absence of a herniated disc or instability that the recommended surgery is not warranted. The Employee was referred back to his primary physician for pain management.

Escobedo v A.D. Welding
Page 3

8.  In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available diagnostic studies, including the discograms, fails to adequately explain the source of the Employee's pain.  Dr. Adobbati recommends that the Employee refrain from undergoing the recommended surgery until another opinion is obtained.

9.  On May 12, 1999, the Employee was examined by Eric Six, M.D., a Neurosurgeon.  Dr. Six states in his report that, in light of the positive discogram, the Employee may represent a rare instance where a lumbar fusion would be of benefit. However, Dr. Six states that the procedure should be done at a major institution of higher learning.

10.  On August 4, 1999, the Employee was examined by Martin Barrash, M.D., a Neurosurgeon selected by the Employer, who states in his report that the overall clinical and diagnostic picture is, in his opinion, insufficient to justify multi-level disc excision and fusion with instrumentation.  In view of the diagnostic studies (including a possible right-sided disc rupture at L5-S1 on the MRI scans) and the Employee's continuing complaints of pain, Dr. Barrash recommends that surgery be limited to a right-sided discectomy at L5-S1.  Dr. Barrash further recommends that the Employee be reassessed after this minimal surgery is performed to determine if additional treatment is warranted.

11.  In his report dated August 11, 1999, Dr. Pisharodi comments on Dr. Barrash's report, reaffirming his original opinion that the Employee requires multi-level disc excision and fusion with instrumentation.  Dr. Pisharodi states in this report that a one-level discectomy is not likely to adequately address the Employee's condition.  In his September 7, 1999 letter to Jack Carinhas, Esq., the Employee's authorized representative, Dr. Pisharodi again reaffirms his original treatment recommendations.

12.  On November 22, 1999, the Employee was examined at the direction of the U.S. Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of Neurosurgery at the Baylor College of Medicine.  After a thorough examination of the patient and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed with a two-level disc excision and fusion with instrumentation.  Dr. Essess states that reasonable treatment would consist of a simple discectomy at L5-S1 on the right.  The advantage of this approach is clearly explained by Dr. Esses report, as he anticipates that the Employee would benefit greatly from a simple one-level discectomy. However, Dr. Esses also points out that the more limited surgery does not preclude a more ambitious surgical approach (including fusion) in the future, if necessary.

13.  Dr. Esses' examination was requested by the Department of Labor in anticipation of an informal conference, which was scheduled via form LS-141 (Notice of Informal Conference) dated December 3, 1999.  This conference was scheduled solely

Escobedo v A.D. Welding
Page 4

to address the issue of medical treatment and Dr. Esses' recommendations. After receipt of the Notice of Conference and upon review of Dr. Esses' report, the parties agreed to proceed with the simple one-level discectomy recommended by the Department of Labor's choice of physicians. This agreement is set forth in the December 21, 1999 letter to Mr. Carinhas from Keith Uhles, Esq., the Employer's representative.

14.   In his report dated November 29, 1999, Dr. Pisharodi notes the additional opinion in favor of a one-level discectomy and again states his recommendation to proceed with multi-level disc excision and fusion with instrumentation.

15.   The Employee was seen by Dr. Pisharodi for a follow-up evaluation on December 20, 1999. In his report of December 21, 1999, Dr. Pisharodi notes the Employee's decision to proceed with the one-level discectomy recommended by Dr. Esses and Dr. Barrash:

> "At the present time, the patient states his pain seems progressively worse. He is thinking about having the simple surgery instead of waiting to get the two-level laminectomy, discectomy, fusion and instrumentation. He states his back pain and right leg pain are much more intense than his left leg pain. He is ready to have the surgery done as soon as possible. I have advised the patient there may be a possibility of a lumbar spine instability since the simple decompressive surgery may not address all his problems. The patient is aware of this and is willing to try the surgery... The patient is aware of the consequences and the possible need of a second surgery to fuse the area. There is always the possibility that the patient may do well with the simple diskectomy, but according to my experience and the pathology that Mr. Escobedo presents, it is quite likely that he will require a second surgery."

Based upon this report from Dr. Pisharodi the parties requested cancellation of the informal conference to discuss medical treatment, and the Employer authorized Dr. Pisharodi to proceed with the one-level disc excision recommended by Dr. Esses.

16.   The Employee was admitted to Valley Medical Center and on December 23, 1999 Dr. Pisharodi performed the following surgical procedures: L4-5 and L5-S1 partial laminectomy, L4-5 and L5-S1 facetectomy and foraminotomy on the right side; L4-5 and L5-S1 diskectomy on the right side; L4/L5/S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow-up reports on January 7, January, 28, February 17, March 3, and April 19, 2000, indicating a normal post-operative course without complications, a slight decrease in the Employee's reported back pain, and an increase in the Employee's leg pain.

Escobedo v A.D. Welding
Page 5

17.     On March 22, 2000, Dr. Barrash issued a report regarding the December 23, 1999 surgery, stating that the surgery performed was not the same procedure recommended by either Dr. Barrash or Dr. Esses. Dr. Barrash characterizes the treatment furnished as "unreasonable" and concludes that if further surgery is necessary, it is due to the performance of this unauthorized procedure. On June 9, 2000, the Employer filed a Notice of Controversion (LS-207) stating their objection to any further medical treatment by Dr. Pisharodi, based on Dr. Barrash's report.

18.     In an April 11, 2000, letter to Mr. Carinhas, and a May 25, 2000 letter to Claims Examiner Freddy Conley, Dr. Pisharodi states that surgery on two levels, instead of the one-level surgery recommended by Dr. Esses and Dr. Barrash, was medically necessary.   Dr. Pisharodi states that the Employee's failure to improve after the December 23, 1999 surgery is due exclusively to the fact that the correct procedure (multi-level disc excision and fusion with instrumentation) was not authorized.   Dr. Pisharodi also makes known his objections to the questions posed to Dr. Barrash by the Employer's representative.

19.     On May 8, 2000, Jose Kuri, M.D., a Neurosurgeon, issued a report stating that he assisted Dr. Pisharodi during the Employee's surgery.   This report states Dr. Kuri's agreement with Dr. Pisharodi's original diagnosis and recommendations for treatment, and endorses the efficacy and appropriateness of Dr. Pisharodi's treatment, given the circumstances of the limited authorization.

20.     On May 30, and June 21, 2000, Dr. Pisharodi issued reports describing the Employee's symptoms and level of pain and recommending further surgery.

21.     On June 29, 2000, the Employee was examined by Dr. Esses at the request of the U.S. Department of Labor for the purpose of discussing the Employee's medical treatment at an informal conference. Dr. Esses states in his report of the same date that "it is my opinion that this man's clinical situation now is different that when I saw him on November 22, 1999. At that time I was of the opinion that it would be reasonable for him to undergo a decompression and discectomy without fusion in order to provide him with significant pain relief." Based on the change in the Employee's clinical picture Dr. Esses recommends further treatment, namely, a two-level laminectomy, discectomy and fusion with instrumentation.

22.     On August 8, 2000, Dr. Pisharodi issued a report to the District Director stating four reasons not to change medical management in this case. Dr. Pisharodi states that the Employee has been satisfied with his care for over two years, the Employee is capable of making a choice of physicians, Dr. Esses has never been his treating physician, and having surgery in Houston would result in additional and unnecessary expense.

Escobedo v A.D. Welding
Page 6

23.    On August 10, 2000, an informal conference was held by the District Director by telephone to discuss Dr. Esses' treatment recommendations. The Employee, his representative, and the Employer's representative participated in the conference call. The Employer's representative reiterated their objection to the authorization of any further medical treatment by Dr. Pisharodi and requested the Department of Labor issue and order to change treating physicians. The Employee stated that he was comfortable with Dr. Pisharodi continuing as treating physician, indicated his concern regarding travel issues if a physician outside his area of residence was selected, and went on record as opposing any change of treating doctors.

24.    On August 22, 2000, the parties submitted an agreement to the District Director regarding additional travel arrangements to be furnished to the Employee by Employer in the event that medical management is changed to a physician in the Houston, Texas area. Said agreement is incorporated herein by reference.

### ORDER

Based upon a thorough review of the administrative file, the medical reports, and discussion with the Employee and his representative at informal conference, I am persuaded by the opinion of Stephen Esses, M.D. I find that reasonable and necessary treatment of the Employee should have been limited to a right-sided discectomy at L5-S1 as recommended by Dr. Esses in his November 22, 1999 report. As is clear from Dr. Esses report, performing surgery limited to the simpler one-level procedure was reasonable and necessary, based on the total clinical picture, and such surgery would not in any way preclude the performance of a more complex procedure, if necessary. Even as Dr. Pisharodi admitted in his December 21, 1999 report, "there is always the possibility that the patient may do well with the simple discectomy."

Having found that Dr. Pisharodi furnished treatment that was not reasonable and necessary, I hereby find that a change of treating physicians is desirable or necessary pursuant to section 7(b) of the Act (33 USC 907(b)). Effective this date I hereby designate Stephen Esses, M.D., as the Employee's treating physician.

GIVEN UNDER MY HAND at Houston, Texas, this _____1_____ day of September, 2000.


CHRIS JOHN GLEASMAN
DISTRICT DIRECTOR
EIGHTH COMPENSATION DISTRICT

## CERTIFICATE OF FILING AND SERVICE

I certify that the foregoing Compensation Order was filed in the Office of the District Director, Eighth Compensation District, and a copy thereof was mailed on said date by certified mail to the parties and their representative at the last known address of each as follows:

Juan Escobedo
5122 Amatista
Brownsville, TX 78520


Reliance Insurance Company
% F. A. Richard & Associates
P. O. Box 3107
Brownsville, TX 78523-3107

A copy was also mailed by regular mail to the following:

Carinhas & Saldana, L.L.P.
Attorneys at Law
302 Kings Highway, Suite 109
Brownsville, TX 78521


Royston-Rayzor-Vickery & Williams
Attorneys at Law
P. O. Box 3509
Brownsville, TX 78520

CHRIS JOHN GLEASMAN
District Director
Eighth Compensation District
U S Department of Labor
ESA/OWCP/LHWCA

Mailed: 9/1/00 js

If any compensation, payable under the terms of an award, is not paid within ten days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.



UNITED STATES DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
EIGHTH COMPENSATION DISTRICT

| | | |
|---|---|---|
| JUAN CARLOS ESCOBEDO,<br>Claimant-Employee | § | OWCP NO. 8-114563 |
| | § | |
| VS. | § | |
| | § | AGREED STIPULATION AND |
| A. D. WELDING, | § | COMPENSATION ORDER PURSUANT |
| Employer | § | TO SECTION 8(i) OF THE LONGSHORE AND |
| | § | HARBOR WORKERS' COMPENSATION |
| | § | ACT [33 U.S.C. § 908(i)] |
| RELIANCE NATIONAL INSURANCE | § | |
| COMPANY, | § | |
| Carrier | § | |

NOW COME **Juan Escobedo,** hereinafter called Employee, **A. D. Welding,** hereinafter

called Employer, and **Reliance National Insurance Company,** hereinafter called Carrier, and

stipulate and agree upon the following facts and, pursuant to the Longshore and Harbor Workers'

Compensation Act, agree on the following basis to a settlement of the claim of the Employee for past

and future compensation benefits, whether for total or partial, temporary or permanent disability.

I.

On April 2, 1998, the Employee was in the employ of the Employer, and the liability of the

Employer for payment of worker's compensation benefits under the Longshore and Harbor Workers'

Compensation Act was insured by the Carrier.

On April 2, 1998, Employee was employed by the Employer as a welder at the AMFELS

shipyard in the Port of Brownsville Texas, and while engaged in his employment, he lifted

equipment and when he turned to place the equipment, he injured his low back, right leg and foot,

and his body generally.

45430:986434.2:022202

Escobedo

**EXHIBIT NO.** D

Bryant & Stingley, Inc.

## II.

The Employee was originally seen by Brownsville general practitioner, Jesus Caquias, M.D., who referred him to Brownsville orthopedic surgeon, Ricardo Adobbati, M.D. Dr. Adobbati examined the Employee on April 21, 1998, noting the Employee's complaints of back pain with radiation to the glutal area but not down to the leg. A diagnosis of back sprain was made and conservative care was recommended. The Employee was subsequently examined by Dr. Adobbati on May 6, 1998, at which time it was noted that the Employee was continuing to work and that he now had leg pain. Dr. Adobbati advised the Employee to discontinue working and ordered an MRI to determine if the Employee had sustained a herniated disc. In his May 19, 1998 report, Dr. Adobbati explained that the MRI scans were normal with no evidence of a ruptured disc. The Employee was advised to remain off work and additional conservative care was recommended. On July 1, 1998, Dr. Adobbati examined the Employee noting that he was not progressing as quickly as expected and recommended a neurosurgical consultation. The Employee was subsequently referred to a consultation to Brownsville neurosurgeon, Madhavan Pisharodi, M.D. Dr. Pisharodi first examined the Employee in July 1998 but his first report was on June 29, 1999. Dr. Pisharodi's report notes the negative MRI but relies on discogram he interprets "positive" for internal disc tear/disruption to explain the Employee's painful weight bearing. An L4/L5 and L5-S1 diskectomy with fusion and instrumentation was recommended by Dr. Pisharodi to address the Employee's painful disk syndrome. On November 5, 1998, the Employee was examined by H. Pacheco-Serrat, M.D., a neurosurgeon. In his report dated November 5, 1998, Dr. Pacheco-Serrat notes Dr. Pisharodi's recommendations for surgery, but finds that in the absence of a herniated disk or

instability that the recommended surgery is not warranted. The Employee was referred back to his primary physician for pain management.

In his report dated January 6, 1999, Dr. Adobbati states that his own review of the available diagnostic study, including the discograms, fails to adequately explain the source of the Employee's pain. Dr. Adobbati recommends that the Employee refrain from undergoing the recommended surgery until another option is obtained. On May 12, 1999, the Employee was examined Eric Six, M.D., a Harlingen Texas neurosurgeon. Dr. Six concluded that in light of the positive discogram, the Employee may represent a rare instance where a lumbar fusion would be of benefit. However, Dr. Six recommends that the surgery should be done at a major institution of higher learning. On August 4, 1999, the Employee was examined by Houston neurosurgeon, Martin Barrash, M.D., a physician selected by the Employer, who states in his report that the overall clinical and diagnostic picture is, in his opinion, insufficient to justify multi-level disk excision with fusion with instrumentation. In view of the diagnostic studies, including a possible right-sided disc rupture at L5-S1 on the MRI scans, the Employee's continuing complaints of pain, Dr. Barrash recommends that the surgery be limited to a right-sided discectomy at L5-S1. Dr. Barrash further recommends that the Employee be reassessed after this minimal surgery is performed to determine if additional treatment is warranted.

In his report of August 11, 1999 and September 7, 1999, Dr. Pisharodi reaffirmed his original surgical recommendation. On November 22, 1999, the Employee was examined at the direction of the Unites States Department of Labor by Stephen I. Esses, M.D., Brodsky Professor of Neurosurgery at the Baylor College of Medicine in Houston, Texas. After a thorough examination and a review of the available reports and studies, Dr. Esses states that it is not advisable to proceed

with a two-level disc excision and fusion with instrumentation. Dr. Esses recommended that a reasonable treatment would consist of simple discectomy at L5-S1 on the right side.

On December 23, 1999, the Employee was admitted to Valley Regional Medical Center in Brownsville, Texas for surgery. Dr. Pisharodi performed the following surgical procedure: L4/L5 and L5-S1 partial laminectomy, L4/L5 and L5-S1 facetectomy and foraminotomy on the right side; L4/L5 and L5-S1 discectomy on the right side; L4/L5, L5-S1 interspinous stabilization with secure strand. Dr. Pisharodi issued follow-up reports on January 7, January 28, February 17, March 3 and April 2000 indicating a normal post-operative course without complications, a slight decrease in the Employee's reported back pain and an increase in the Employee's leg pain. Dr. Pisharodi recommended additional low back surgery including a multi-level fusion with instrumentation.

On June 29, 2000, the Employee was examined by Dr. Esses at the request of the United States Department of Labor. Dr. Esses states in his report of the same date that, "It is my opinion that this man's clinical situation now is different then when I saw him on November 22, 1999. At that time, I was of the opinion that it would be reasonable for him to undergo a decompression and discectomy without fusion in order to provide him with significant pain relief." Based on the change in the Employee's clinical picture, Dr. Esses recommended further treatment: a two-level laminectomy, discectomy and fusion with instrumentation.

On September 18, 2000, Dr. Esses performed the recommended surgery on the Employee at St. Luke's Episcopal Hospital in Houston, Texas. After a normal hospital course, the Employee first saw Dr. Esses for a follow-up on November 2, 2000. At that time, the Employee's medical exam was normal and Dr. Esses stated, "He is doing extremely well following his surgery." The Employee saw Dr. Esses again on December 18, 2000 and Dr. Esses reported that the Employee

continued to show improvement and provided a prescription for physical therapy. The Employee underwent physical therapy and continued with follow-up appointments with Dr. Esses. The Employee last saw Dr. Esses on July 26, 2001. Dr. Esses reports that he could not find any hard findings or deficits. Dr. Esses completed an OWCP 5 Form which indicates that the Claimant can work an eight hour day, but is restricted from lifting greater than 20 lbs. and not bending, squatting, climbing, kneeling, twisting or standing on a constant basis. The OWCP 5 also indicates that the Claimant has reached maximum medical improvement.

Employee has now been released from further medical care for the effects of this injury with instructions to return to work with minimal work restrictions regarding his low back. The Employee is now prepared to return to work with some restrictions as set forth by Dr. Esses. The Employee acknowledges and stipulates and agrees that he is able to work eight (8) hours per day, five (5) days per week, and that he has an earning capacity of $6.25 per hour. His plan is to earn this amount or more through work in a business with his wife or on the open job market.

III.

The Employer furnished the Employee with medical services in accordance with the provisions of Section 7 of the Act. Copies of reports from the Employee's treating and examining physicians are attached hereto.

IV.

The Employer did not receive written notice of the Employee's injury within thirty (30) days of the injury, but the Employer had knowledge of the injury and has not been prejudiced by lack of such written notice.

## V.

The average weekly earnings of the Employee at the time of the injury of April 2, 1998 were $353.90.

## VI.

As a result of this injury, Employee was temporarily and totally disabled from May 6, 1998 until July 26, 2001, inclusive, entitling him to compensation at a rate of $235.95 per week for 168 weeks totaling $39,639.60. The Employee's permanent partial disability began on July 27, 2001 and continues, entitling him to compensation at the rate of $69.27 per week. The Employer/Carrier have continued to pay the Employee at the rate of $235.95 and have agreed to continue said payments through March 5, 2002. Through March 5, 2002, the Employee will have been paid a total of $47,356.23. This has resulted in an overpayment by the Employer/Carrier, which overpayment is waived by the Employer and Carrier. The Employee acknowledges receipt of weekly compensation benefits at the rate of $235.95 from May 6, 1998 to present, as a result of the injury of April 2, 1998.

## VII.

The Employee has now reached maximum medical improvement and has been released to return to work with minimal work restrictions regarding his low back. The Employee is 27 years of age (Date of Birth: September 14, 1974) and his education and employment background consists of a high school education in Mexico and employment as a dishwasher, waiter and welder. A controversy exists as to the nature and extent of disability and whether there is any medical connection between the injury of April 2, 1998, as described by the Employee, and his present physical condition and complaints. The Employer and Carrier deny both the nature and extent of

disability as claimed by the Employee and that such are the result of the incident of April 2, 1998, as claimed.

The parties agree that the liability of the Employer and Carrier is uncertain as to the nature and extent of Employee's present disability, if any, resulting from the injury of April 2, 1998, and as to whether the Employee's present physical condition and complaints are medically related to the injury of April 2, 1998. However, solely for the purposes of this application for a disposition of this claim under Section 8(i) of the Act, the parties have negotiated and compromised their differences and agreed upon a disposition of this claim.

## VIII.

The Employee, Employer and Carrier recognize that the outcome of any formal litigation is extremely speculative and that to require a formal hearing of this claim could possibly work to the detriment of the Employee. The Employee does not wish to pursue his claim to a formal hearing because of the contested nature of his claim and the dispute over the nature and extent of his present disability, if any, and the dispute as to whether any or all of the Employee's present complaints are in any way causally related to the accident of April 2, 1998. Therefore, whether or not the Employee has any disability resulting from the accident of April 2, 1998, the Employee wishes to compromise and settle any claim for further disability, be it temporary or permanent, for a lump sum payment of EIGHTY-FOUR THOUSAND AND NO/100 DOLLARS ($84,000.00) and the Employee requests approval of the proposed settlement.

## IX.

The Employee acknowledges that he has some degree of possible limitation of motion in his low back and that he has had two operations on his low back. Nevertheless, the Employee has

agreed to accept and the Employer and Carrier have agreed to pay a total sum of $84,000.00 in a lump sum pursuant to Section 8(i) of the Act. The parties agree and stipulate that such sum shall discharge the Employer's and Carrier's liability for any and all claims for compensation, which Claimant may now have or which may at any time hereafter be asserted by the Employee, his heirs, executors, or assigns, whether for total or partial, temporary or permanent disability, under the Longshore and Harbor Workers' Compensation Act, as the result of any accident or illness arising out of or in any way connected to the injury of April 2, 1998.

## X.

The parties also have agreed to settle the liability of the Employer and Carrier for future medical benefits on the basis that the Employer and Carrier will not continue to provide medical care and treatment and the medical will be CLOSED.

## X.

Medical benefits paid by the Carrier have been as follows:

| | | |
|---|---|---|
| 1998 | $ 12,711.69 |
| 1999 | $ 12,731.00 |
| 2000 | $ 63,018.11 |
| 2001 | $ 14,237.61 |
| 2002 | $    198.00 |

In his report of July 26, 2001, Dr. Esses did not schedule a follow-up appointment for the Employee until one year and Mr. Escobedo has not returned to Dr. Esses since this time.

## XI.

The Employee's attorney is entitled to receive an attorney's fee under the provisions of Section 28 of the Act, such attorney's fee to be paid by the Employer and Carrier in addition to the compensation payable to the Employee. The Employer and Carrier have agreed to pay an attorney's fee to the Employee's attorney in an amount not to exceed $15,000.00.

## XII.

This settlement has been explained in detail to the Employee by his attorney. The Employee understands that this is a full and final settlement of his claim for compensation and medical benefits pursuant to the Longshore and Harbor Workers' Compensation Act for his injury of April 2, and he further understands that he does not have to make this settlement, that he is not being forced to make this settlement in any way, and that he could continue to pursue his claim for compensation and medical benefits except for his decision to make this settlement. In view of the disputed issues presented by this claim, the nature and extent of the Employee's present disability, if any, and whether the Employee's current complaints are causally related to the incident of April 2, 1998, the present settlement is considered adequate by the parties, and approval is hereby requested.

**UPON THE FOREGOING STIPULATED FACTS**, the parties hereto waive a formal hearing and consent to the issuance of a formal compensation order based hereon.

**APPROVED AND STIPULATED** this _____ day of February, 2002.

By _____
JUAN CARLOS ESCOBEDO, Claimant

By _____
JACK G. CARINHAS,
Attorney for Employee

45430:986434.2:022202                    -9-

APPROVED AND STIPULATED this ___ day of February, 2002.

By _____
KEITH N. UHLES
Of Royston, Rayzor, Vickery & Williams, L.L.P.,
Attorneys for Employer and Carrier

THE STATE OF TEXAS            §
COUNTY OF CAMERON            §

    BEFORE ME, the undersigned authority, on this day personally appeared JUAN CARLOS ESCOBEDO, known to me to be the person who executed his name to the foregoing agreement, and after being duly sworn, on oath, stated that he has read the foregoing agreement and understands the effect thereof to be a full and final discharge and release of his claim arising out of the injury of April 2, 1998, and that he has executed this agreement as his free and voluntary act without any persuasion, promise, force, duress or representation of any kind except as stated in said agreement.

    SWORN TO AND SUBSCRIBED BEFORE ME by Juan Carlos Escobedo, Claimant, this 26 th day of February, 2002, to certify which witness my hand and seal of office.

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2005

_____
Notary Public, State of Texas
My Commission Expires: 10/23/2005

### TRANSLATOR'S CERTIFICATE

    I, PATRICIA M. RIVERA _____, being fluent in both English and Spanish, do hereby certify that I have read the foregoing AGREED STIPULATION, including the Notary's Certificate, to Juan Carlos Escobedo, the Claimant-Employee, in both English and Spanish, faithfully rendering the English text into idiomatic and grammatical Spanish verbatim, and he has confirmed to me that he has understood each and every word, phrase and number in the AGREED STIPULATION.

_____
Translator
PATRICIA M. RIVERA (Printed Name)

45430:986434.2:022202                                    -10-

## ORDER APPROVING
## LUMP SUM SETTLEMENT

The undersigned District Director pursuant to the provisions of Section 8(i) of the Longshore and Harbor Workers' Compensation Act, having considered the foregoing settlement and the contents of the administrative file in this case, finds and determines the following:

1. That the agreed settlement is adequate and was not procured by duress;

2. That the agreed settlement should be and is hereby approved.

Upon such findings and determinations, the undersigned District Director **ORDERS:**

1. That the Employer and Carrier having previously paid Compensation benefits through March 5, 2002 totaling $47,365.23, shall pay additional compensation in the amount of $84,00.00 to the Employee in a lump sum, which will discharge the liability of the Employer and Carrier for all past and future payments of compensation and this file will be CLOSED.

2. The Employer and Carrier shall not be liable for any additional medical expenses pursuant to Section 7 of the Act.

3. An attorney's fee in the amount of $ 15,000.00

is hereby approved in favor of Jack G. Carinhas, attorney, for services rendered on behalf of the Employee, such sum to be a lien upon and paid out of this award. Such sum to be paid by the Employer and Carrier pursuant to Section 28 of the Act in addition to the compensation payable to the Employee.

GIVEN UNDER MY HAND at Houston, Texas, on this 15th day of ___March___,

2002.

District Director
United States Department of Labor
Eighth Compensation District

## PROOF OF SERVICE

I hereby certify that a copy of the foregoing Compensation Order was sent to the parties herein, as follows:

**BY CERTIFIED MAIL:**

Juan Carlos Escobedo
Employee

5122 Amatista
Brownsville, Texas 78521

A. D. Welding
Employer

P. O. Box 6086
Brownsville, Texas 78523

Reliance National Insurance Co.
Carrier

c/o F.A. Richard & Associates
P. O. Box 3107
Brownsville, Texas 78523-3107

**BY REGULAR MAIL:**

Jack G. Carinhas

302 Kings Highway, Suite 109
Brownsville, Texas 78521

Keith N. Uhles

Royston, Rayzor, Vickery & Williams, L.L.P.
P. O. Box 3509
Brownsville, Texas 78523-3509

Troy Milburn

Texas Property & Casualty Insurance Guaranty
Association
9120 Burnet Road
Austin, Texas 78758

MAILED: ___3/15/02___ mb

District Director

45430:986434.2:022202      -2-

If any compensation, payable under the terms of an award, is not paid within ten (10) days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.